**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE STONECO LTD. SECURITIES LITIGATION | No. 1:21-cv-09620(GHW)(OTW) |

**AMENDED CLASS ACTION COMPLAINT FOR**
**VIOLATION OF THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION ........................................................................................ 1

       A.     StoneCo's Background and Transition into the Loan Business............................. 2

       B.     StoneCo Announces to Investors the Launch of a Pilot Program for a New
              and Highly Profitable Credit Product ..................................................................... 3

       C.     Defendants Continued to Make False and Misleading Statements About
              the Safety and Profitability of the Credit Product.................................................. 4

       D.     Defendants Continued to Tout the Safety and Profitability of StoneCo's
              Credit Product Throughout the Class Period ...................................................... 10

       E.     The Brazilian Government Enacted a New Registry System for Loan
              Collateral that Exposed StoneCo's Foundering Loan Portfolio ......................... 11

       F.     Defendants Decided to Pull StoneCo's Credit Product Well in Advance of
              the Enactment of the New Registry System, Belying Their Excuse for
              Increased Delinquencies ....................................................................................... 12

       G.     The Truth About StoneCo's Poor Credit Standards and Collectability
              Issues Are Revealed Through a Series of Disclosures.......................................... 13

II.    JURISDICTION AND VENUE ............................................................................... 16

III.   PARTIES .................................................................................................................. 16

       A.     Lead Plaintiff ....................................................................................................... 16

       B.     Defendants ............................................................................................................ 17

              1.     Corporate Defendant................................................................................. 17

              2.     Individual Defendants............................................................................... 17

              3.     Relevant Third Parties.............................................................................. 19

IV.    SUBSTANTIVE ALLEGATIONS .......................................................................... 22

       A.     StoneCo's Background and Expansion into Credit ............................................. 22

       B.     StoneCo Announced to Investors the Pilot Program for a New and Highly
              Profitable Credit Product ..................................................................................... 24

       C.     StoneCo Announced the Expansion of its Credit Product While Touting its
              Low Risk................................................................................................................ 26

D.      Unbeknownst to Investors, StoneCo Materially Loosened Its Due Diligence and Credit Standards in Order to Expand as Quickly as Possible During the Pandemic ......................................................................... 28

E.      StoneCo's Credit Product was Riddled with Massive Collectability Issues ........ 32

F.      Defendants Had Access to and Knowledge of Risky Borrowers Not Paying Back Their Loans ..................................................................... 36

G.      As the Class Period Progressed, Defendants Misled the Market by Boasting About the Credit Product's Purported Low Risk, Growth, and Profitability ................................................................................ 38

H.      As StoneCo's Losses from Bad Loans Mounted, the Company Used the Pandemic as a Cover But Assured Investors that the Credit Product was Still Healthy ............................................................................... 41

I.      The Brazilian Government Enacted a New Registry System for Loan Collateral that Would Have Fixed StoneCo's Collectability Issues, but in Reality, Exposed Its Risky Loan Portfolio ........................................... 42

J.      Defendants Decided to Pull the Credit Product Well in Advance of the Enactment of the New Registry System, Belying Their Excuse for Increased Delinquencies ............................................................... 44

K.      The Reality of Defendants' Credit Issues Began to Be Revealed When StoneCo Announced Increased Delinquencies and Belatedly Announced the Removal of the Credit Product ..................................................... 45

L.      The Extent of the StoneCo's Loan Losses Continued to Be Revealed ................ 47

M.      The Full Truth Is Revealed When StoneCo Issued Poor Results and Confirmed that the Company Was Still Not Issuing New Credit ....................... 49

N.      Post-Class Period Events ................................................................. 50

V.      DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ................................................... 51

A.      March 2, 2020 – 4Q 2019 Press Release ................................................ 52

B.      March 2, 2020 – 4Q 2019 Earnings Conference Call ................................... 54

C.      April 29, 2020 – Form 20-F for Fiscal Year 2019 ...................................... 55

D.      May 26, 2020 – 1Q 2020 Press Release ................................................ 56

E.      May 26, 2020 – 1Q 2020 Earnings Conference Call .................................... 58

F.     August 11, 2020 – 2Q 2020 Press Release ........................................... 59

G.    October 29, 2020 – 3Q 2020 Earnings Conference Call ...................................... 59

H.    March 11, 2021 – 4Q 2020 Press Release ............................................. 60

I.     March 11, 2021 – 4Q 2020 Earnings Conference Call............................................. 61

J.     April 17, 2021 – StoneCo's Annual Form 20-F for FY 2020.............................. 62

K.    June 1, 2021 – 1Q 2021 Press Release ................................................. 63

L.     June 1, 2021 – 1Q 2021 Earnings Conference Call ......................................... 64

M.    Facts About StoneCo's Underwriting and Collectability Issues begin to Emerge as StoneCo Abruptly Pulls Its Credit Product Amid Mounting Losses................................................................................ 65

       1.    August 25, 2021 – StoneCo Teach-In Paper.............................................. 65

       2.    August 30, 2021 – 2Q 2021 Press Release ................................................ 66

N.    The Truth About StoneCo's Credit Product is Fully Revealed as the Company Again Revises Its Loan Portfolio Downwards and Confirms it Was Still Not Offering New Credit ...................................................... 68

VI.    LOSS CAUSATION/ECONOMIC LOSS .......................................................... 69

A.    August 25, 2021 – First Corrective Disclosure/Materialization of the Risk......... 72

B.    August 30, 2021 – Second Corrective Disclosure/Materialization of the Risk ................................................................................ 74

C.    November 16, 2021 – Final Corrective Disclosure/Materialization of the Risk ................................................................................ 76

VII.   ADDITIONAL INDICIA OF SCIENTER ...................................................... 78

A.    The Credit Product Was a Core Operation of StoneCo's Business ..................... 78

B.    Defendants' Statements Themselves Support Scienter......................................... 81

VIII.  CLASS ACTION ALLEGATIONS ................................................................ 82

IX.    PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE............. 84

X.     INAPPLICABILITY OF STATUTORY SAFE HARBOR ...................................... 86

XI.    CONTROL PERSON ALLEGATIONS.............................................................. 87

XII.    CAUSES OF ACTION ................................................................................................. 89

        COUNT  I For Violation of §10(b) of the Exchange Act and Rule 10b-5 against
        Defendants StoneCo, Piau, Pereira, Matos, and Baldin ..................................................... 89

        COUNT  II For Violation of §20(a) of the Exchange Act  against the Individual
        Defendants .......................................................................................................................... 90

XIII.   PRAYER FOR RELIEF ............................................................................................... 91

XIV.    JURY TRIAL DEMAND APPLICABLE TO ALL CLAIMS ........................................ 91

Lead Plaintiff Indiana Public Retirement System ("INPRS"), individually and on behalf of all others similarly situated, by its undersigned counsel, hereby brings this Amended Class Action Complaint (the "Complaint") against Defendants StoneCo Ltd. ("StoneCo," "Stone," or the "Company"), Thiago dos Santos Piau ("Piau"), Lia Machado de Matos ("Matos"), Rafael Martins Pereira ("Pereira"), Marcelo Bastianello Baldin ("Baldin"), André Street de Aguiar ("Street"), and Eduardo Cunha Monnerat Solon de Pontes ("Pontes") (the "Individual Defendants," and collectively with StoneCo, "Defendants").  The allegations herein are based on Lead Plaintiff's personal knowledge as to its own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Lead Counsel, which includes a review of: U.S. Securities and Exchange Commission ("SEC") filings by StoneCo; securities analysts' reports and advisories about the Company; press releases and other public statements issued by the Company; media reports about the Company; and interviews of former employees of StoneCo with knowledge of the matters alleged herein. Lead Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of itself and the class it seeks to represent, Lead Plaintiff alleges as follows:

## I.    NATURE OF THE ACTION

1.    This is a federal securities class action brought on behalf of all persons and entities who purchased or otherwise acquired the publicly traded common stock of StoneCo during the period from March 2, 2020 through November 16, 2021, both dates inclusive (the

"Class Period"), and were damaged thereby (the "Class").[1]  The action is brought against StoneCo and certain of its former officers for violations of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

### A.    StoneCo's Background and Transition into the Loan Business

2.    Founded in 2012, StoneCo is a provider of financial technology ("Fintech") solutions, primarily in Brazil.  StoneCo's Fintech services allow merchants and other vendors to conduct electronic commerce across in-store, online, and mobile channels.  Specifically, the Company provides payment processing through online software and physical point-of-sale ("POS") devices.  StoneCo's brick-and-mortar merchant customers purchase physical POS devices (*i.e.* cash registers and credit card processing terminals) from the Company and then utilize them to process in-store transactions.  StoneCo generates revenue by charging its customers payment processing fees (typically between 1% and 3%) on each transaction that uses StoneCo's POS or its online transaction processing program.

3.    Since its founding, StoneCo's goal was to become one of the largest payment processing companies in Brazil.  In order to achieve this goal, StoneCo acquired a slew of different software and hardware companies in an attempt to grow both its footprint and its sales. By October 2018, upon its IPO, StoneCo had grown into one of Brazil's largest financial-technology and payment processing companies.  As of December 2020, StoneCo had over 652,600 active payment clients in Brazil.

---

[1] Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of StoneCo during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) StoneCo's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

4.      However, Defendants knew that the StoneCo's profitability and growth potential was limited if their primary source of revenue was simply collecting small payment processing fees.  Accordingly, the Company began trying to leverage its expansive customer base by offering its merchant customers financial products such as loans and banking services that would purportedly come along with higher profit margins for StoneCo.  Specifically, beginning in 2019 StoneCo began offering its customers credit such as working capital loans and revolving lines of credit in addition to the Company's traditional credit card transaction services.

5.      StoneCo marketed the new credit product as a "simple" and "transparent" way for clients to pay back the credit loans through automatic retention of a percentage of their sales. Therefore, in addition to paying a transaction processing fee for each transaction processed through a StoneCo POS, merchants would also pay an additional percentage fee on each transaction in order to pay back the loan to StoneCo.

**B.      StoneCo Announces to Investors the Launch of a Pilot Program for a New and Highly Profitable Credit Product**

6.      In early 2019, StoneCo rolled out its credit product a with a "pilot" program that was meant to demonstrate to investors the profitability and the low risk that came along with it. During StoneCo's 1Q 2019 earnings release on May 13, 2019, Defendants first unveiled the soft launch of the credit product and told investors that "[i]nitial feedback, usage and economics have been very encouraging."  By November 21, 2019, Defendants boasted to investors that StoneCo had "already provided over R$185.0 million[2] in credit to ~13,400 clients" by October 2019, which purportedly came with very low risk as evidenced by "mid-single digit NPLs [*i.e.*, non-performing loans] and improved customer experience."

---

[2] During the Class Period, the exchange rate ranged between approximately $0.17 to $0.22 US Dollars to $R1.00 Brazilian Real ("Reis").

7.      Defendants also touted the importance of credit as a massive opportunity for the Company and investors alike.  Specifically, during an S&P Global Market Intelligence interview held during the Class Period, Defendant Piau told investors, that, **"[t]he prospect for lending in Brazil is really big. For [StoneCo], it is a 200 billion reais opportunity**."  Indeed, analysts bought StoneCo's safe and reliable depiction of their credit product.  For example, on February 27, 2020, JP Morgan issued an analyst report stating: "Stone[Co]'s new lending venture, in our view, could yield additional substantial revenues. Stone[Co]'s cross-selling abilities should continue to foster new revenue streams."  Likewise, on March 2, 2020, Credit Suisse issued an analyst report parroting the purported safety of the new credit product stating: "credit…initiatives continued to show good evolution and management conveyed positive messages for 2020." Further, "**Stone[Co] expects credit portfolio to expand fast but always keeping delinquency under control**."

8.      Finally, a Cantor Fitzgerald analyst report published on March 13, 2020 highlighted StoneCo's supposedly "extremely selective process for loan[s]" and ostensible requirement that borrowers had to be with the Company "for 6mo+" (*i.e.* more than six months) stating that Defendants: "**note[d] an extremely selective process for loan** [opportunity], **with only 5% of total merchants with outstanding loans (must be with [StoneCo] for 6mo+)**."

C.      **Defendants Continued to Make False and Misleading Statements About the Safety and Profitability of the Credit Product**

9.      On March 2, 2020, the first day of the Class Period, Defendants made a number of false and misleading statements touting the safety and profitability of StoneCo's loan portfolio and the supposed "tight control" the Company had over the issuance of credit to merchant customers.  In the Company's March 2, 2020 press release filed on SEC Form 6-K Defendants boasted: "***The growth of our credit solution is being ruled by low delinquency rates,*** currently

4

at mid-single digits."  Later that day during an earnings call with analysts, Defendant Piau

discussed the supposedly conservative approach to credit the Company was taking claiming:

"***[w]e keep tight control over our supply of credit looking very closely at NPL levels as we

continue to improve our solution and credit scoring***."

10.     However, StoneCo's credit product was not the safe, profitable product

Defendants portrayed to the market.  In reality, far from exhibiting "***tight control***" over the credit

product and it "***being ruled by delinquency rates***" beginning in March 2020, StoneCo had

materially **loosened, not tightened**, its due diligence standards in order to issue as much credit

as possible and expand the Company's initiative to grow market share during the Covid-19

Pandemic ("Pandemic").

11.     Specifically, according to Confidential Witness ("CW") 10, in 2019 StoneCo

started to have some "soft targets" or a pilot program for lending credit.  CW 10 explained that in

2019, when they first started providing credit to these soft targets/the pilot program, they would

look at recurring sales for a six-month period and other minor factors to determine if the

customer was stable.  In light of the pilot program in 2019, CW10 described how StoneCo

accelerated extending credit in 2020 to more merchant clients by loosening the previous due

diligence standard.  CW 10 explained that the main change in diligence occurred in late

2019/early 2020, where instead of looking at six months of recurrent sales, they only looked at

three months.

12.     Likewise, according to CW 7—a former Pole Leader[3] whose team had the

responsibility to sell StoneCo's credit products—the Company started internally pushing the

---

[3] A Pole Leader is an internal term used at StoneCo to refer to a Commercial Manager or the
head of a *Stone Hub*.  *Stone Hubs* are local distribution, sales and customer service centers
spread out across Brazil.

credit product business at the beginning of the Pandemic.[4]  According to CW 7, starting at the

beginning of the Pandemic and the related shutdowns, Stone saw this as an opportunity to

**"dominate the market at all costs" against its similar competitors.**  CW 7 stated that in early

2020 when the Company started pushing the credit product (after the Pandemic started), StoneCo

started easing its look-back period on POS activity as part of the due diligence process.  CW 7

explained that Stone traditionally reviewed the previous six months of POS activity when

determining approval on a line of credit or how much the line could be, and **that Stone**

**shortened this to around three months of POS activity sometime in 2020 with the stated**

**purpose of trying to get as many loans out there as possible**.

        13.      In addition to cutting back the amount of transactions the Company was

reviewing before issuing a loan, at the same time StoneCo also abruptly fired the third-party

credit verification company it used to assess the creditworthiness of its potential borrowers.

Indeed, according to CW 9, a third-party company, *Money Plus*, originally conducted the six-

month review, and that StoneCo eventually pulled that business from *Money Plus*.  Likewise,

according to CW 3—another former StoneCo Pole Leader—the third-party had started being

used around January 2020, and that in March 2020, at the start of the Pandemic, Stone began a

"big credit push."  Then, CW 3 described how around March 2020, Stone started giving out "lots

of credit" as they started building up their own versions of the customer profiles and shifting

away from using the third-party to perform their due diligence for prospective borrowers.  CW 3

went on to explain that when Stone removed the third-party and was handling the due diligence

internally, **they no longer had the capabilities to conduct the real time credit verification**

**that they had previously relied upon.**

---

[4] CW 3 confirmed the Pandemic began in Brazil in March 2020.

14.     As the Class Period progressed, far from being more conservative, StoneCo continued to loosen its credit standards even further; going so far as to offer credit to individuals based on as little as a few days of transaction data.  According to CW 3, Stone was supposed to have a three-month look back period but recalled that it was often ignored based on what he witnessed.  CW 3 recounted how at the end of 2020, **Stone customers were getting approved for lines of credit after being customers for "only" 5, 10, or 15 days**.  He explained that essentially there was almost **no review at all**, and it just took a few days for the credit to be extended.

15.     Critically, CW 3 also stated that he knew the information and charts showing the credit delinquencies made it up the chain of command to the senior executives because the credit division, the commercial division, and the Inside Sales division met "regularly" and discussed the information in the charts and then sent them up the chain of command to StoneCo's Chief Operating Officer ("COO"), Mateus Biselli[5], ("Biselli") because Biselli led these three divisions. Moreover, according to CW 3, every Friday there was a separate weekly call attended by the "top brass" and the rest of the Company, including CW 3.  CW 3 identified the Individual Defendants Thiago dos Santos Piau, Lia Machado de Matos, Rafael Martins Pereira, Marcelo Bastianello Baldin, and André de Aquiar Street as being regular participants.  According to CW 3, the problems with the credit product were brought up on these weekly Friday calls.

16.      In addition to issuing highly risky loans, Defendants were also aware that StoneCo had been experiencing major issues with collecting loan repayments from the risky customers it lent money to in an effort to grow its credit business.  According to numerous former StoneCo employees, customers began using competitor POS machines to process

---

[5] Mateus Biselli is also referred to as the National Commercial Director.

transactions to avoid having to pay the increased fees associated with repayment of StoneCo's credit product. Accordingly, **StoneCo was not getting paid back on its loans** because the Company could only collect loan repayments on transactions performed on StoneCo POS devices.

17.     For example, according to CW 10 if StoneCo extended credit to a SMB[6], the SMB owner had to pay a higher fee that accounted for the amount they owed. CW 10 went on to say that this fee was much steeper than rates offered by StoneCo's competitors and that, as a result, the SMB merchant customers were forced to use competitors' machines as a "survival" tactic, adding that SMBs used the competitors' machines rather than paying StoneCo, which meant that they were in default to StoneCo because the Company could only collect from their own machines at that time. Likewise, CW 7 explained that it was "very common" that customers were using the POS machines from StoneCo's competitors while also using StoneCo's machines. CW 7 explained that it was understood that StoneCo's merchant customers could find a better rate from other "credit card" providers or other entities that provided better terms on installment payments. Similarly, CW 9 confirmed that when StoneCo increased its rates and terms due to delinquencies, its customers took the lines of credit but just used the competitors' POS machines so as to not have to pay back Stone's line of credit with the increased rates.

18.     Critically, during the Class Period, Defendants had access to and knowledge of this collection problem as well as increased default rates related to the credit product from

---

[6] SMB is a small-to-medium sized business. According to StoneCo, SMBs are companies with "annual gross revenues between R$81 thousand and R$78 million. There are approximately 8.8 million SMBs in Brazil. We believe the majority of these are SMB merchants that conduct commerce primarily through brick-and-mortar storefronts and are increasingly adopting e-commerce and mobile channels to sell goods and services. SMBs represent the focus of our strategy within the *Stone Business Model*."

internal meetings and StoneCo's internal operational reporting program known as *Marco Polo*.

Through *Marco Polo*, Defendants were able to track StoneCo's customers' sales activity,

StoneCo POS usage and utilization of competitor machines, as well as necessary information

related to credit.  Notably, *Marco Polo* provided StoneCo with information regarding its

customers not repaying loans because *Marco Polo* could, and did, send alerts when there were at

least thirty days of merchant inactivity on the Company's POS machines, indicating the use of a

competitor POS and default on the outstanding loan.

19.     Specifically, CW 1 explained that StoneCo used an internal system known as

*Marco Polo* to track the POS business.  CW 1 explained that *Marco Polo* could track the volume

of transactions on each POS machine that StoneCo's merchant customers used, and also tracked

the value of each transaction, as well as transactions conducted by those merchants' customers

on the POS machines provided by StoneCo's competitors.  CW 1 added that StoneCo received

"alerts" from *Marco Polo* when the merchant customers used a competitor's POS machine.

According to CW 1, he, his supervisors, and everyone up through his chain of command,

including Defendants André Street de Aguiar and Eduardo Cunha Monnerat Solon de Pontes,

had access to *Marco Polo* and "the data."

20.     In addition to *Marco Polo*, senior leadership tracked losses through weekly,

monthly, quarterly, and annual reports and thus, knew of StoneCo's credit standards,

collectability, and delinquency issues.  CW 6 explained that the Risk Analysis group analyzed all

risk at StoneCo, which were broken down by the three types of losses (fraud, business risk and

POS).  According to CW 6, some loss reports were reviewed in weekly meetings that he and the

entire risk team attended and were also reviewed at quarterly meetings with CEO Thiago dos

Santos Piau present.

21.     Accordingly, Defendants knew of and had access to information contradicting their statements regarding the safety and profitability of the highly touted credit product and the Company's ability to collect repayment on the loans it issued to merchant customers.

**D.     Defendants Continued to Tout the Safety and Profitability of StoneCo's Credit Product Throughout the Class Period**

22.     Despite knowing about these systemic issues with StoneCo's credit product, Defendants continued to mislead investors throughout the Class Period about the supposed safety and profitability of the credit product and the growth it was experiencing.  For example, in a press release on May 26, 2020, Defendants touted the new credit product and supposed due diligence associated with it, stating: "*[o]ur credit approach*, ***which includes a rigorous credit-scoring system, receivables lock-up, and pay-as-you-sell model, has also proven to be more resilient than even we expected,*** providing a return on asset of 2.7% per month even after COVID-19 [Pandemic]-related provisions."  The press release continued "***[w]e have improved significantly our scoring system over time, with daily enhancements to our algorithms, new talents brought in 2019 and a requirement of a minimum relationship period (data) that help us to be more assertive on the credit scoring.***"

23.     Likewise, on October 29, 2020, Defendants held an earnings call which they furthered attested to the purportedly conservative nature of their credit product stating: "[m]ore than 73,000 merchants now use these working capital loans, which they seamlessly pay by deducting a small percentage of their sales every day. ***Our product remains fairly conservative****…****We remain very focused on balancing risk and profitability, which is reflected in our relatively stable ROA and low expected losses*...*"

24.     And on March 11, 2021, StoneCo issued a press release, where Defendants boasted about the success of the credit product stating: "***The economics of our credit solution***

*have continued to be strong*, with ***healthy risk-return levels***." During the earnings call that day, Defendants misleadingly assured investors that the Company was adhering to a conservative due diligence process claiming that the Company was ***"being even more selective while disbursing new credit."***

25.     However, far from engaging a "***rigorous credit-scoring system***" and "***being even more selective***," in reality, Defendants loosened their credit standards and were in fact being ***less selective*** because they started issuing loans to borrowers based solely on a couple of days' worth of data and not the six months that investors understood the Company to be relying on. Moreover, contrary to Defendants' statements, the "***economics***" and "***risk return levels***" were not "***strong.***" Rather, the Company knew that delinquencies and defaults were increasing because of its customers using competitors' POS devices to process transactions to avoid repaying StoneCo.

**E.     The Brazilian Government Enacted a New Registry System for Loan Collateral that Exposed StoneCo's Foundering Loan Portfolio**

26.     On June 7, 2021, the Brazilian government enacted a new law governing the registry of receivables that was meant to protect lenders from the exact issues StoneCo was facing—namely the use of competitor POS devices to avoid repaying loans. Unlike before, the new registry system ensured that the lender that first perfected an interest in a borrowers' future accounts receivable (*i.e.,* future transactions) was entitled to repayment **regardless of what POS system the merchant used to perform a transaction.** In other words, if customers used a competitors' POS system (something StoneCo knew was previously causing its collectability issues) the Company would now be able to recover loan payments from such transactions.

27.     Notably, the new registration system also required StoneCo and its competitors to ensure that all credit agreements entered into before June 7, 2021 were migrated to one of the

three new registries authorized by the Central Bank.  This meant that StoneCo and all of its

competitors would be able to ascertain which lender held a priority interest in the collateral for

all of the loans issued to merchant customers prior to June 7, 2021.  Thus, StoneCo had to

register all the loans it had made since it launched the credit product in 2019 (many of which the

Company knew were in default).  StoneCo was aware that it had to either start disclosing to the

market the true extent of the losses in the Company's loan portfolio or register the bad loans

under the new registry system thereby exposing them.  Either way, by June 7, 2021, Defendants

were going to be forced to disclose the true health of the Company's loan portfolio.

> **F.    Defendants Decided to Pull StoneCo's Credit Product Well in Advance of the
> Enactment of the New Registry System, Belying Their Excuse for Increased
> Delinquencies**

28.    As discussed below, following the enactment of the new registry laws in June

2021, Defendants began disclosing significantly increased loan delinquencies that were far

beyond what the market expected, and what Defendants had previously signaled.  StoneCo

blamed the new registry system for the Company's increased delinquencies and attributed it as

the reason for the Company pulling the credit product in August 2021.  However, Defendants'

attempts to attribute the failure of the credit product to the new registry system was contradicted

by numerous CWs who confirmed that, internally and unbeknownst to investors, the Company

had decided to pull the credit product well in advance of the new registry law's effective date.

29.    Indeed, numerous confidential witnesses recalled that the Company began pulling

the credit product internally well before the Company officially announced on August 25, 2021

that it would no longer be issuing new loans.  For example, when asked when StoneCo knew the

Company was going to temporarily stop disbursing credit, CW 5 recalled that it was being

discussed in March, April, or May of 2021.  Likewise, CW 8, although it was not a part of his

daily scope of work, was directed to push the sales of credit products beginning in January 2021,

but "very soon" after, sometime between March-May 2021, he was ordered to halt sales of the same products that he was told to push less than five months prior.

30.     Accordingly, despite providing a convenient excuse, the changes in the registry could not have been the real cause of StoneCo's increased loan delinquencies.  The true causes were the Company's loosening of its credit standards in order to grow its market share during the Pandemic as well as collectability issues that resulted when borrowers stopped paying back their loans.

### G.     The Truth About StoneCo's Poor Credit Standards and Collectability Issues Are Revealed Through a Series of Disclosures

31.     Facts about the extent of Defendants' failed credit product and the extent of the related losses began to be revealed on August 25, 2021.  On that day, StoneCo abruptly disclosed that the Company had decided to "**[t]emporarily stop disbursing credit at [the] beginning of June [2021]**" as a result of increased credit delinquencies.

32.     In response to this news **shares of StoneCo common stock dropped 4% to close at $52.88 from its prior closing price of $55.05**.

33.     However, instead of disclosing the true reasons for pulling the credit product and the increased delinquencies, Defendants misleadingly attributed the problems to the new registry system stating ". . . *given the problems the market has faced with the accurate registration of receivables . . . we are seeing higher delinquencies than what we expected and observed in prior periods, especially due to more difficult collections and considerably worse recoveries from non-performing clients.*"

34.     But, as described above, the registration of receivables had nothing to do with the increase in delinquencies because Defendants decided to pull the credit product long before the

effectiveness of the new registry law.  Instead, the increased delinquencies were attributable to Defendants' undisclosed risky lending practices and collectability issues.

35.     Then, after the market closed on August 30, 2021, StoneCo issued another press release filed on SEC Form 6-K detailing the Company's financial results for 2Q 2021 and announcing the actual numbers underlying the significantly increased delinquencies the Company announced five days earlier.  Specifically, **the release explained that 35% of StoneCo's credit clients were unable to pay back any principal in the last 60 days and at least 19% were unable to pay either interest or principal—far above what investors had expected**.

36.     Analysts reacted to Defendants' statements regarding the cause of StoneCo's issues.  For example, Guggenheim filed an analyst report on August 31, 2021, discussing StoneCo's 2Q 2021 results and stating "[t]he severity of the credit-related headwinds were a surprise, in our view."

37.     In response to this news, **the Company's share price dropped 6% to close at $46.54 per share on August 31, 2021**, on unusually heavy trading volume.

38.     However, yet again, the Company misleadingly attributed the increase in delinquencies to the new Brazilian registry laws while failing to disclose the true reason the Company's loan portfolio was foundering.

39.     Finally, on November 16, 2021, the full impact of StoneCo's underwriting and collectability failures were fully disclosed when StoneCo announced further poor results and missed guidance while simultaneously confirming that the Company was still not issuing new credit and could not confirm when it would issue new credit at scale again.  Specifically, in StoneCo's SEC Form 6-K detailing the Company's results for 3Q 2021 filed that day StoneCo

disclosed "a reduction in the expected cash flows, especially due to the reduction of observed recovery rates in delinquent loans," and that the Company had again "reviewed downwards the fair value of our loan portfolio."  According to the release, the percentage of non-performing loans—loans that the Company did not expect to be repaid—**was now up to 48% from the 35% the Company had disclosed the previous quarter.**

40.     The Company was also unable to provide any firm guidance on whether the Company was intending on reinstituting the credit product.  Indeed, during the earnings call that day, an analyst asked when the credit volume would return to levels "that we saw prior to halting the origination of credit."  Defendant Piau replied that StoneCo is "not ready to provide a specific guidance in terms of scaling the credit."

41.     On this news, the Company's share price fell $10.96, or **34%**, to close at $20.70 per share on November 17, 2021.  **Over the course of the three stock drops, the price of StoneCo shares lost over 43% their value**.

42.     Analysts were alarmed by Defendants' disclosures.  On November 17, 2021, Credit Suisse reported "Q3: Negative on low profitability…the absence of credit revenues…were, and should continue to be, headwinds for margins…Credit to enter on test mode. Credit origination was virtually zero in Q3 as well as its contribution to revenues (no additional provisions)."  Further, that same day analysts from Morgan Stanley reported, "Weak results from Stone[Co] …On the back of the complicated lending issues this year, **we think the market expects/needs more transparency and specificity from management**."

43.     As of the filing of this Complaint, StoneCo has still not re-introduced its credit product.

## II.     JURISDICTION AND VENUE

44.     The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5. Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.

45.     Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §1391(b), as upon information and belief, StoneCo shareholders reside in this District, the acts and transactions giving rise to the violations of law complained of occurred in part in this District, the false and misleading statements were disseminated in this District, and the manipulative conduct was carried out in part in this District.

46.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mail, interstate telephone communications, and the facilities of the national securities exchange.

## III.     PARTIES

### A.     Lead Plaintiff

47.     Lead Plaintiff INPRS, as set forth in the Certification attached hereto as Exhibit 1, purchased StoneCo securities during the Class Period at artificially inflated prices, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.  INPRS is a pension fund that is based in Indianapolis, Indiana, and offers pension, retirement plans and various other benefits to its participants. INPRS serves the needs of approximately 507,000 members and retirees representing more than 1,200 employers, including public universities, school corporations, municipalities, and state agencies throughout the state of Indiana.  INPRS is a sophisticated institutional investor that had $45.8 billion in assets under management at fiscal year-end 2021.

B.      **Defendants**

1.      **Corporate Defendant**

48.      Defendant StoneCo is incorporated under the laws of the Cayman Islands with its head office located in George Town, Cayman Islands. StoneCo's common stock trades on the NASDAQ Stock Market ("NASDAQ") under the symbol "STNE."  StoneCo's Annual Report filed on Form 20-F with the SEC on April 29, 2022, states that 312,531,248 shares of StoneCo were outstanding as of December 31, 2021.

2.      **Individual Defendants**

49.      Defendant Thiago dos Santos Piau was the Chief Executive Officer ("CEO") of StoneCo at all relevant times.  During the Class Period Defendant Piau made false and misleading statements.  Defendant Piau signed SEC Form 6-Ks and Form 20-Fs and spoke during earnings calls with investors.  During the Class Period, Piau also told investors that StoneCo was to stop issuing credit due to higher delinquencies and problems with collectability.

50.      Defendant Lia Machado de Matos was the Chief Strategy Officer ("CSO") of StoneCo at all relevant times.  During the Class Period Defendant Matos made false and misleading statements.  Defendant Matos was tasked with managing StoneCo's credit operations and modeling.  In Matos' role as CSO, Matos spoke during earnings calls about StoneCo's credit product.  Matos is also responsible for overseeing the risk analysis associated with the credit product.

51.      Defendant Rafael Martins Pereira was the Vice President ("VP") of Finance and Investor Relations Officer of StoneCo at all relevant times.  During the Class Period, Defendant Pereira made false and misleading statements.  Pereira was also tasked with managing StoneCo's financial operations.  In his role as VP of Finance, Pereira spoke in earnings calls and in press releases about StoneCo's credit product and its impact on StoneCo's financial performance.  As

VP of Investor Relations, throughout the Class Period, Pereira was responsible for accurately disseminating information to investors and analysts about StoneCo's business and financial operations.

52.     Defendant Marcelo Bastianello Baldin was the VP of Finance of StoneCo at all relevant times.  During the Class Period, Defendant Baldin made false and misleading statements.  Defendant Baldin also signed Form 20-Fs and spoke during earnings calls with investors.  In his role as VP of Finance, Baldin was tasked with managing StoneCo's financial operations.

53.     Defendant André Street de Aguiar is the co-founder of StoneCo and was Chairman of the Board of Directors of StoneCo at all relevant times.  During the Class Period, Street was responsible for overseeing the operations of the credit product as well as its impact on StoneCo's business.

54.     Defendant Eduardo Cunha Monnerat Solon de Pontes is the co-founder of StoneCo and was Vice Chairman of the Board of Directors of StoneCo at all relevant times. During the Class Period, Pontes participated in the oversight of StoneCo's operations including the credit product.

55.     Defendants Piau, Matos, Pereira, Baldin, Street, and Pontes (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors (*i.e.*, the market).  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

### 3.    Relevant Third Parties[7]

56.    **CW 1** worked for StoneCo from September 2020 to May 2021 as a Sales Consultant.  CW 1 reported to his supervisor, who in turn reported to a "team of principals," who reported to Defendants André Street de Aguiar and Eduardo Cunha Monnerat Solon de Pontes. CW 1's responsibilities included analyzing activity on StoneCo's POS machines and analyzing sales on those machines.  CW 1 was also exposed to StoneCo's "line of credit" product—which was provided to many of StoneCo's POS merchant customers.  According to CW 1, he, his supervisors, and everyone up through his chain of command, including Defendants André Street de Aguiar and Eduardo Cunha Monnerat Solon de Pontes, had access to Marco Polo and the data.

57.    **CW 2** worked for StoneCo from March 2019 to October 2021 as a Pole Leader and Business Consultant.  CW 2 was responsible for eight sales agents and focused on reaching out to clients to offer credit.

58.    **CW 3** was formerly employed by Stone as a Sales Agent from February 2019 to July 2019, then a Commercial Manager from July 2019 to January 2022.  According to CW 3, he reported to a District Manager, who in turn reported to a Regional Manager, who in turn reported

---

[7] CWs are identified herein by number (CW 1, CW 2, etc.).  All CWs are described in the masculine to protect their identities.

to Mateus Biselli.  CW 3 advised that as Pole Leader, he led a team of 10 to 11 Sales Agents responsible for sales in a geographic area, and his responsibilities included directing and training them on sales activities.

59.     **CW 4** worked for StoneCo from April 2021 to September 2021 as a Data Scientist based out of the Company's Brazilian headquarters in Sao Paulo.  CW 4 reported to the Head of Modeling, who in turn reported to another, who in turn reported to Defendants Baldin and Piau.  Part of CW 4's responsibilities at the Company was to "automate" and "modernize" pre-existing credit models.

60.     **CW 5** worked for StoneCo from November 2019 to August 2021 as a Senior Business Consultant.  CW 5's role was similar to that of a commercial agent and sales manager as he led a team of sales representatives conducting POS system sales in a particular region.  CW 5 described POS system sales as selling StoneCo's credit card swipe machine to merchants for use at their store locations.  With respect to the credit product, CW 5 added that he personally observed "a lot" of customers taking the line of credit and not paying it back and that, internally, there was a general sense of fear that StoneCo would continue to lose money.  CW 5 explained that he was aware of customers not meeting the credit product payments in his region because he presented the performance numbers for his region to corporate – both on the POS side and credit product.

61.     **CW 6** worked for StoneCo from April 2021 to December 2021 as a Risk Monitoring Analyst.  CW 6 reported directly to Risk Leader George Pozzobon.  CW 6's responsibilities included analyzing losses due to customer fraud.  According to CW 6, his Risk Analysis group monitored three types of losses – fraud, business risk, and POS losses. CW 6 also

explained how meetings were held, where at minimum, Defendant Piau was present quarterly to discuss risks and fraud prevention.

62.     **CW 7** worked for StoneCo from October 2020 to April 2022 as a Pole Leader and Commercial Agent.  According to CW 7, as Pole Leader he led an office, or *Stone Hub*, in Brazil and he had nine executives reporting to him, and that each executive was responsible for their own area.  CW 7 received directives from the "National Commercial Director" Mateus Biselli, who passed it down to CW 7's Regional Manager, then his District Manager, and CW 7 passed it down to executives that reported to him. CW 7 explained that in his role, he led a *Stone Hub* in Brazil.  CW 7 advised that he and his team's responsibilities included securing business, facilitating the installation of POS machines, and making sure the POS machines function as well as the resulting transactions were correctly processed.  CW 7 and his team, also had the responsibility to sell StoneCo's credit products, or line of credit.

63.     **CW 8** worked for StoneCo from October 2018 to January 2022 as a Sales Team Leader and Sales Consultant (also referred to as a Pole Leader).  CW 8 received directives from the "National Commercial Director," COO, Mateus Biselli, who passed it down to CW 8's Regional Manager, then his District Manager.  CW 8's responsibilities included overseeing StoneCo's POS business in his geographic territory and selling banking accounts to merchant customers.

64.     **CW 9** was formerly employed by Stone as a Pole Leader from July 2018 to May 2022, and prior to that his title was Business Consultant from October 2017 to July 2018.  According to CW 9, in his final reporting structure he reported directly to District Manager Rafael Monteiro.  According to CW 9, as a Pole Leader he had a team of Sales Agents who reported to him.  CW 9 explained that his team's primary focus was on expanding Stone's POS

line of business.  Moreover, CW 9 stated that he could see both the loans that were approved for each customer and if the loans were being paid in his territory, and that he had visibility to this information on both the app and Stone's internal program called *Marco Polo*.

65.     **CW 10** worked for StoneCo as a Manager and had familiarity with the Company's POS systems and credit products.[8]

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     StoneCo's Background and Expansion into Credit

66.     Founded in 2012, StoneCo is a provider of Fintech solutions, primarily in Brazil. StoneCo's Fintech services allow merchants and other vendors to conduct electronic commerce across in-store, online, and mobile channels.  Specifically, the Company provides payment processing through online software and physical POS devices.  StoneCo's brick-and-mortar merchant customers receive physical POS devices (*i.e.* cash registers and credit card processing terminals) from the Company and then utilize them to process in-store transactions.  StoneCo generates revenue by charging its customers payment processing fees (typically between 1% and 3%) on each transaction that uses StoneCo's POS or its online transaction processing program.

67.     Since its founding, StoneCo's goal was to become one of the largest payment processing companies in Brazil.  In order to achieve this goal, StoneCo acquired a slew of different software and hardware companies in an attempt to grow both its footprint and its sales. By October 2018, upon its IPO, StoneCo had grown into one of Brazil's largest financial-

---

[8] At CW 10's request, Lead Plaintiff has withheld additional details of CW 10's employment at StoneCo. While Lead Plaintiff believes that the details of CW 10's employment contained herein are sufficient to satisfy the requirements of the PSLRA, Lead Plaintiff will provide additional information, including CW10's exact title and job responsibilities to the Court for an *in camera* inspection at the Court's request.

technology and payment processing companies.  Indeed, as of December 2020, StoneCo had over 652,600 active payment clients in Brazil.

68.     However, Defendants knew that the Company's profitability and growth potential was limited if its primary source of revenue was simply collecting small payment processing fees.  Accordingly, the Company began trying to leverage its expansive customer base by offering its merchant customers financial products such as loans and banking services which came along with higher profit margins for StoneCo.  Specifically, StoneCo began offering its customers credit such as working capital loans and revolving lines of credit in addition to the Company's traditional credit card transaction services.[9]

69.     StoneCo marketed the new credit product as a "simple" and "transparent" way for clients to pay back the credit loans through automatic retention of a percentage of their sales.  According to StoneCo, the Company generated revenue for the services they provide based on three specific fees charged to its merchant customers: "(i) payment processing fees related to transaction activities and other services (which are typically charged as a percentage of the transaction amount or as a fixed amount per transaction), (ii) financial income related to prepayment financing fees and interest/fees related to our credit solution and (iii) subscription and equipment rental fees."[10]

---

[9] StoneCo monitored its customers through local distribution, sales, and customer service centers spread out across Brazil known as *Stone Hubs*.  *Stone Hubs* were established close to StoneCo's clients and included an integrated team of sales, service, and operations support staff to reach the Company's customers.  As of December 2020, StoneCo had approximately 350 operational proprietary *Stone Hubs* operating in Brazil, which increased to 450 by December 2021.

[10] The total fees generated from the transactions charged on a StoneCo POS is known as Total Process Value ("TPV") and was one of the metrics that StoneCo tracked and reported to the market.

70.     Therefore, in addition to paying a fee for each transaction processed through a StoneCo POS device as well as subscription and equipment rental fees, merchants would also pay an additional percentage fee on each transaction in order to pay back the loan from StoneCo. For example, according to CW 10, a typical POS machine has 2-3% fee but then if the merchant customer was getting credit extended, StoneCo could add approximately a 10% fee in order for the merchant to re-pay the loan.  Similarly, CW 9, explained that StoneCo was paid on their lines of credit through additional charges taken from each transaction conducted by their merchant customers.

**B.     StoneCo Announced to Investors the Pilot Program for a New and Highly Profitable Credit Product**

71.     StoneCo rolled out its credit product in gradual steps beginning in early 2019 with a "pilot" program that was meant to test the new credit solution and demonstrate to investors its profitability as well as the low risk that came along with it.  During StoneCo's 1Q 2019 earnings release on May 13, 2019, Defendants first unveiled the soft launch of the credit product stating "[i]n February of 2019, we launched the pilot of our credit solution to SMBs with a third-party credit provider" and noting "[w]e believe this solution will support our clients when they need funding to grow their business, by allowing them to effortlessly contract, monitor and pay back loans, by fully integrating our credit solution within our payments platform.  **Initial feedback, usage and economics have been very encouraging.**"  By November 21, 2019, Defendants told investors that StoneCo had "already provided over R$185.0 million in credit to ~13,400 clients" by October 2019, which purportedly came with very low risk as evidenced by "**mid-single digit NPLs [*i.e.* non-performing loans] and improved customer experience**."

72.     The credit product also represented, by far, the largest economic opportunity for StoneCo going forward.  According to the Company's Form 20-F filed on April 29, 2020, the

Company identified four "new markets" for potential growth: (1) acquiring new merchant customers; (2) retail management software; (3) banking; and (4) credit.  According to StoneCo, the "market potential" for acquiring new merchant customers represented a R$20 Billion opportunity; retail management software, a R$9.5 Billion opportunity; banking, a R$10 Billion opportunity; **and by far the largest, credit, which StoneCo claimed was a R$75 Billion opportunity for the Company.**

73.     Indeed, during the Class Period, Defendants continued to tout the importance of credit as an opportunity, telling investors that the potential for the product was much more than just R$75 Billion but actually closer to $200 Billion.  Specifically, during an S&P Global Market Intelligence interview held during the Class Period, Defendant Piau told investors, that, **"[t]he prospect for lending in Brazil is really big. For [StoneCo], it is a 200 billion reais opportunity**."

74.     Analysts bought StoneCo's safe and reliable depiction of their credit product.  For example, prior to the Class Period, JP Morgan issued an analyst report on February 27, 2020 that said, "Stone[Co]'s **differentiated business model** based on a closer approach to clients through hubs (hyper-local distribution centers) has allowed it to grow its market share quickly. . . Stone[Co]'s **new lending venture**, in our view, **could yield additional substantial revenues**. Stone[Co]**'s cross-selling abilities should continue to foster new revenue streams**."  As discussed below, throughout the Class Period, analysts reacted positively to StoneCo's statements about the credit product and the potential it represented to StoneCo's future success as well as the purported low risk that accompanied the new venture.

C.     **StoneCo Announced the Expansion of its Credit Product While Touting its Low Risk**

75.     On March 2, 2020, the first day of the Class Period, StoneCo issued a press release announcing that the Company would expand its credit offering to more StoneCo customers as part of their newly evolved "consolidated financial platform (ABC), integrating the client's acquiring, banking and credit offerings."[11]   Specifically, the Company explained that "at the end of January 2020 . . .we had over 5% of our total active clients using our credit solution" and "[w]e continue to improve our credit offering to be able to offer our product to a larger base in 2020."

76.     However, that same day Defendants made a number of false and misleading statements touting the safety of the loans and the supposed "tight control" the Company had over the issuance of credit to merchant customers.   For example, the Company's March 2, 2020 press release, filed on SEC Form 6-K boasted, ***The growth of our credit solution is being ruled by low delinquency rates***, currently at mid-single digits."   Later that day, Defendants hosted an earnings call with investors attended by Defendants Baldin, Matos, Martins, and Piau.   During the call, Defendant Piau discussed StoneCo's supposedly conservative approach to credit, claiming: "***[w]e keep tight control over our supply of credit looking very closely at NPL levels as we continue to improve our solution and credit scoring***.   We already have more than 5% of our acquiring clients using our credit solution."

77.     Likewise, during the investor call, in response to a question posed by an analyst from HSBC about the prospects for the credit product, Defendant Piau again touted the potential of the credit product while downplaying any concerns about non-performing loans:

---

[11]According to the Company's quarterly earnings presentation on March 2, 2020, at that time the average maturity on a StoneCo credit offering was between six and nine months.

So first, we expect to accelerate a lot credit through 2020. So we are very focused on that. ***So we will accelerate a lot, but it will be with a lot of focus on NPLs control. So we are doing very well in terms of NPL management with low single-digit NPLs,*** and we already have the structure in place to factor out those receivables.

78.     As discussed below, these, and other statements like them were false and misleading because far from exhibiting "***tight control***" over the credit product and "***focus[ing] on NPL control***" StoneCo had, at that time, materially **loosened, not tightened**, its due diligence standards in order to issue as much credit as possible and expand the Company's market share during the Pandemic.  According to numerous former StoneCo employees and unbeknownst to investors, the Company stopped using an outside credit agency to review customer creditworthiness and then unilaterally cut the number of historical transactions reviewed when issuing credit from six months' to only three-months' worth of data, and in some instances only a handful of days.  In doing so, StoneCo greatly increased the likelihood of default.  Worse, according to several former StoneCo employees, StoneCo knew, at the time, that many of the Company's credit customers were in fact defaulting on their loans because they were using StoneCo's competitors' devices in order to avoid having to pay the increased per-transaction fee associated with accepting credit from StoneCo.

79.     Notably, investors relied on StoneCo's false and misleading claims about the safety and profitability of StoneCo's growing credit portfolio.  On March 2, 2020, Citi Research reported, "[a]ccording to management, the working capital credit offering has been growing steadily . . . NPL levels are currently at low single digits. While the business is still not very representative in terms of total revenues for Stone[Co], management expects it to grow a lot in 2020."

27

80.     Also on March 2, 2020, Credit Suisse reported on StoneCo's 4Q 2019 earnings with, "credit . . . initiatives continued to show good evolution and management conveyed positive messages for 2020."  Further, "Stone[Co] expects credit portfolio to expand fast but always keeping delinquency under control."  Cantor Fitzgerald reported on March 13, 2020, that StoneCo's "Credit Solutions are Taking Off."  Specifically, Cantor Fitzgerald noted that the credit product seemed like a safe venture because StoneCo "has continued to build out its Credit offering to long-standing merchants" and management "notes an extremely selective process for loan" opportunity, "with only 5% of total merchants with outstanding loans as merchants (must be with [StoneCo] for 6mo+)."

**D.     Unbeknownst to Investors, StoneCo Materially Loosened Its Due Diligence and Credit Standards in Order to Expand as Quickly as Possible During the Pandemic**

81.     Although Defendants touted its huge potential and low levels of risk from the beginning, StoneCo's credit product was, in reality, a massive gamble due to loosened credit standards and massive collectability problems.  According to several former StoneCo employees at the beginning of the Pandemic, StoneCo began aggressively issuing credit to as many customers as it could to grow its market share and loan portfolio.  To do this, the Company reduced or effectively eliminated previously applicable checks for creditworthiness in favor of assigning credit to as many customers as possible, regardless of the riskiness of those loans.

82.     As described above, prior to the Company announcing the credit product in March of 2020, StoneCo performed a test to see how the credit product performed.  Specifically, according to CW 10, in 2019 StoneCo started to have some "soft targets" or a pilot program for lending/credit.  At first, StoneCo would look at recurring sales for a six-month period and other minor factors to determine if the customer was stable.  CW 10 explained that StoneCo accelerated extending credit in 2020 to more merchant clients by loosening the previous due

diligence standard.  CW 10 explained that the main change in diligence occurred in late 2019/early 2020, where instead of looking at six months of recurrent sales, they only looked at three months.

83.     Indeed, as the Pandemic began in March of 2020, StoneCo saw this as an opportunity to grow its market share and customer base by loosening its underwriting standards. For example, CW 3 recalled that StoneCo's merchant customers were getting credit "quickly and too easily" and not paying it back.  CW 3 explained that when Stone originally launched their credit product sometime in 2019, the Company used an outside, or third-party entity to conduct the review of merchant customers' credit history and POS transactional history when determining credit worthiness.  According to CW 3, this was when Stone's "real problems" with their credit product began.  He recounted how the third-party had started being used around January 2020, and that it was in March 2020 at the start of the Pandemic, when Stone began a "big credit push."  Further, StoneCo gave out "lots of credit" around March 2020 as they started building up their own versions of the customer profiles and shifting away from using the third-party to perform their due diligence for prospective borrowers.

84.     Further, CW 3 recounted that this third-party was used at that time to facilitate the loans and was conducting real time credit verifications for StoneCo.  CW 3 went on to explain that in March 2020, Stone removed the third-party and was handling the due diligence internally, they no longer had the capabilities to conduct the real time credit verification that they had previously relied upon.  According to CW 3, the third-party or *Money Plus*, was "much better" than Stone on the credit side because *Money Plus* had a more traditional method of conducting their credit business and the due diligence required, including the six-month review of POS transactions and the ability and resources to conduct real-time credit verifications.

85.     Likewise, according to CW 7, StoneCo started internally pushing the credit product business at the very beginning of the Pandemic in 2020.  According to CW 7, starting at the beginning of the Pandemic and the related shutdowns, StoneCo saw this as an opportunity to "dominate the market at all costs" against its similar competitors, and that the Company had not done its due diligence on customers when pushing the credit product.  Indeed, CW 7 described a situation starting in early 2020 as StoneCo's leadership began pushing for contracts and intentionally trying to attract credit product merchant customers that were riskier given their size and lack of, on StoneCo's part, looking into the amount of debt that these customers already had.

86.     CW 7 stated that in early 2020 when the Company started pushing the credit product, StoneCo started easing its look-back period on POS activity as part of the due diligence process.  Specifically, CW 7 stated that Stone traditionally reviewed the previous six months of POS activity when determining approval on a line of credit or how much the line could be, and that Stone shortened this to around three-months of POS activity sometime in 2020 with the stated purpose of trying to get as many loans out there as possible.

87.     At the same time, StoneCo abruptly stopped using the third-party credit checking company that it had previously relied on to perform credit checks of its borrowers.  According to CW 9, a third-party company called Money Plus originally conducted the six-month review, and that StoneCo eventually pulled that business from Money Plus.  CW 9 explained that StoneCo had always been involved in the review process including while Money Plus led it, and that once the Company felt that they understood the review process, that they figured Money Plus could be cut out of the process to not to have to pay Money Plus.

88.     According to CW 2, StoneCo had configured *Marco Polo* to automatically conduct a three-month review of a customer's POS transactions, and that it was this data in

*Marco Polo* that he and his colleagues reviewed when determining the credit line for a customer. CW 2 added that this automated three-month review was "the only" due diligence required by StoneCo in determining a customer's credit worthiness.

89.     Further into the Class Period, StoneCo loosened its credit standards even more, **offering credit to individuals based on just days of transaction information**.  Specifically, CW 3 explained Stone was supposed to have a three month look back period but recalled that it was often ignored based on what he witnessed.  CW 3 recounted how at the end of 2020, Stone customers were getting approved for lines of credit after being customers for "only" 5, 10, or 15 days.  He explained that essentially there was almost no review at all, and it just took a few days for the credit to extend.  CW 3 explained that he knew of this because he saw the information in excel spreadsheets provided by "Farmers" which showed this information.[12]  According to CW 3, "it was clear," based on what he saw in these charts, that merchants were becoming Stone customers to just get "easy credit."  According to CW 3, these reports were generated by Farmers, whom were part of Stone's credit division and received "all data on credit," and that it was the Farmers who provided the spreadsheets.

90.     CW 3 also stated that he knew the information and charts showing the credit delinquencies made it up the chain of command to the senior executives because the credit division (or "Farmers"), the commercial division, and the Inside Sales division met "regularly" and discussed the information in the charts and then sent them up the chain of command to Mateus Biselli because Biselli led these three divisions.

91.     According to CW 3, daily meetings were attended by his district manager and the Pole Leaders, including CW 3, who reported into that district manager as well as all of the sales

---

[12] CW 3 explained that Farmers were part of Stone's credit division.

agents in that district.  CW 3 stated that there were also meetings held twice a week that were led

by the regional manager and that were attended by the district managers in that region, as well as

the Pole Leaders, including CW 3, and sales agents in that region.  CW 3 further advised that

there was a weekly video call with Mateus Biselli, that was attended by everyone in the

departments that he led – credit, commercial, and inside sales.[13]

92.     According to CW 3, every Friday there was a separate weekly call attended by the

"top brass" and the rest of the Company, including CW 3.  CW 3 identified the Individual

Defendants Thiago dos Santos Piau, Lia Machado de Matos, Rafael Martins Pereira, Marcelo

Bastianello Baldin, and André Street de Aguiar as being regular participants.  According to CW

3, the problems with the credit product and the registry were brought up on these weekly Friday

calls.  He recalled that PowerPoint presentations were displayed on the video screen, and he

described the calls as being a "very open dialogue and sometimes harsh."  CW 3 further recalled

that Defendant Pereira "was there a lot" and gave information on important activity.  According

to CW 3, Defendant Piau always attended because he initiated the weekly Friday calls.  Finally,

CW 3 also recalled that after problems started with the credit product, André Street de Aguiar

also attended the weekly Friday calls.

        **E.     StoneCo's Credit Product was Riddled with Massive Collectability Issues**

93.     In addition to the increased risk created by the loosened underwriting standards,

Defendants knew that StoneCo's customers—many of whom Defendants knew were not

creditworthy—were evading their loan payments by using competitor POS machines yet

continued to extend lines of credit to these risky customers.  Specifically, because StoneCo

---

[13] CW 3 notes that the meetings occurred throughout all of 2020 and 2021 except for possibly a week during the Pandemic lockdowns in early 2020.

increased the total fees it charged per transaction to the customers with lines of credit, its credit customers chose to use competitor POS devices in order to evade paying the increased fees and repaying the loan.  Critically, StoneCo could not collect any fees on transactions that were performed on competitor POS devices, meaning once a customer started using a competitor's POS system to perform transactions, the likelihood of the borrower defaulting was almost certain.

94.     At the beginning of the Class Period, in March 2020, StoneCo identified a red flag related to the repayment of the Company's loans.  The Company observed a massive drop in TPV, signaling that customers were not using StoneCo POS devices for transactions and effectively confirming that those customers were going to default on their loans.  Specifically, CW 10 confirmed that they noticed the huge drop in TPV that started in March 2020 based on reports that they had internally and that it was so drastic, that it led to StoneCo laying off 20% of their employees in May 2020.  CW 10 explained that the drop in TPV meant that they were not getting paid back and "they couldn't collect anything" for the credit that StoneCo had extended prior to the Pandemic.  Yet, after March 2020, the Company continued to issue more credit than ever despite being aware of these red flags related to collectability.

95.     CW 10 explained that StoneCo noticed there was a high amount of churn and stated that what he meant by this is a lot of customers were using competitors' POS machines instead of StoneCo's.  According to CW 7 it was "very common" that customers were using the POS machines from StoneCo's competitors while also using StoneCo's machines.  CW 7 explained that it was understood that StoneCo's merchant customers could find a better rate from other "credit card" providers or other entities who provided better terms on installment payments.

96.     Indeed, StoneCo's low transaction processing fees rates were initially a competitive advantage.  But once the additional fees for the credit were tacked on, it caused customers to turn to StoneCo's competitors for their transactions.  And while StoneCo's rates were competitive on the POS transaction fees alone, the transaction fees went up significantly if the customer had obtained credit from the Company.  CW 8 explained that Stone's rates were much better, and the process was much easier than a bank's because the customer did not receive an invoice but rather the payment to Stone was deducted from the customer's transactions.

97.     CW 10 explained that if StoneCo extended credit to a SMB, the SMB owner had to pay a higher fee that accounted for the amount they owed.  CW 10 went on to say that this fee was much steeper than rates offered by StoneCo's competitors and that, as a result, the SMB merchant customers were forced to use competitors' machines as a "survival" tactic.  Adding that the SMBs used the competitors' machines rather than paying StoneCo which meant that they were in default to StoneCo because the Company could only collect from their own machines at that time.  CW 10 confirmed that once a merchant customer defaulted, there was very little that StoneCo could do to collect given that the customer would likely go under.  According to CW 10, "you could even send in the Pope, but you won't be successful."

98.     CW 10 knew that their customers were using their competitors' machines instead of StoneCo's because the operations team had visibility into their customers, and that they could see if their transactions stopped.  CW 10 elaborated that it was the operations team's responsibility to physically go to the customer when they identified this issue to see if the customer was using a competitors' machine or had gone out of business.  CW 10 advised that when the operations team met with the owners of the businesses to verify that they were using competitors' machines, the owners would tell the StoneCo agent that they were using a

competitor's machine because of the increased rates on StoneCo's machine related to the credit that had previously been extended.[14]

99.     Further, CW 2 recalled that he would visit customers in person and reminded customers that they had the line of credit, so they had to use the Stone POS, in order to pay back the credit loan.  CW 2 explained that the customers would say, "Okay, I will use the Stone POS" but the customers did not use it after he left their store.

100.     Several other former employees likewise confirmed that there were significant issues with StoneCo's customers borrowing money from StoneCo and not paying it back.  For example, CW 9 confirmed that when StoneCo increased their rates and terms due to delinquencies, that their customers took the lines of credit but just used the competitors' POS machines so as to not have to pay back Stone's line of credit with the increased rates.  Likewise, according to CW 5, he personally observed "a lot" of customers taking the line of credit and not paying it back and that, internally, there was a general sense of fear that StoneCo would continue to lose money.  CW 5 added that he was aware of customers not meeting the credit product payments in his region because he presented the performance numbers for his region to corporate--both on the POS side and credit product.  Similarly, when asked if StoneCo was aware of merchant customers not meeting their payment obligations to StoneCo for the credit product, CW 1 responded, "Yes," and added the merchant customers were "telling us that they could not make their payments."

---

[14] CW 10 reiterated that before the registry laws were changed, StoneCo could not collect for any credit product that they had extended to a customer unless the customer used a StoneCo machine.  Adding that in May 2021, prior to the registry laws being enacted in Brazil, they would issue an IOU, which was difficult to collect on, but once the registry laws were enacted StoneCo could collect from competitors' machines through the registry, however, even this was complicated.

101.    Finally, according to CW 9, when he was told by either his supervisor, District

Manager Rafael Monteiro, or Mateus Biselli that the credit product was being pulled in June or

July of 2021, it was because merchant customers had been taking the lines of credit, and then

using Stone's competitors' POS machines to make transactions with their own customers and

because Stone clients were not making payments on their accounts.

### F.    Defendants Had Access to and Knowledge of Risky Borrowers Not Paying Back Their Loans

102.    During the Class Period, Defendants had access to and knowledge of information

contradicting their statements about the safety and profitability of the credit product from

internal meetings and from StoneCo's internal operational reporting program known as *Marco

Polo*.

103.    CW 1 explained that StoneCo used an internal system known as *Marco Polo* to

track the POS business.  CW 1 explained that *Marco Polo* could track the volume of transactions

on each POS machine that StoneCo's merchant customers used, and also tracked the value of

each transaction as well as transactions conducted by those merchants' customers on the POS

machines provided by StoneCo's competitors.  CW 1 added that StoneCo received "alerts" from

*Marco Polo* when the merchant customers used a competitor's POS machine.

104.    Likewise, CW 10 explained that StoneCo had a standard procedure internally

where they would update their app, *Marco Polo*.  According to CW 10, *Marco Polo* alerted

StoneCo if any merchant customers had no transactions for thirty days or other indicators of a

client not using StoneCo's machines.  CW 10 stated that the app would indicate that the StoneCo

salesperson needed to physically go perform a check on the customer to see use or nonuse of

StoneCo's machine and that these visits were tracked in *Marco Polo* as well.  In terms of credit,

CW 10 confirmed that a CRM, or back-end system, tracked each merchant

establishment/customer that had a StoneCo POS machine and indicated whether that customer had borrowed from StoneCo and this information appeared in *Marco Polo*.

105.    *Marco Polo* was used throughout StoneCo.  Indeed, according to CW 1, he, his supervisors, and everyone up through his chain of command, including Defendants André Street and Eduardo Cunha Monnerat Solon de Pontes, had access to *Marco Polo* and "the data." Further, according to CW 1, Defendants Street and Pontes could access information from the POS and credit product lines of business "at any time," and that gave them a "full understanding" of the "sales numbers."

106.    In addition to *Marco Polo*, senior leadership, including named Defendants, tracked losses through weekly, monthly, quarterly, and annual reports and thus, knew and had intimate knowledge of StoneCo's risky loans and collectability issues.  For example, CW 10 advised that the executives at StoneCo were absolutely aware of the changes in TPV and the high churn at StoneCo when the Pandemic began.  He went on to say that it is likely that the executives, including the CEO, had an understanding of how many customers borrowed from StoneCo at any given time.  When asked about customers not using StoneCo's machines to avoid paying back their credit, CW 10 advised that there was likely a report from the Risk Credit Team to the CEO and other executives.

107.    Further, CW 6 explained that while the Risk Analysis group analyzed all risk at StoneCo, which were broken down by the three types of losses (fraud, business risk and POS), there were reports provided on a weekly basis containing information on some losses. According to CW 6, some loss reports were reviewed in weekly meetings that he and the entire risk team attended and that were led by Risk Leader George Pozzobon and Fraud and Prevention Leader Juliana Gomes, who he described as the senior leader of StoneCo's entire risk team.  CW

6 added that some loss reports were also reviewed at quarterly meetings with CEO Thiago dos Santos Piau present, along with CW 6, Pozzobon, Gomes, the entire risk and fraud prevention teams, and many others.

108.   Likewise, when asked if Stone's senior executives were aware that merchant customers were not paying back the credit loans, CW 3 responded "Absolutely."  And according to CW 1, Baldin led all "conferences" on the POS and the credit business.[15]

109.   According to CW 4, StoneCo historically had models to track credit amounts in customer portfolios used for monitoring "value of credit impacted." CW 4 explained that StoneCo "started to question [if] 'our customers are paying' and 'are our delinquents paying.'" CW 4 further explained that in January 2021, the Company added a new component to their model that involved how they assessed risk to their models for customer portfolios, but that it was not working and that it was CW 4's responsibility to "further upgrade it."

110.   Accordingly, Defendants had ample access to information contradicting their statements regarding the safety of the credit product and the Company's ability to collect repayment on the loans it issued to merchant customers.

### G.   As the Class Period Progressed, Defendants Misled the Market by Boasting About the Credit Product's Purported Low Risk, Growth, and Profitability

111.   Nonetheless, despite knowing that: (1) the Company had significantly loosened its credit standards; and (2) its customers were evading paying back their loans by using competitor POS devices to process transactions; throughout the Class Period, Defendants continued to issue false and misleading statements about the Company's credit product.

---

[15] CW 1 confirmed that he knew this through first-hand knowledge or through direct interaction or conversations with other StoneCo employees.

112.    For example, on May 26, 2020, StoneCo announced its first quarter 2020

financial results in a press release, in which Defendants touted the new credit product and due

diligence associated with it, saying, "*[o]ur credit approach*, *which includes a rigorous credit-*

*scoring system, receivables lock-up, and pay-as-you-sell model, has also proven to be more*

*resilient than even we expected* providing a return on asset of 2.7% per month even after

COVID-19-related provisions."

113.    The May 26, 2020 earnings release went on to explain that while the Pandemic

was contributing to delinquency rates, the Company assured investors that the credit product

remained safe and profitable because of the Company's purportedly selective credit criteria:

> Given the uncertainty surrounding the current scenario, we expect
> higher delinquency rates in our credit portfolio, especially from
> older cohorts of clients. However, our credit business has four key
> elements that help us keep healthy returns, even with higher
> delinquency rates.
>
> 1. Our policy has always been to not provide credit for some
> sectors that we deem to be riskier, such as airlines, seasonal
> businesses, clients that already have a lock on their receivables and
> merchants exposed to high chargeback levels.
>
> 2. *We have improved significantly our scoring system over*
> *time, with daily enhancements to our algorithms, new talents*
> *brought in 2019 and a* <u>*requirement of a minimum relationship*</u>
> <u>*period (data) that help us to be more assertive on the credit scoring.*</u>
>
> 3. Our business model works in a merchant cash advance mode,
> in which clients pay with their sales; *the deduction of a percentage*
> *of clients´ daily processed volumes provide both alignment of our*
> *interests with theirs and protection for us, as we receive down*
> *payments immediately when they engage in electronic*
> *transactions, regardless of their payment provider*. Additionally,
> we have local agents who know clients personally, which reduces
> the risk of fraud significantly.

114.    Defendants' statements touting the "key elements that help us keep healthy

returns" were false and misleading because the Company had in fact loosened its credit standards

and it therefore was not the "*rigorous credit-scoring system*" the Company claimed it to be. Moreover, Defendants claims that "*the deduction of a percentage of clients´ daily processed volumes*" did not provide "*protection for [StoneCo] . . . regardless of their payment provider*." In reality, however, StoneCo knew that customers were turning to competitor devices to process transactions so to avoid paying the increased fees imposed by receiving loans.  Such behavior resulted in defaults and did not allow the Company to "*keep healthy returns*" as Defendants contended.

115.    Likewise, on October 29, 2020, Defendants held an earnings call to announce StoneCo's 3Q 2020 financial results, in which they furthered attested to the purportedly conservative nature of their credit product stating: "[m]ore than 73,000 merchants now use these working capital loans, which they seamlessly pay by deducting a small percentage of their sales every day. *Our product remains fairly conservative* with a small duration of seven months and an average ticket for new loans of 19,000 reais, the equivalent of roughly a month of their TPV. *We remain very focused on balancing risk and profitability, which is reflected in our relatively stable ROA and low expected losses*..."  Further, "[w]e see a huge opportunity ahead of us, and *we will leverage our distribution and proprietary credit scoring model* to continue to serve merchants with our working capital solutions."

116.    Defendants continued to make similar statements through the Class Period.  For instance, on March 11, 2021, StoneCo issued a press release, wherein Defendants stated that they touting the credit products growth while simultaneously reassuring investors that the Company was "improving" its "scoring model and risk management tools" and that the credit product had "healthy risk return levels":

> *On credit, our differentiated solution allowed us to keep growing our outstanding balance at a strong pace while constantly improving our scoring model and risk management tools*…
>
> *The economics of our credit solution have continued to be strong, with healthy risk-return levels.*

117.    Defendants double downed on the earnings call following the press release boasting the success of the credit product by stating that "[o]ur credit portfolio reached 1.5 billion reais, distributed among nearly 90 thousand clients, with healthy monthly returns ranging from 2% to 2.5%. *We continue to enhance our credit scoring model, provisioning and collection tools, especially as we experience a second wave of Covid in Brazil, with lockdowns being imposed in some areas. For this reason, we are being even more selective while disbursing new credit.*"

### H.    As StoneCo's Losses from Bad Loans Mounted, the Company Used the Pandemic as a Cover But Assured Investors that the Credit Product was Still Healthy

118.    Defendants continued to make positive statements about the growth of its credit product, yet unbeknownst to investors, the Company was winding down the credit product internally due to its poor performance.  For instance, on June 1, 2021, in the 1Q 2021 press release, Defendants touted an overall positive outlook over their credit operations, notwithstanding increased delinquencies which Defendants conveniently attributed to the Pandemic noting "[h]igher provisions for expected delinquency in our credit operations were influenced by more commerce restrictions in Brazil in the first quarter of 2021 amid a second wave of COVID [Pandemic]. *Despite such higher provisions, our credit portfolio grew and remains healthy. . .*"

119.    Later that day, during the 1Q 2021 earnings call, Defendants continued to reassure investors, touting the success of the credit product despite the Pandemic, "*It do[es] not reduce*

41

*our appetite for this product . . .  It's actually the opposite* because when **you go through such difficult environment and you can operate with healthy level of returns**," and that the Company was "***actually very confident with working capital solutions and credit***."  Such statements gave investors the misleading impression to the market that it was only external factors that caused the higher expected delinquency in StoneCo's credit product and that going forward the product would be unencumbered.  However, in reality the increase in credit delinquencies was due to the Company's internal and undisclosed loosening of credit standards and collectability issues.

> **I.      The Brazilian Government Enacted a New Registry System for Loan Collateral that Would Have Fixed StoneCo's Collectability Issues, but in Reality, Exposed Its Risky Loan Portfolio**

120.     After months of delays, on June 7, 2021, the Brazilian government enacted a new law governing the registry of receivables system that was meant to protect borrowers from the exact issues StoneCo was facing—namely the use of competitor POS devices to avoid repaying loans.[16]  These new rules introduced several modifications related to registration of receivables of credit and debit payment instruments.  As soon as they became effective, financial-based institutions such as StoneCo had to ensure that receivables used as collateral for credit transactions (*i.e.* the credit fees StoneCo's customers paid to the Company each time it made a sale) had to be recorded in registration systems, operated by a registry authorized by the Central Bank.

121.     Unlike before, the new registry system ensured that whatever lender had first perfected an interest in a borrowers' future accounts receivable (*i.e.,* future transactions) was

---

[16] In Brazil the new registry laws were enacted under Resolution No. 4,734/2019 and Circular No. 3,952/2019.  The original laws were published in 2019 but were delayed several times before becoming effective in June 2021.

entitled to repayment **regardless of what POS system the merchant used to perform a transaction.**

122.    Notably, the new registration system also required StoneCo and its competitors to ensure all credit agreements that were entered into before June 7, 2021 were migrated to one of the three registries authorized by the Central Bank.  This meant that StoneCo and all of its competitors would be able to ascertain which lender held a priority interest in the collateral for all of the loans issued by any lender prior to June 7, 2021.  Indeed, according to CW 3, in a March 2021 video call, Stone announced that they and their competitors are putting all of their transactions in the registry and that they all, including Stone, would have access to that information in the registry.  CW 3 explained that with the new registry laws, all lenders were supposed to be able to see transactions and the credit loans that all merchants were already responsible for.

123.    In other words, if StoneCo adhered to the new registry laws it would have to register of all the loans it had made since it launched the credit product in 2019 (many of which the Company knew were in default).[17]  Therefore, StoneCo knew that would have to either start disclosing to the market the true extent of the losses in the Company's loan portfolio or register the bad loans under the new registry system thereby exposing them.[18]  Either way, by June 7,

---

[17] StoneCo announced on August 25, 2021 that the Company "decided to change the accounting method of our credit portfolio for new contracts originated from the third quarter of 2021 onwards to provide better transparency by moving from a fair value method to an accrual basis. Per IFRS 9 rules, this change will only affect new credit operations, so our legacy portfolio (through June 30, 2021) will continue to be accounted for using the fair value method."

[18] Far from being a surprise, StoneCo had advanced notice of the new registry laws coming into effect and ample time to prepare for them.  Indeed, during the October 29, 2020, 3Q 2020 StoneCo earnings call—eight months before the law went into effect—in response to a question posed by a Bank of America analyst regarding preparations and expectations for the new registry requirements, Defendants shared that, "we'll be 100% ready for what the Central Bank has asked everyone…I think that the registry of receivable is a good opportunity for whole

2021, Defendants were going to be forced to disclose the true health of the Company's loan portfolio.

J.     **Defendants Decided to Pull the Credit Product Well in Advance of the Enactment of the New Registry System, Belying Their Excuse for Increased Delinquencies**

124.    As discussed below, following the enactment of the new registry laws in June 2021, Defendants began disclosing significantly increased loan delinquencies that were far beyond what Defendants had previously signaled and thus, what the market expected.  In doing so, StoneCo blamed the new registry system for the Company's increased delinquencies and attributed it as the primary reason for the Company pulling the credit product in August 2021. However, Defendants' attempts to attribute the failure of the credit product to the new registry system were contradicted by numerous confidential witnesses who confirmed that, internally and unbeknownst to investors, the Company had decided to pull the credit product well in advance of the new registry's effective date—thereby confirming that it was not the cause of the credit product's failure.

125.    Indeed, numerous confidential witnesses recalled that the Company began pulling the credit product internally well before the Company officially announced on August 25, 2021 that it would no longer be issuing new loans.  For example, when asked when StoneCo knew the Company was going to temporarily stop disbursing credit CW 5 recalled that it was being

---

society, both clients, new players, everyone, because at the end of the day, makes all the process more efficient."  Defendants continued "[s]o I think that by having the registry of receivable, we will have a better avenue of growth to provide credit for our clients that still don't use our payment solution with the same level of security and NPLs that we have today. So we're very excited about this. We can't wait to see the registry of receivable happening."  Indeed, according to CW 10, StoneCo was aware of the proposed changes to the registry laws way before they were enacted.

discussed in March, April, or May of 2021.  Likewise, according to CW 8, although it was

outside his daily scope of work, he was directed to push the sales of credit products beginning in

January 2021 but "very soon" after, sometime between March-May 2021, he was ordered to halt

sales of the same products that he was told to push less than five months prior.  He added that at

the very same time that he was ordered by his regional manager to discontinue selling the credit

product, he was also informed (by his regional manager) that the decision was made by StoneCo

to pull the credit product for a period of time.

126.    Similarly, CW 9 further recalled that he and his team of Sales Agents were further

instructed in June 2021 to tell customers "No" if and when they asked if lines of credit (or the

credit product) were available, and to let them know that the credit product is "temporarily

unavailable."  CW 9 explained that in June or July 2021, the credit product was pulled in because

Stone clients were not making payments on their accounts.  CW 9 explained that he was

instructed not to call customers up, but to only inform them if they asked for it.  Moreover, CW 2

recalled Biselli stating that [the credit product] was being pulled because "the credit product

process was the problem" and that StoneCo "was not ready to sell credit."

## K.    The Reality of Defendants' Credit Issues Began to Be Revealed When StoneCo Announced Increased Delinquencies and Belatedly Announced the Removal of the Credit Product

127.    Facts about the extent of Defendants' failed credit product and the extent of the

losses from the credit initiative began to be revealed on August 25, 2021.  On that day, StoneCo

issued a "teach-in paper" that explained to investors the complexities of the new registry system

and why it was supposedly impacting the Company negatively.  Buried in the paper, however,

was Defendants' surprise disclosure that StoneCo had decided to "**Temporarily stop disbursing

credit at beginning of June [2021].**"  The paper went on to disclose that the Company was

"seeing higher delinquencies than what we expected and observed in prior periods,

especially due to more difficult collections and considerably worse recoveries from non-performing clients."

128.    In response to this news, **shares of StoneCo common stock dropped 4% to close at $52.88 from its previous closing price of $55.05**.

129.    However instead of attributing these issues to the Company's undisclosed loosened underwriting and credit standards, Defendants misleadingly attributed it to the new registry laws:

> *[G]iven the problems the market has faced with the accurate registration of receivables (as described in the prior sections), we are seeing higher delinquencies than what we expected and observed in prior periods, especially due to more difficult collections and considerably worse recoveries from non-performing clients*.

130.    Defendants' statements ascribing the increased delinquencies and pulling of the credit product to the new registry system were false and misleading because they failed to disclose that the true reason the Company was seeing increased delinquencies was not due to the change in the registry system but because of the loosened credit standards and collectability issues that the Company experienced during the Class Period and knew about all along.

131.    Financial news outlets absorbed Defendants statements quickly.  For example, that day Seeking Alpha, a financial news website, published an article entitled "StoneCo stock drops 4% after regulatory change results in higher delinquencies," which noted that the stock price fell "after the Brazilian fintech discloses that it's seeing higher delinquencies than it expected and observed in prior periods due to a regulatory change in the way Brazil registers receivables."

L.     **The Extent of the StoneCo's Loan Losses Continued to Be Revealed**

132.    Then, on August 30, 2021, after the market closed, StoneCo issued another Press Release filed on SEC Form 6-K detailing the Company's results for 2Q 2021 and announcing significantly increased delinquencies—this time attaching specific numbers to the delinquent loans and revealing further information to investors about the extent of the losses of the loan portfolio.  Specifically, StoneCo disclosed **that 35% of its credit clients were unable to pay back any principal in the last 60 days and at least 19% were unable to pay either interest or principal—far above what investors had expected.**

133.    In response to this news, the Company's share price plummeted $2.96, or 6%, to close at $46.54 per share on August 31, 2021, on unusually heavy trading volume.

134.    However, once again Defendants attributed the increase in loan delinquencies to the new registry system as opposed to the real reason for the losses: the Company's loose underwriting standards and collectability issues.  For example, during StoneCo's August 30, 2021 2Q earnings call, Defendant Pereira responded to an analyst question, regarding the giant write-off of credit receivables, with ". . . *our credit product was designed to be fully collateralized*. So when we saw that the *new registry system was not working properly*, we saw that *we could not enforce those collaterals.* So given the methodology that we have been using, the fair value methodology, and we saw this happening, what we did is we decreased our expectation of recovery of nonperforming loans."

135.    In the August 30, 2021 press release, Defendants also reassured investors that they expected Brazil's new registry system to be fixed, and "all parties to begin playing by the same rules" in just three to six months. Defendants further reassured investors that they had taken "cautious" measures to address the problems with StoneCo's credit product, as follows:

Our credit business remains in the early stages and ***we made some mistakes in our execution, especially not foreseeing how the malfunctioning of the registry system could harm our business***. So we decided to take a cautious approach and implemented some prudent actions, like temporarily stopping the disbursement of credit and increasing coverage for potential future losses, which impacted our reported results for the quarter. While conservative, we think this was the best course of action to try to deal with the issue head-on. We will wait for the system to be fixed, all parties to begin playing by the same rules and turnaround our execution before resuming our operations, which we think could take three to six months. We have learned a lot in the past two years of building our credit product and we remain very excited about the long-term opportunity and the material benefits to our clients.

136.    Analysts relied on Defendants' statements regarding the cause of StoneCo's issues.  For example, Guggenheim filed an analyst report on August 31, 2021, discussing StoneCo's 2Q 2021 results, specifically "[t]he severity of the credit-related headwinds were a surprise, in our view - and the short-term backdrop in credit looks challenging for [StoneCo] given the difficulties in Brazil getting the new national registry of receivables up . . ."  Further, the report noted that "this is a transitory issue that will eventually pass as the appropriate regulatory guardrails are eventually put into place."

137.    Likewise, an analyst report also filed on August 31, 2021 from HSBC Global Research, indicated shock at the extent of the losses from the credit product noting "[w]hile management had communicated previously that provisions in 2Q will be **high due to malfunctioning of the registry of receivables**, we believe the magnitude was **higher than anticipated by the market**."  J.P. Morgan issued an analyst report on August 30, 2021, entitled "2Q21: Lending Substantially worse than expected" and explained:

Results were characterized by substantial losses in Stone's lending portfolio. Notably, Stone reported that 35% of its clients were unable to pay any principal in the last 60 days and 19% were unable to pay either interest or principal—this compares to NPLs in the SME segment usually gravitating around 10%. We were surprised

to see Stone further reducing NPV of its loans on ~R$397mn in
addition to an already ~R$116mn done in 1Q21.

**M.    The Full Truth Is Revealed When StoneCo Issued Poor Results and
Confirmed that the Company Was Still Not Issuing New Credit**

138.    Finally, on November 16, 2021, the full impact of StoneCo's underwriting and
collectability failures were fully disclosed when StoneCo announced further poor results and
missed guidance while simultaneously confirming that the Company was still not issuing new
credit and could not confirm when new credit would be issued again.  Specifically, in StoneCo's
November 16, 2021 filed SEC Form 6-K detailing the Company's results for 3Q 2021, the
Company disclosed "a reduction in the expected cash flows, especially due to the reduction of
observed recovery rates in delinquent loans" and that the Company had again "reviewed
downwards the fair value of our loan portfolio."  Further, the percentage of non-performing
loans—loans that the Company did not expect to be repaid—**was now up to 48% from the 35%
the Company had disclosed the previous quarter.**

139.    Moreover, during the earnings call with analysts later that day, in response to a
question from an analyst about the "expected timeline to restart credit origination, how the
integration with the registry of receivables is going, and when we might start to see some
operating leverage in the credit business," Defendant Matos responded that the Company
"expect[s] to start retesting our original product, which is short-term loans, between the fourth
quarter of '21 and the first quarter of '22."  Moreover, when asked when the credit volume
would return to levels "that we saw prior to halting the origination of credit," Defendant Piau
replied that StoneCo is "**not ready to provide a specific guidance in terms of scaling the
credit**."

140.    On this news, **the Company's share price fell $10.96, or 34%, to close at
$20.70 per share on November 17, 2021**.

141.    Analysts reacted negatively to this update and attributed the bad news to the Company's failed credit product.  For example, JP Morgan issued an analyst report that day stating, "On the lending side, NPLs rose further 48% of the portfolio without paying principal vs 35% in 2Q21 and coverage over those late loans stood at 102%. Given small balance contraction we wouldn't rule out further impairments/provisions in upcoming quarters. Management expects small attempts to lend again in upcoming quarters, but no guidance of meaningful lending contribution was provided."

142.    The same day, Evercore also reported "For 3Q/21…EPS fell sharply below our forecasts and consensus given…increasing financial expenses. On a YoY (*i.e.*, Year over year) basis, the primary drivers of the weaker-than-expected results included: 1) a R$181 million headwind from halting new credit origination…Decreasing Price Target…given the ongoing uncertainty regarding [StoneCo's] ability to successfully originate credit and pass-through higher funding costs."

143.    And on November 17, 2021, Credit Suisse reported that, "Q3: Negative on low profitability . . . the absence of credit revenues . . . were, and should continue to be, headwinds for margins . . . Credit to enter on test mode. Credit origination was virtually zero in Q3 as well as its contribution to revenues (no additional provisions)."

144.    Further, that same day analysts from Morgan Stanley reported, "Weak results from Stone[Co], driven by higher operating costs and financial expenses…On the back of the complicated lending issues this year, **we think the market expects/needs more transparency and specificity from management.**"

### N.    Post-Class Period Events

145.    On March 17, 2022, StoneCo reported fourth quarter and Fiscal Year 2021 results where Defendants opined on the lack of effective execution and lackluster performance:

> 2021 was an unsatisfying year for Stone.  We executed well in some areas but faced challenges in others.  We believe our market opportunity is huge and merits an aggressive approach, **but we tried to do too much last year** and **did not execute as well as we would have liked**. **Our aggressive commercial approach, combined with a challenging macro environment, impacted our profitability. In credit, we ramped up our offering quickly, but did not manage it well.**

146.     As of StoneCo's 1Q 2022 earnings release, filed on June 2, 2022, StoneCo has still not re-introduced its credit product.

## V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

147.     Lead Plaintiff alleges that the statements highlighted in bold and italics within this section were knowingly and materially false and misleading and/or omitted to disclose material information of which Defendants were aware or were reckless in not knowing.  As alleged herein, such statements artificially inflated or maintained the price of StoneCo's publicly traded common stock and operated as a fraud or deceit on all persons and entities that purchased common stock during the Class Period.

148.     Throughout the Class Period, Defendants made a series of misrepresentations concerning StoneCo's credit business.  Specifically, Defendants made material misstatements and omissions including: (1) that StoneCo had materially loosened its credit standards going into the Pandemic in order to increase its market share and sales of its credit product; (2) that StoneCo was experiencing significant collectability issues related to its customers using competitor POS devices to process transactions and avoid repaying the Company; (3) that, as a result of the foregoing, the Company's financial results would be adversely impacted; and (4) that, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

149.    To the extent any of Defendants' statements were opinions, they were false and misleading because they lacked a reasonable basis as Defendants knew that StoneCo had materially loosened its credit standards in March 2020 at the beginning of the Pandemic and was aware of customers not repaying its loans by using competitor POS devices.

150.    In addition, even if Defendants' statements were literally true, they were false and misleading by omission because Defendants failed to disclose material facts, rendering their statements misleading.

### A.    March 2, 2020 – 4Q 2019 Press Release

151.    StoneCo announced its fourth quarter and Fiscal Year 2019 financial results in a press release filed on SEC Form 6-K on March 2, 2020 and signed by Defendant Piau, wherein Defendants touted the purported safety of the credit venture:

> Regarding credit, we have already disbursed over R$290 million to our clients by the end of 4Q19, with 24,200 active clients and R$166 million of outstanding balance. This has evolved to R$360 million disbursed by the end of January 2020, with over 28,600 thousand clients with and an outstanding balance of almost R$200 million. We continue to improve our credit offering to be able to offer our product to a larger base in 2020. ***The growth of our credit solution is being ruled by low delinquency rates***, currently at mid-single digits.

152.    The statements above that "**[t]he *growth of [their] credit solution is being ruled by low delinquency rates for*** credit, were materially false and misleading when made because, as discussed in sections IV. D-F above, StoneCo (i) was relying on significantly reduced due diligence look-back periods when deciding which merchants received credit offerings, (ii) had stopped using a third party credit check provider to provide real time credit checks for borrowers; (iii) reduced its due diligence standards in order to obtain as many customers as possible during the Pandemic; and (iv) was aware that its borrowers were avoiding repaying their loans by using competitor POS devices to perform transactions.

153.     Specifically, beginning no later than March 2020, StoneCo materially loosened its due diligence standards in order to issue as much credit as possible and expand the Company's market share during the Pandemic.  For example, according to CW 10, StoneCo accelerated extending credit in 2020 to more merchant clients by loosening the previous due diligence standard.  CW 10 explained that the main change in diligence occurred in late 2019/early 2020, where instead of looking at six months of recurrent sales, they only looked at three months.  Likewise, according to CW 7, the Company started internally pushing the credit product business at the very beginning of the Pandemic in 2020.  According to CW 7, starting at the beginning of the Pandemic and the related shutdowns, Stone saw this as an opportunity to **"dominate the market at all costs" against its similar competitors.**  CW 7 explained that Stone traditionally reviewed the previous six months of POS activity when determining approval on a line of credit or how much the line could be, and **that Stone shortened this to around three-months of POS activity sometime in 2020 with the stated purpose of trying to get as many loans out there as possible**.

154.     StoneCo also abruptly fired the third-party credit checking company it used to assess its potential borrower's creditworthiness thereby increasing the riskiness of the Company's credit product.  Indeed, according to CW 9, a third-party company called Money Plus originally conducted the six-month review, and that StoneCo eventually pulled that business from Money Plus.  Likewise, according to CW 3, the third-party had started being used around January 2020, and that it was in March 2020 at the start of the Pandemic, Stone began a "big credit push."  Further, CW 3 described that around March 2020, StoneCo started giving out "lots of credit" as they started building up their own versions of the customer profiles and shifting away from using the third-party to perform their due diligence for prospective borrowers.  CW 3

went on to explain that in March 2020, Stone removed the third-party and was handling the due diligence internally, **they no longer had the capabilities to conduct the real time credit verification that they had previously relied upon.**

155.    In addition to issuing highly risky loans, Defendants also knew that StoneCo was experiencing major issues with collecting loan repayments from the risky customers it lent money to.  For example, according to CW 10, the SMB merchant customers were forced to use competitors' machines as a "survival" tactic because the transaction fee was much steeper than rates offered by competitors.  Adding that the SMBs used the competitors' machines rather than paying StoneCo which meant that they were in default to StoneCo because the Company could only collect from their own machines at that time.  Likewise, CW 7 stated that it was "very common" that customers were using the POS machines from StoneCo's competitors while also using StoneCo's machines.  CW 7 explained that it was understood that StoneCo's merchant customers could find a better rate from other "credit card" providers or other entities who provided better terms on installment payments.  Similarly, CW 9 confirmed that when StoneCo increased their rates and terms due to delinquencies that their customers took the lines of credit but just used the competitors' POS machines so as to not have to pay back Stone's line of credit with the increased rates.  Accordingly, Defendants' statements touting the safety and profitability of the credit product were materially false and misleading when made.

### B.    March 2, 2020 – 4Q 2019 Earnings Conference Call

156.    On March 2, 2020, Defendants hosted an earnings call with investors attended by Defendants Baldin, Matos, Martins, and Piau.  During the call, Defendant Piau discussed the supposedly conservative approach to credit the Company was taking:

> The credit solution continues to ramp up to an outstanding balance
> of BRL 166 million in December, jumping to BRL 200 million in
> January. ***We keep tight control over our supply of credit looking***

*very closely at NPL levels* as we continue to improve our solution and credit scoring. We already have more than 5% of our acquiring clients using our credit solution.

157.   Later during the investor call, in response to a question from an analyst with HSBC about the prospects for the credit product, Defendant Piau again downplayed the Company's supposed focus on creditworthiness and non-performing loans noting:

> So first, we expect to accelerate a lot credit through 2020. So we are very focused on that. *So we will accelerate a lot, but it will be with a lot of focus on NPLs control. So we are doing very well in terms of NPL management with low single-digit NPLs,* and we already have the structure in place to factor out those receivables.

158.   The above statements were false and misleading for the same reasons set forth in paragraphs 152-55, above.

**C.    April 29, 2020 – Form 20-F for Fiscal Year 2019**

159.   In StoneCo's annual Form 20-F disclosures for Fiscal-Year 2019 filed on April 29, 2020, which was signed by Defendants Piau and Baldin, StoneCo provided the following misleading language under a section describing risks to credit:

> *We may not be able to effectively manage individual or institutional credit risk*, or credit trends that can affect spending on card products and the ability of customers and partners to pay us, which *could have a material adverse effect on our results of operations and financial condition.*

> We are exposed to institutional credit risk, principally from loans to our clients. *Clients may default on their obligations to us due to bankruptcy, lack of liquidity, operational failure or other reasons.* General economic factors, such as the rate of inflation, unemployment levels and interest rates, *may result in greater delinquencies that lead to greater credit losses.* A client's ability and willingness to repay us can be negatively impacted not only by economic, market, political and social conditions but by a customer's other payment obligations, and increasing leverage can result in a higher risk that customers will default or become delinquent in their obligations to us.

> ***We rely principally on the client's creditworthiness and their ability to generate receivables for repayment of the loan, and therefore have no other collateral embedded. Our ability to assess creditworthiness may be impaired if the criteria or models we use to manage our credit risk prove inaccurate in predicting future losses, which could cause our losses to rise and have a negative impact on our results of operations.*** Further, our pricing strategies may not offset the negative impact on profitability caused by increases in delinquencies and losses; thus any material increases in delinquencies and losses beyond our current estimates ***could have a material adverse impact on us.***
>
> Rising delinquencies and rising rates of bankruptcy are often precursors of future write-offs and ***may require us to increase our reserve for loan losses.*** Although we regularly review our credit exposure to specific clients and counterparties and to specific industries that we believe may present credit concerns, default risk may arise from events or circumstances that are difficult to foresee or detect, such as fraud. In addition, ***our ability to manage credit risk may be adversely affected by legal or regulatory changes, such as restrictions on collections or changes in bankruptcy laws***. Increased credit risk, whether resulting from underestimating the credit losses inherent in our portfolio of loans, deteriorating economic conditions (particularly in Brazil), increases in the level of loan balances, changes in our mix of business or otherwise, ***could require us to increase our provisions for losses and could have a material adverse effect on our results of operations and financial condition***.

160.     In addition to the reasons set forth in paragraphs 152-55 above, the statements above were false and misleading because Defendants purported tentative warnings about what "may" or "could" pose a risk to the credit product had already transpired, rendering the purported warning about the potential nature of such risks false and misleading.

**D.     May 26, 2020 – 1Q 2020 Press Release**

161.     On May 26, 2020, StoneCo announced its first quarter 2020 financial results in a press release, filed on SEC Form 6-K on May 26, 2020 and signed by Defendant Piau, in which Defendants boasted about the new credit product and due diligence associated with it:

> Our ***credit approach***, ***which includes a rigorous credit-scoring system***, receivables lock-up, and pay-as-you-sell model, has also

56

> ***proven to be more resilient than even we expected,*** providing a
> return on asset of 2.7% per month even after COVID-19-related
> provisions.

162.     The earnings release went on to explain that while the Pandemic was contributing

to higher delinquency rates, the Company assured investors that the credit product remained safe

and profitable:

> Given the uncertainty surrounding the current scenario, we expect
> higher delinquency rates in our credit portfolio, especially from
> older cohorts of clients. However, our credit business has four key
> elements that help us keep healthy returns, even with higher
> delinquency rates.
>
> 1. Our policy has always been to not provide credit for some
> sectors that we deem to be riskier, such as airlines, seasonal
> businesses, clients that already have a lock on their receivables and
> merchants exposed to high chargeback levels.
>
> 2. ***We have improved significantly our scoring system over
> time, with daily enhancements to our algorithms, new talents
> brought in 2019 and a requirement of a minimum relationship
> period (data) that help us to be more assertive on the credit scoring.***
>
> 3. Our business model works in a merchant cash advance mode,
> in which clients pay with their sales; ***the deduction of a percentage
> of clients´ daily processed volumes provide both alignment of our
> interests with theirs and protection for us, as we receive down
> payments immediately when they engage in electronic
> transactions, regardless of their payment provider***. Additionally,
> we have local agents who know clients personally, which reduces
> the risk of fraud significantly.
>
> 4. Our pricing management provides significant protection
> against delinquency.
>
> These elements have helped maintain a healthy 2.7% per month
> return on assets (ROA) of our portfolio, despite conservative higher
> delinquency levels from COVID-19 impact already factored in our
> results.

163.     The above statements were false and misleading for the same reasons set forth in

paragraphs 152-55, above.

E.     **May 26, 2020 – 1Q 2020 Earnings Conference Call**

164.     During that day's earnings call, attended by Defendants Baldin, Matos, Pereira,

and Piau, Defendant Piau elaborated:

> Moving to our credit product. We've reached more than BRL 386
> million in total outstanding balance in the end of April, presenting a
> return on assets of 2.7% per month even after a conservative
> increase in provision for potential COVID impact. In fact, ***we have
> seen our April cohorts performing very well, which demonstrates
> our ability to adapt our credit policy to a new riskier environment.***

165.     Defendants continued to mislead investors about their "***ability to adapt*** [their]

***credit policy to a new riskier environment***" by boasting about the conservative approach to

dealing with outstanding credit payments utilizing sophisticated scoring processes.  Specifically,

during an exchange with an analyst during the investor call, Defendant Piau stated the following:

> **Daer Labarta**
> *Goldman Sachs Group Inc., Research Division*
> Great. Very helpful. I guess -- so it looks like the take rate was
> increasing, except for the higher provisions, which impacted in the
> quarter. And you showed some good loan growth there like BRL
> 386 million already in April. How large do you think that, that loan
> portfolio can get by year-end, considering the additional risk as
> well?
>
> **Thiago dos Santos Piau**
> *Chief Executive Officer*
>
> It's very difficult to provide an outlook about this, Tito, but we still
> expect a huge room to grow this year. I think that in the next 3 or 4
> quarters, we can double the amount of our outstanding credit
> balance and using a conservative approach, mainly because I think
> that as our business evolves and the way that we created this product,
> we know pretty much the transactional behavior of our clients. ***We
> are very conservative in the way that we have built our scoring
> process, and we invest a lot to keep evolving the intelligence behind
> our algorithms on a daily basis***. And now I think that with the
> regulation being the right place regarding the lock of receivables,
> we can still use -- we can already use credit sometimes as a first
> relationship with our clients because now we have the ability to lock
> receivable of the other payment providers. So those receivables,
> they are mainly backed by future sales, so the risk that you take is

that the clients will be able or not to transact in the future in any type
of different payment matters.

166.     The above statements were false and misleading for the same reasons set forth in

paragraphs 152-55, above.

**F.     August 11, 2020 – 2Q 2020 Press Release**

167.     On August 11, 2020, StoneCo announced its second quarter 2020 financial results

in a press release, filed on SEC Form 6-K on August 11, 2020 and signed by Defendant Piau, in

which Defendants assured investors of the credit product's health by using a "conservative"

approach to credit:

> Our credit portfolio grew 48% in 2Q20 (vs 1Q) to R$491 million
> driven by a 51% increase in credit clients, but our delinquency rates
> are trending downwards ***as we implemented a more conservative
> credit policy during COVID.***

168.     In addition to the reasons set forth in paragraphs 152-55, the above statement was

false and misleading because Defendants did not implement a "***more conservative credit policy***"

during the Pandemic and in reality, did the opposite by transitioning credit checks from a six-

month to three-month look-back period.

**G.     October 29, 2020 – 3Q 2020 Earnings Conference Call**

169.     On October 29, 2020, Defendants held an earnings call attended by Defendants

Baldin, Matos, Pereira, and Piau, to announce StoneCo's 3Q 2020 financial results, in which

Defendant Matos furthered attested to the progress of StoneCo's credit product:

> [T]he evolution of our credit solution…achieved a significant
> milestone last quarter, surpassing over 1 billion reais in total
> outstanding volume. More than 73,000 merchants now use these
> working capital loans, which they seamlessly pay by deducting a
> small percentage of their sales every day. ***Our product remains
> fairly conservative*** with a small duration of seven months and an
> average ticket for new loans of 19,000 reais, the equivalent of
> roughly a month of their TPV. ***We remain very focused on***

> *balancing risk and profitability, which is reflected in our relatively stable ROA and low expected losses...*
>
> *We see a huge opportunity ahead of us, and we will leverage our distribution and proprietary credit scoring model to continue to serve merchants with our working capital solutions.*

170. In addition to the reasons set forth in paragraphs 152-55, the above statements were false and misleading because as the Class Period progressed StoneCo continued to loosen its credit standards even further; going so far as to offer credit to individuals based on just days of transaction data. For example, according to CW 3, Stone was supposed to have a three-month look back period but recalled that it was often ignored based on what he witnessed. CW 3 recounted how at the end of 2020, Stone customers were getting approved for lines of credit after being customers for "only" 5, 10, or 15 days. He explained that essentially there was almost no review at all, and it just took a few days for the credit to be extended.

## H.   March 11, 2021 – 4Q 2020 Press Release

171. StoneCo announced its fourth quarter and Fiscal Year 2020 financial results in a press release, filed on SEC Form 6-K on March 11, 2021 and signed by Defendant Piau, where Defendants stated that they expected StoneCo's finances, business, operations, and prospects to continue to flourish in 2021:

> *On credit, our differentiated solution allowed us to keep growing our outstanding balance at a strong pace while constantly improving our scoring model and risk management tools. . .*
>
> *The economics of our credit solution have continued to be strong,* with *healthy risk-return levels.* The product has been presenting an ROA2 ranging from 2.0% to 2.5%, risk-adjusted-return, or RAR3, from 2.1% to 2.6% and risk-adjusted return after funding costs from 1.6% to 2.1% per month.

172. The above statements were false and misleading for the same reasons set forth in paragraphs 152-55 and 170, above.

I.        **March 11, 2021 – 4Q 2020 Earnings Conference Call**

173.    StoneCo held an earnings conference call on March 11, 2021, attended by

Defendants Baldin, Matos, Pereira, and Piau, in which Defendant Matos discussed StoneCo's

supposedly enhanced scoring model for the credit product:

> Our credit portfolio reached 1.5 billion reais, distributed among
> nearly 90 thousand clients, with healthy monthly returns ranging
> from 2% to 2.5%. ***We continue to enhance our credit scoring
> model***, provisioning and collection tools, especially as we
> experience a second wave of Covid in Brazil, with lockdowns being
> imposed in some areas. ***For this reason, we are being even more
> selective while disbursing new credit***. We have also started to
> manage ***new metrics***, such as risk-adjusted return and risk-adjusted
> return net of funding costs. These metrics better factor in the
> portfolio profitability as they essentially reflect the total IRR
> (internal rate of return) for a series of cashflows at different
> timeframes.

174.    During that call, Craig Jared Maurer from Autonomous Research LLP also asked

questions regarding the expansion of growth in the SMB credit business and StoneCo's adoption

of new risk metrics when tracking financials. Defendant Piau added to Defendant Pereira's

response regarding credit operations:

> [W]e are not changing the way that we book this operation…we
> have exactly the ***same methodology since the beginning***. What we
> are doing here is that we are ***showing new operational metrics in
> order to help everyone to track these operations***. So basically,
> going forward, we will talk about the return, the risk-adjusted return
> because it shows the internal rate of return net of losses on the best
> way possible for the whole Stone imbalance, and we are showing
> the risk-adjusted return, net of cost of funding for everyone to
> understand the internal rate of return, net of the funding process that
> we are undertaking now, and we are showing the duration of the
> outstanding balance. And we will show the outstanding balance and
> the outstanding balance net of the sale that we did to third-party
> partners. ***So everybody will understand the size of the outstanding
> balance, how much we have sold, risk-adjusted return and risk
> adjusted return net of cost of funding and the duration of the
> outstanding balance***. So I think that with these KPIs, ***everything
> can track the performance of our credit solutions. And we are very
> positive. We are very happy to see the healthy level of the returns***

*and the growth of this balance*. I think it's a way that we are really helping our clients to have access to capital so they can invest more in their operation to buy more goods to sell. And at the same time, it creates a positive take rate dynamics for the company.

175.    The above statements were false and misleading for the same reasons set forth in paragraphs 152-55 and 170, above

**J.    April 17, 2021 – StoneCo's Annual Form 20-F for FY 2020**

176.    In StoneCo's annual Form 20-F disclosures for Fiscal-Year 2020 filed on April 17, 2021, which reflected 2020 and includes Defendant Baldin as the contact person, StoneCo provided the following misleading language under a section describing risks to credit:

> *We may not be able to effectively manage individual or institutional credit risk, or credit trends that can affect spending on card products and the ability of customers and partners to pay us, which could have a material adverse effect on our results of operations and financial condition.*
>
> We are exposed to institutional credit risk, principally from credits provided to our clients. *Clients may default on their obligations to us* due to bankruptcy, lack of liquidity, operational failure or other reasons. General economic factors, such as the rate of inflation, unemployment levels and interest rates, may result in greater delinquencies that lead to greater credit losses. *A client's ability and willingness to repay us can be negatively impacted not only by economic, market, political and social conditions but by a customer's other payment obligations, and increasing leverage can result in a higher risk that customers will default or become delinquent in their obligations to us. . .*
>
> Our ability to assess creditworthiness *may be impaired if the criteria or models we use to manage our credit risk prove inaccurate in predicting future losses . . .* Thus, any material increases in delinquencies and losses beyond our current estimates *could have a material adverse impact on us*.
>
> Rising delinquencies and rising rates of bankruptcy are often precursors of future write-offs and *may require us to increase our reserve for credit losses*. Although we regularly review our credit exposure to specific clients and counterparties and to specific industries that *we believe may present credit concerns, default risk may arise from events or circumstances that are difficult to foresee*

*or detect*… In addition, our ability to manage credit risk **may** be adversely affected by legal or regulatory changes, such as restrictions on collections or changes in bankruptcy laws. Increased credit risk, whether resulting from underestimating the credit losses inherent in our portfolio, deteriorating economic conditions (particularly in Brazil), increases in the level of credit balances, changes in our mix of business or otherwise, **could** require us to increase our provisions for losses and could have a material adverse effect on our results of operations and financial condition.

177.   Defendants' statements above were false and misleading for the same reasons set forth in paragraphs 152-55, 160, and 170, above.

**K.    June 1, 2021 – 1Q 2021 Press Release**

178.   After the market closed, StoneCo announced its 1Q 2021 financial results, filed on SEC Form 6-K on June 1, 2021 and signed by Defendant Piau, stating an overall positive outlook in a press release but at the same time noting delinquencies in the Company's credit operations (blaming commerce restrictions associated with COVID):

> *Higher provisions for expected delinquency in our credit operations were influenced by more commerce restrictions in Brazil in the first quarter of 2021 amid a second wave of COVID. Despite such higher provisions, our credit portfolio grew and remains healthy, reaching a risk-adjusted-return ("RAR") net of funding costs between 1.5% and 1.9% on a monthly basis. Also, we continue to evolve in our strategy to fund our product with third-party capital and thus limit our exposure to credit risk.*
>
> *On credit, we have been improving our credit scoring model* and given the volatility in commerce activity as a result of the [P]andemic, *we have decided to increase provisions for expected losses*, which has impacted negatively our results in the first quarter of 2021. *Despite that, we believe the COVID crisis has demonstrated the resiliency of our credit business* . . .

179.   In addition to the reasons set forth in paragraphs 152-55, 168 and 170, the above statements were false and misleading because Defendants failed to disclose that the Company had already begun pulling the credit product internally due to the Company's loosened credit standards and collectability issues.  For example, when asked when StoneCo knew the Company

was going to temporarily stop disbursing credit, CW 5 recalled that it was being discussed in March, April, or May of 2021.  Likewise, according to CW 8, although it was outside his daily scope of work, he was directed to push the sales of credit products beginning in January 2021 but "very soon" after, sometime between March-May 2021, he was ordered to halt sales of the same products that he was told to push less than five months prior.  He added that at the very same time that he was ordered by his regional manager to discontinue selling the credit product, he was also informed (by his regional manager) that the decision was made by StoneCo to pull the credit product for a period of time.

### L.    June 1, 2021 – 1Q 2021 Earnings Conference Call

180.    During the earnings call held on June 1, 2021, to discuss the first quarter 2021 earnings attended by Defendants Baldin, Matos, Pereira, and Piau, an analyst asked StoneCo executives questions regarding older credit cohorts and fair value reduced in connection with higher expected delinquencies and thus, less origination of credit. Defendant Pereira responded:

> [T]he provisions that we built, this is mainly provisions for older cohorts, right? So we have to have our best estimate when we have our numbers out…***it does not change our appetite for credit for growing our solution***. ***We remain very optimistic about the prospects there.*** So just to remind you, the market is really, really big. ***So our credit solution is really in the early beginning***. So the ***opportunity is big. And the returns, even net of those delinquency, expected delinquencies that we have, we see returns around 2% a month net of delinquency. So this is a very healthy return, and we remain very enthusiastic about that solution, working capital solutions for our clients.***

181.    During the call, an analyst posed a question regarding the Company's credit product and higher expected delinquencies.  In response, Defendant Piau responded:

> Basically, at that time [2020], our model was not ready to deal with lockdowns and what happens with certain type of clients when they are close to a big period of time. So some of our clients, they are not in business anymore. So we had to adapt our models…And I think that the adjustments we did was based on the learnings and the

effects on the last year cohorts. And *I think that, that's done*. *It do[es] not reduce our appetite for this product.... It's actually the opposite* because when *you go through such difficult environment and you can operate with healthy level of returns*, you can see that the worst cohort is 0.5% amount of return. *It increase[s] your ability to provide more working capital to your clients*.... *So actually very confident with working capital solutions and credit*. I think that the learnings we had during the COVID and the lockdowns was very, very valuable for the future.

182.    The above statements were false and misleading for the same reasons set forth in paragraphs 152-55, 168, 170 and 179, above.

**M.    Facts About StoneCo's Underwriting and Collectability Issues begin to Emerge as StoneCo Abruptly Pulls Its Credit Product Amid Mounting Losses**

**1.    August 25, 2021 – StoneCo Teach-In Paper**

183.    On August 25, 2021, StoneCo issued a "teach-in paper" that explained to investors the complexities of the new registry system and why it was supposedly negatively impacting the Company.  Buried in the paper, Defendants provided a surprise disclosure that StoneCo had decided to "**temporarily stop disbursing credit**" and "**make a significant downward adjustment in the fair value of [StoneCo's] portfolio…adapt[ing] the way [StoneCo] reports credit metrics.**"  Specifically, Defendants disclosed the following:

Given these problems and uncertainty in the registry system, we felt that it was important to take a cautious approach and implement some prudent actions. So we decided to:

(i) Temporarily stop disbursing credit at beginning of June;

(ii) Adjust down our estimates on the potential recovery rate from our non-performing clients given that we are currently not able to identify the priority of our contracts that should be in place; and

(iii) Update our best estimate on the provisioning (through the fair value methodology) of credit in our second quarter results.

184.    The market reacted negatively to the news.  That day, StoneCo's share price fell approximately 4% or $2.17, to close at $52.88 per share.

185.    However, the teach-in paper misleadingly claimed that the Company was seeing higher delinquencies that expected due to "more difficult collections" and "non-performing clients:"

> *[G]iven the problems the market has faced with the accurate registration of receivables (as described in the prior sections), we are seeing higher delinquencies than what we expected and observed in prior periods*, especially due to more difficult collections and considerably worse recoveries from non-performing clients.

186.    In addition to the reasons set forth in paragraphs 152-55, 168, 170 and 179, the above statements were false and misleading because instead of attributing these issues to the Company's undisclosed loosened underwriting and credit standards, Defendants misleadingly attributed it to the new registry laws.  These statements failed to disclose that the true reason the Company was seeing increased delinquencies was not due to the change in the registry system but because of the loosened credit standards and collectability issues that the Company experienced during the Class Period rendering them false and misleading.

### 2.    August 30, 2021 – 2Q 2021 Press Release

187.    On August 30, 2021, StoneCo filed a Form 6-K with the SEC signed by Defendant Piau, stating that the Company had "observed a reduction in the expected cash flows, especially due to the reduction of observed recovery rates in delinquent loans, we have reviewed downwards the fair value of our loans portfolio."  The release went on to note that the Company experienced "mixed results" for second quarter 2021 "primarily driven by a challenging short-term scenario in our credit product" and that total revenue and income had decreased by "8.1% year over year, explained by R$ 397.2 million negative revenue contribution from credit, mainly

due to adjustments in credit fair value and significantly lower credit disbursements." Defendants also confirmed that the Company would be pulling its long-heralded credit product "[g]iven the short-term headwinds in credit" and that it was "suspending [its] previous Take Rate and Adjusted Net Margin outlooks for 2021."

188.    In the August 30, 2021 disclosure, StoneCo attached specific numbers to the delinquent loans, revealing further information to investors about the extent of the losses of the loan portfolio. Specifically, StoneCo disclosed that 35% of its credit clients were unable to pay back any principal in the last 60 days and at least 19% were unable to pay either interest or principal—far above what investors had expected.

189.    In response to this news, the Company's share price dropped $2.96, or 6%, to close at $46.54 per share on August 31, 2021, on unusually heavy trading volume.

190.    However, once again Defendants attributed the increase in loan delinquencies to the new registry system as opposed to the real reason for the losses: the Company's loose underwriting standards and collectability issues. For example, during StoneCo's August 30, 2021 2Q earnings call, Defendant Pereira responded to an analyst question, regarding the giant write-off of credit receivables, with "…*our credit product was designed to be fully collateralized*. So when we saw that the *new registry system was not working properly*, we saw that *we could not enforce those collaterals.* So given the methodology that we have been using, the fair value methodology, and we saw this happening, what we did is we decreased our expectation of recovery of nonperforming loans."

191.    Likewise, during the earnings call that same day, Defendants reassured investors that they expected Brazil's new registry system to be fixed, and "all parties to begin playing by the same rules" in just three to six months.

> . . . ***Although we recognize that our underwriting capabilities and collection process still have to evolve given the early stage of our credit solution, we believe that the malfunctioning of the providers of registry of receivables services has played an important role in the poorer-than-expected results,*** as it has enabled merchants to shift transactions to other acquiring services that in practice by-passed the collateral guarantees they had given to us. The demand from merchants, especially those more affected by lockdowns, to by-pass the "lock" of receivables met the supply of temporary alternatives by opportunistic acquirers and sub-acquirers in the market.

192.    In the August 30, 2021 press release, Defendants also reassured investors that they expected Brazil's new registry system to be fixed, and "all parties to begin playing by the same rules" in just three to six months. Defendants further reassured investors that they had taken "cautious" measures to address the problems with StoneCo's credit product, as follows:

> Our credit business remains in the early stages and ***we made some mistakes in our execution, especially not foreseeing how the malfunctioning of the registry system could harm our business***. So we decided to take a cautious approach and implemented some prudent actions, like temporarily stopping the disbursement of credit and increasing coverage for potential future losses, which impacted our reported results for the quarter. While conservative, we think this was the best course of action to try to deal with the issue head-on. We will wait for the system to be fixed, all parties to begin playing by the same rules and turnaround our execution before resuming our operations, which we think could take three to six months. We have learned a lot in the past two years of building our credit product and we remain very excited about the long-term opportunity and the material benefits to our clients.

193.    The above statements were false and misleading for the same reasons set forth in paragraphs 152-55, 168, 170, 179 and 186 above.

**N.    The Truth About StoneCo's Credit Product is Fully Revealed as the Company Again Revises Its Loan Portfolio Downwards and Confirms it Was Still Not Offering New Credit**

194.    On November 16, 2021, StoneCo issued a press release on SEC Form 6-K signed by Defendant Piau, where the Company disclosed in the 6-K's estimate section:

> As we have observed a reduction in the expected cash flows, especially due to the reduction of observed recovery rates in delinquent loans, we have reviewed downwards the fair value of our loan portfolio.

195.    Further, the percentage of non-performing loans—loans that the Company did not expect to be repaid—was now up to 48% from the 35% the Company had disclosed the previous quarter.

196.    Later that day, StoneCo announced its third quarter 2021 financial results during the earnings call.  An analyst asked about the "expected timeline to restart credit origination, how the integration with the registry of receivables is going, and when we might start to see some operating leverage in the credit business."  Defendant Matos responded that the Company "expect[s] to start retesting our original product, which is short-term loans, between the fourth quarter of '21 and the first quarter of '22."  Moreover, when asked when the credit volume would return to levels "that we saw prior to halting the origination of credit," Defendant Piau replied that StoneCo is "not ready to provide a specific guidance in terms of scaling the credit" but that the Company is "near executing the credit" and "expect[s] to start disbursing this quarter."

197.    On this news, the Company's share price fell $10.96, or 34%, to close at $20.70 per share on November 17, 2021, thereby injuring investors further.

## VI.    LOSS CAUSATION/ECONOMIC LOSS

198.    During the Class Period, as detailed herein, StoneCo and Defendants engaged in a course of conduct that artificially inflated and/or artificially maintained the price of StoneCo securities and operated as a fraud or deceit on the Class Period purchasers of StoneCo securities by making the materially false and misleading statements and omissions recited above.

199.    When the truth was disclosed and became known to the market, the price of

StoneCo securities declined abruptly as the prior artificial inflation was removed from the price

of the stock.  As a result of their purchases of StoneCo securities at artificially inflated prices

during the Class Period, Lead Plaintiff and other members of the Class suffered a substantial

economic loss (*i.e.*, damages under the federal securities laws).  The price decline in StoneCo

securities was a direct result of the nature and extent of the materially false and misleading

statements and omissions revealed to investors and the market.  Thus, the Defendants' wrongful

conduct, as alleged herein, directly and proximately caused the damages suffered by Lead

Plaintiff and the Class.

200.    The truth about StoneCo's business was disclosed through a series of corrective

disclosures and/or materializations of undisclosed risks beginning on August 25, 2021.  During

this period, StoneCo's stock fell precipitously as the artificial inflation caused by Defendants'

unlawful conduct affected StoneCo's stock price.  It was not until the final corrective disclosure

and/or materialization of concealed risk on November 16, 2021, that the full truth was known to

the market, such that there was no longer any artificial inflation in StoneCo's stock price

attributable to the fraud.

201.    The declines in StoneCo's stock price during this period, including the declines

summarized below, are directly attributable to the market absorbing information that corrected

and/or reflected the materialization of risks concealed by Defendants' material

misrepresentations or omissions.

202.    As a result of their purchases of StoneCo securities during the Class Period, Lead

Plaintiff and the other Class members suffered economic loss (*i.e.*, damages) under the federal

securities laws.  Defendants' materially false and misleading statements had the intended effect and caused StoneCo securities to trade at artificially inflated levels throughout the Class Period.

203.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of StoneCo's credit business.  As the truth about the Company and the extent of the fraud was revealed to the market, the price of StoneCo securities fell significantly.  These declines removed the inflation from the price of StoneCo securities, causing real economic loss to investors who had purchased StoneCo securities during the Class Period.

204.    Each decline in the price of StoneCo securities, as detailed below, was a direct or proximate result of the nature and extent of Defendants' fraudulent misrepresentations and/or omissions being revealed to investors and the market.

205.    The economic loss (*i.e.*, damages) suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of StoneCo securities and the subsequent significant decline in the value of StoneCo securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

206.    The market for StoneCo securities was open, well-developed, and efficient at all relevant times, with average daily trading volume of approximately 2,994,291 shares during the Class Period.  As a result of Defendants' misstatements and material omissions, as alleged herein, StoneCo's securities traded at artificially inflated prices.  Lead Plaintiff and other Class members purchased StoneCo securities relying upon the integrity of the market relating to StoneCo securities and suffered economic losses as a result thereof.

207.    The declines in StoneCo securities price on August 25, 2021, August 31, 2021, and November 17, 2021, were a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors during and after the market closed on

August 25, 2021, August 30, 2021, and November 16, 2021.  The timing and magnitude of the

declines in StoneCo securities evidence the impact Defendants' statements had on the

Company's stock price during the Class Period and negate any inference that the loss suffered by

Lead Plaintiff and other Class members was caused by changed market conditions or

macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent

conduct.

A.      **August 25, 2021 – First Corrective Disclosure/Materialization of the Risk**

208.    On August 25, 2021, the relevant truth and foreseeable risks concealed by

Defendants' misconduct and their false representations and omissions during the Class Period

were partially revealed and/or materialized in connection with StoneCo's publications of the

teach-in paper which revealed for the first time that StoneCo had decided to "**temporarily stop**

**disbursing credit**" and "**make a significant downward adjustment in the fair value of**

**[StoneCo's] portfolio . . . adapt[ing] the way [StoneCo] reports credit metrics.**"  Specifically,

Defendants disclosed the following:

> Given these problems and uncertainty in the registry system, we felt
> that it was important to take a cautious approach and implement
> some prudent actions. So we decided to:
>
> (i) Temporarily stop disbursing credit at beginning of June;
>
> (ii) Adjust down our estimates on the potential recovery rate from
> our non-performing clients given that we are currently not able to
> identify the priority of our contracts that should be in place; and
>
> (iii) Update our best estimate on the provisioning (through the fair
> value methodology) of credit in our second quarter results.

209.    The August 25, 2021 disclosure that StoneCo was making a significant downward

adjustment to its credit portfolio and was pulling its credit product from the market and news

related thereto was a foreseeable consequence of, and within the zone of risk concealed by,

Defendants' representations and omissions concerning the safety and profitability of the credit product.  This disclosure partially revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions touting the Company's credit product.

210.    As a direct and proximate result of this partial corrective disclosure and/or materializations of foreseeable risk concealed by Defendants' fraud, on August 25, 2021, StoneCo's share price fell approximately 4% or $2.17, to close that day at $52.88 per share.

211.    Financial news outlets absorbed Defendants statements quickly.  For example, that day Seeking Alpha, a financial news website, published an article entitled "StoneCo stock drops 4% after regulatory change results in higher delinquencies," which noted that the stock price fell "after the Brazilian fintech discloses that it's seeing higher delinquencies than it expected and observed in prior periods due to a regulatory change in the way Brazil registers receivables."

212.    However, despite this partial disclosure of adverse news, which removed some of the artificial inflation in StoneCo's share price, its share price remained artificially inflated after this announcement as Defendants knew but failed to disclose, or deliberately disregarded, that the true reason for the downward adjustment to the loan portfolio and pulling of the credit product was due to the Company's loosening of its credit standards and collectability issues that existed throughout the Class Period.

213.    Further, the Company's share price remained artificially inflated even after the August 25, 2021 teach-in paper was released because, as described in paragraphs 185-86, *supra*, Defendants falsely reassured investors that the reason for the problems with the credit product was related to the new Brazilian registry laws enacted in June of 2020.  These statements misled investors about the state of the Company's credit product and left them in the dark regarding

Defendants' prior undisclosed actions loosening StoneCo's credit standards and the related collectability issues.  As a result, the Company's share price continued to trade at artificially inflated prices.

**B.      August 30, 2021 – Second Corrective Disclosure/Materialization of the Risk**

214.    On August 30, 2021, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were partially revealed and/or materialized in connection when StoneCo revealed for the first time specific numbers related to the Company's loan portfolio, the number of delinquent loans, and information about the extent of the losses of the loan portfolio.  Specifically, StoneCo disclosed that 35% of its credit clients were unable to pay back any principal in the last 60 days and at least 19% were unable to pay either interest or principal—far above what investors had expected.  Further, StoneCo's announced "mixed results" for the second quarter 2021 and confirmed that the Company would stop issuing credit.  The Company also explained that the mixed results were "primarily driven by a challenging short-term scenario in our credit product" and that total revenue and income had decreased by "8.1% year over year, explained by R$ 397.2 million negative revenue contribution from credit, mainly due to adjustments in credit fair value and significantly lower credit disbursements."

215.    The August 30, 2021 disclosure revealing the extent of the Company's significant downward adjustment to its credit portfolio, confirmation that it was pulling its credit product from the market and news related thereto was a foreseeable consequence of, and within the zone of risk concealed by, Defendants' representations and omissions concerning the safety and profitability of the credit product.  This disclosure partially revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions touting the Company's credit product.

216.    As a direct and proximate result of this partial corrective disclosure and/or materializations of foreseeable risk concealed by Defendants' fraud, on August 31, 2021 the Company's share price plummeted $2.96, or 6%, to close at $46.54 per share on August 31, 2021.

217.    Analysts relied on Defendants' statements regarding the cause of StoneCo's issues.  For example, Guggenheim filed an analyst report on August 31, 2021, discussing StoneCo's 2Q 2021 results, specifically "[t]he severity of the credit-related headwinds were a surprise, in our view - and the short-term backdrop in credit looks challenging for [StoneCo] given the difficulties in Brazil getting the new national registry of receivables up . . ."  Further, the report noted that "this is a transitory issue that will eventually pass as the appropriate regulatory guardrails are eventually put into place."

218.    Likewise, an analyst report also filed on August 31, 2021 from HSBC Global Research, indicated shock at the extent of the losses from the credit product noting "[w]hile management had communicated previously that provisions in 2Q will be high due to malfunctioning of the registry of receivables, we believe the magnitude was higher than anticipated by the market."  J.P. Morgan issued an analyst report on August 30, 2021, entitled "2Q21: Lending Substantially worse than expected" and explained:

> Results were characterized by substantial losses in Stone's lending portfolio. Notably, Stone reported that 35% of its clients were unable to pay any principal in the last 60 days and 19% were unable to pay either interest or principal—this compares to NPLs in the SME segment usually gravitating around 10%. We were surprised to see Stone further reducing NPV of its loans on ~R$397mn in addition to an already ~R$116mn done in 1Q21.

219.    However, despite this partial disclosure of adverse news, which removed some of the artificial inflation in StoneCo's share price, its share price remained artificially inflated after

this announcement as Defendants knew but failed to disclose, or deliberately disregarded, that the true reason for the downward adjustment to the loan portfolio and pulling of the credit product was due to the Company's loosening of its credit standards and collectability issues.

220.   Further, the Company's share price remained artificially inflated even after the August 30, 2021 disclosure because, as described in paragraphs 190-93, *supra*, Defendants falsely reassured investors that the reason for the problems with the credit product was related to the new Brazilian registry laws enacted in June of 2020 and claimed that they would be reinstating the credit program in the near future.  These statements misled investors about the state of the Company's credit product and left them in the dark regarding Defendants' prior undisclosed actions loosening StoneCo's credit standards and the related collectability issues. As a result, the Company's share price continued to trade at artificially inflated prices.

**C.**     **November 16, 2021 – Final Corrective Disclosure/Materialization of the Risk**

221.   On November 16, 2021, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were fully revealed and/or materialized when StoneCo announced its third quarter 2021 financial results.  Specifically, StoneCo issued a press release wherein the Company disclosed for the first time a further reduction of observed recovery rates in delinquent loans and a further downward adjustment of the fair value of its loan portfolio.  Specifically, the percentage of non-performing loans—loans that the Company did not expect to be repaid—was now up to 48% from the 35% the Company had disclosed the previous quarter.

222.   Later that day, StoneCo announced its third quarter 2021 financial results during the earnings call.  An analyst asked about the "expected timeline to restart credit origination, how the integration with the registry of receivables is going, and when we might start to see some operating leverage in the credit business."  Defendant Matos responded that the Company

"expect[s] to start retesting our original product, which is short-term loans, between the fourth quarter of '21 and the first quarter of '22."  Moreover, when asked when the credit volume would return to levels "that we saw prior to halting the origination of credit," Defendant Piau replied that StoneCo is "not ready to provide a specific guidance in terms of scaling the credit."

223.    The November 16, 2021 disclosure revealing the further extent of the Company's significant downward adjustment to its credit portfolio and inability to confirm when or if it would be able to scale the credit product was a foreseeable consequence of, and within the zone of risk concealed by, Defendants' representations and omissions concerning the safety and profitability of the credit product.  This disclosure fully revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions touting the Company's credit product.

224.    As a direct and proximate result of this partial corrective disclosure and/or materializations of foreseeable risk concealed by Defendants' fraud, the Company's share price fell 34%, or $10.96 to close at $20.70 per share on November 17, 2021.

225.    Analysts reacted negatively to this update and attributed the bad news to the Company's failed credit product.  For example, JP Morgan issued an analyst report that day stating, "On the lending side, NPLs rose further 48% of the portfolio without paying principal vs 35% in 2Q21 and coverage over those late loans stood at 102%. Given small balance contraction we wouldn't rule out further impairments/provisions in upcoming quarters.  Management expects small attempts to lend again in upcoming quarters, but no guidance of meaningful lending contribution was provided."

226.    The same day Evercore also reported "For 3Q/21 . . . EPS fell sharply below our forecasts and consensus given . . . increasing financial expenses. On a YoY (*i.e.*, Year over year)

basis, the primary drivers of the weaker-than-expected results included: 1) a R$181 million headwind from halting new credit origination . . . Decreasing Price Target…given the ongoing uncertainty regarding [StoneCo's] ability to successfully originate credit and pass-through higher funding costs."

227.   And on November 17, 2021, Credit Suisse reported that, "Q3: Negative on low profitability . . . the absence of credit revenues…were, and should continue to be, headwinds for margins . . . Credit to enter on test mode. Credit origination was virtually zero in Q3 as well as its contribution to revenues (no additional provisions)."

228.   Further, that same day analysts from Morgan Stanley reported, "Weak results from Stone, driven by higher operating costs and financial expenses . . . On the back of the complicated lending issues this year, we think the market expects/needs more transparency and specificity from management."

## VII.   ADDITIONAL INDICIA OF SCIENTER

229.   Defendants were active and culpable participants in the fraud, as evidenced by their knowing and reckless issuance and/or ultimate authority over StoneCo's and the Individual Defendants' materially false or misleading statements and omissions. The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements more specifically set forth in Section V were materially false or misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws. In addition to the specific facts alleged above, Defendants' scienter is further evidenced by the following facts:

### A.   The Credit Product Was a Core Operation of StoneCo's Business

230.   *First*, Defendants' knowledge that StoneCo had materially loosened the Company's credit standards and were experiencing collectability issues with respect to

borrowers' use of competitor POS devices and its impact on increased delinquency rates can be inferred because these facts were critical to StoneCo's core operations.

231.    Notably, both before and throughout the Class Period, Defendants touted the importance of StoneCo's credit product and how critical this product was for the future growth and success of the Company.  As set forth above, Defendants saw the credit product as a massive opportunity for the Company and investors alike.

232.    Throughout the Class Period, Defendants attested to the importance of credit as an opportunity, telling investors that the potential for the product was much more than just R$75 Billion but actually closer to R$200 Billion.  Specifically, during an S&P Global Market Intelligence interview held during the Class Period, Defendant Piau told investors that **"[t]he prospect for lending in Brazil is really big. For [StoneCo], it is a 200 billion reais opportunity**."

233.    That the credit product was one of StoneCo's core operations is further demonstrated by analysts' constant focus on the expectations associated with Defendants pursuing credit loan originations.  For instance, JP Morgan reported right before the Class Period on February 27, 2020, "Stone[Co]'s new lending venture, in our view, could yield additional substantial revenues. Stone[Co]'s cross-selling abilities should continue to foster new revenue streams."

234.    On March 2, 2020, Citi Research reported "[a]ccording to management, the working capital credit offering has been growing steadily . . . NPL levels are currently at low single digits. While the business is still not very representative in terms of total revenues for Stone[Co], management expects it to grow a lot in 2020."  Likewise, on February 4, 2021, Credit Suisse published a report titled, "Pedal to the Metal; Upgrade to Outperform," in which the

analysts raved about StoneCo's new credit endeavor by stating "***High expectations for credit. We should see a good expansion in credit origination throughout 2021, as past cohorts have been performing well with controlled delinquency*** and ROAs have been running at healthy levels (2.5% per month)." Further, on February 8, 2021, JP Morgan issued a report stating "Summary Investment Thesis and Valuation: …***Stone's new lending venture***, in our view, ***could yield additional substantial revenues***."

236. Finally, On April 13, 2021, UBS published an analyst report titled, "StoneCo Solid strategy and attractive entry point; upgrading to Buy." UBS predicted growth for StoneCo's credit solutions and noted that it is "**strategically important for Stone**" to increase cross-sell of its products, such as offering more than one solution to their clients.

236. Importantly, Defendants also had access to data that reflected the fact that its borrowers were not repaying their loans and were using competitor devices to avoid repaying StoneCo. As set forth in Section IV. F above, Defendants had access to StoneCo's internal operational reporting program known as *Marco Polo*. Through *Marco Polo*, Defendants had insight into the fact that its customers were not going to repay their loans because it could, and did, send alerts if there was at least thirty days of merchant inactivity on the Company's POS machines, indicating the use of a competitor POS or default.

237. Numerous CWs attested to Defendants' use of *Marco Polo* to access and track credit data. For example, CW 1 explains that he, his supervisors, and everyone up through his chain of command, including Defendants André Street de Aguiar and Eduardo Cunha Monnerat Solon de Pontes had access to *Marco Polo* and "the data." Further, according to CW 1, Defendants Street and Pontes could access information from the POS and credit product lines of business "at any time," and that gave them a "full understanding" of the "sales numbers."

238.    In addition to *Marco Polo*, senior leadership had access to and tracked losses through weekly, monthly, quarterly, and annual reports and thus, knew and had intimate knowledge of the failure of the credit product.  For example, CW 6 explained that his Risk Analysis group monitored three types of losses – fraud, business risk, and POS losses in the "Five Biggest Losses" reports.  Further, CW 6 explains that there were reports with some losses provided on a weekly basis.  Further, these reports were also reviewed at quarterly meetings with CEO Thiago dos Santos Piau present.  CW 10 advised that the executives at StoneCo were absolutely aware of the changes in TPV and the high churn at StoneCo when the Pandemic began."  CW 1 advised that Defendant Baldin's name was "always on" presentations given, and internal emails about the POS and credit products.

**B.    Defendants' Statements Themselves Support Scienter**

239.    *Second*, as discussed above, Defendants spoke repeatedly and at length during the Class Period about StoneCo's delinquency rates, TPV, and the Company's credit scoring model. These false and misleading statements and others like it, provide a strong inference that Defendants were aware of or, at the very least, were reckless in not knowing that StoneCo's credit product was failing, and merchants were failing to make loan payments.  Accordingly, Defendants breached their duty under the federal securities laws by speaking about these topics and failing to fully disclose all relevant material information while doing so.

240.    For example, in the March 2, 2020 4Q 2019 earnings release, Defendants stated "[w]e continue to improve our credit offering to be able to offer our product to a larger base in 2020. ***The growth of our credit solution is being ruled by low delinquency rates***, currently at mid-single digits."

241.    Likewise, in  the May 26, 2020 1Q 2020 press release, Defendants touted the new credit product and supposed due diligence associated with it, stating: "***[o]ur credit approach***,

***which includes a rigorous credit-scoring system, receivables lock-up, and pay-as-you-sell***

***model, has also proven to be more resilient than even we expected*** providing a return on asset

of 2.7% per month even after COVID-19-related provisions."  The press release continued: ***[w]e***

***have improved significantly our scoring system over time, with daily enhancements to our***

***algorithms, new talents brought in 2019 and a requirement of a minimum relationship period***

***(data) that help us to be more assertive on the credit scoring.***"

242.   Defendants' repeated detailed statements to investors about StoneCo's credit

scoring system and collectability rates demonstrate that Defendants either knew that StoneCo

was experiencing credit problems or were reckless in not knowing or investigating that this was

the case. In either scenario, there is a strong inference that Defendants made these statements

with scienter.

## VIII.   CLASS ACTION ALLEGATIONS

243.   Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a Class of all persons and entities that purchased or

otherwise acquired the publicly traded common stock of StoneCo during the period from March

2, 2020 through November 16, 2021, both dates inclusive.  Excluded from the Class are: (i)

Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii)

any person who was an officer or director of StoneCo during the Class Period; (iv) any firm,

trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v)

StoneCo's employee retirement and benefit plan(s), if any, and their participants or beneficiaries,

to the extent they made purchases through such plan(s); and (vi) the legal representatives,

affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

244.   The members of the Class are so numerous that joinder of all members is

impracticable.  Throughout the Class Period, StoneCo's shares actively traded on the NASDAQ.

While the exact number of Class members is unknown to Lead Plaintiff at this time and can only

be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least

hundreds or thousands of members in the proposed Class.  Millions of StoneCo shares were

traded publicly during the Class Period on the NASDAQ.  Record owners and other members of

the Class may be identified from records maintained by StoneCo or its transfer agent and may be

notified of the pendency of this action by mail, using the form of notice similar to that

customarily used in securities class actions.

245.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all

members of the Class are similarly affected by Defendants' wrongful conduct in violation of

federal law that is complained of herein.

246.    Lead Plaintiff will fairly and adequately protect the interests of the members of

the Class and has retained counsel competent and experienced in class and securities litigation.

247.    Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class. Among the

questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as

alleged herein;

(b)    whether statements made by Defendants to the investing public during the

Class Period omitted and/or misrepresented material facts about the business, operations, and

prospects of StoneCo;

(c)    Whether, and to what extent, the market price of StoneCo common stock

was artificially inflated during the Class Period because of the material misstatements alleged

herein;

(d)      Whether Defendants acted with the requisite level of scienter;

(e)      Whether Defendants Piau, Matos, Pereria, Baldin, Street and Pontes were controlling persons of StoneCo; and,

(f)      Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of such damages.

248.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX.    PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

249.    To the extent that Lead Plaintiff alleges that Defendants made affirmative misstatements, Lead Plaintiff will rely upon the presumption of reliance established by the fraud on-the-market doctrine in that, among other things:

(a)      Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)      the omissions and misrepresentations were material;

(c)      the Company's securities traded in an efficient market;

(d)      the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)      Lead Plaintiff and other members of the Class purchased StoneCo securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

(f)     StoneCo stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(g)     According to the Company's Form 20-F filed on April 29, 2022, the Company had approximately 312,531,248 shares outstanding as of the date of the filing, demonstrating a very active and broad market for StoneCo securities;

(h)     StoneCo filed periodic public reports with the SEC;

(i)     StoneCo regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services, the Internet and other wide-ranging public disclosures;

(j)     StoneCo was followed by several securities analysts employed by major brokerage firms including Bank of America, JP Morgan, UBS, Credit Suisse, HSBC, and Wells Fargo, which wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms, were publicly available, and entered the public marketplace;

(k)     Unexpected material news about StoneCo was rapidly reflected in and incorporated into the Company's stock price during the Class Period; and

(l)     There were market makers for StoneCo's shares during the Class Period.

250.    As a result of the foregoing, the market for StoneCo securities promptly digested current information regarding StoneCo from publicly available sources and reflected such information in StoneCo's share price.  Under these circumstances, all persons and entities who purchased or otherwise acquired StoneCo securities during the Class Period suffered similar injury through their purchase of StoneCo at artificially inflated prices and the presumption of reliance applies.

251.    To the extent that the Defendants concealed or improperly failed to disclose material facts with respect to StoneCo and its business in Brazil, Lead Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## X.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

252.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  To the extent certain statements alleged to be false or misleading are determined to be mixed statements of historical or present information and future information, such statements are not entitled to the safe harbor with respect to the part of the statement that refers to historical or present conditions.

253.    To the extent certain of the statements alleged to be false or misleading may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

254.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of StoneCo who knew that the statement was false when made.

## XI.   CONTROL PERSON ALLEGATIONS

255.   The Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company and were directly involved in the day-to-day operations of the Company at the highest levels.  The Individual Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

256.   The Individual Defendants, as senior executive officers of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to StoneCo during the Class Period.  The Individual Defendants were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected.  Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

257.   The Individual Defendants, because of their positions of control and authority as senior executive officers and directors, had access to the adverse undisclosed information about StoneCo's business through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at regularly-held meetings, as well as other management and Board of Directors meetings thereof, and reports and other information provided to them in connection therewith.

258.   As senior officers and controlling persons of a publicly held company whose common stock was, during the relevant time, registered with the SEC pursuant to the Exchange

Act and traded on the NASDAQ, the Individual Defendants each had a duty to promptly

disseminate accurate and truthful information with respect to StoneCo's operations and business,

and to correct any previously issued statements that were or had become materially misleading or

untrue, so that the market price of StoneCo securities would be based upon truthful and accurate

information. The Individual Defendants' wrongdoing during the Class Period violated these

specific requirements and obligations.

259.    The Individual Defendants are liable as primary participants in a wrongful scheme

and course of business that operated as a fraud and deceit on all persons and entities who

purchased or otherwise acquired StoneCo securities during the Class Period, which included the

dissemination of materially false and misleading statements (both affirmative statements and

statements rendered misleading because of material omissions) regarding StoneCo's electronic

commerce offerings to its credit customers in Brazil and its failure to adequately conform to

Brazil's regulatory standards for credit offerings.

260.    The scheme: (i) deceived the investing public regarding StoneCo's operations

and the true value of StoneCo's securities, and (ii) caused Lead Plaintiff and other members of

the Class to purchase or otherwise acquire StoneCo securities at artificially inflated prices.

261.    In making the statements complained of herein, the Individual Defendants, who

were senior officers and controlling persons of StoneCo, were acting on behalf of the Company

in the regular course of business. Therefore, each of the statements made by the Individual

Defendants is attributable to the Company.

## XII.   CAUSES OF ACTION

### COUNT  I

**For Violation of §10(b) of the Exchange Act
and Rule 10b-5 against Defendants StoneCo, Piau, Pereira, Matos, and Baldin**

262.    Lead Plaintiff repeats, incorporates, and realleges each and every allegation
contained above as if fully set forth herein.

263.    During the Class Period, Defendants carried out a plan that was intended to, and
did: (a) deceive the investing public, including Lead Plaintiff and the Class; and (b) artificially
manipulate the price of StoneCo securities.

264.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made
untrue statements of material fact and/or omitted material facts necessary to make the statements
made not misleading; and (c) engaged in acts, practices and a course of conduct that operated as
a fraud and deceit upon purchasers of StoneCo securities in violation of §10(b) of the Exchange
Act and Rule 10b-5. Defendants are sued as primary participants in the wrongful and illegal
conduct charged herein.

265.    Defendants, individually and in concert, directly and indirectly, by the use, means
or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a
continuous course of conduct to conceal the adverse material information as specified herein.

266.    Defendants' liability arises from the fact that they developed and engaged in a
scheme to manipulate the price of StoneCo securities and were aware of the dissemination of
information to the investing public that they knew or recklessly disregarded to be materially false
and misleading.

267.    Defendants had actual knowledge of the misrepresentations, omissions, and
deceptive conduct alleged herein, or acted with reckless disregard for the truth. Defendants' acts

were done for the purpose and effect of concealing the scheme alleged herein from the investing

public, and to artificially manipulate the market price of StoneCo securities.

268.    By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act

and Rule 10b-5 promulgated thereunder.

269.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff

and members of the Class suffered damages in connection with their respective purchases and

sales of StoneCo securities during the Class Period.

**COUNT  II**

**For Violation of §20(a) of the Exchange Act
against the Individual Defendants**

270.    Lead Plaintiff repeats, incorporates, and realleges each and every allegation

contained above as if fully set forth herein.

271.    The Individual Defendants had control over StoneCo and made the materially

false and misleading statements and omissions on behalf of StoneCo within the meaning of

§20(a) of the Exchange Act as alleged herein. By virtue of their executive positions and their

culpable participation, as alleged above, the Individual Defendants had the power to influence

and control and did, directly or indirectly, influence and control the decision making of the

Company, including the content and dissemination of the various statements that Lead Plaintiff

contend were false and misleading. The Individual Defendants were provided with or had

unlimited access to the Company's internal reports, press releases, public filings, and other

statements alleged by Lead Plaintiff to be misleading prior to or shortly after these statements

were issued, and had the ability to prevent the issuance of the statements or cause them to be

corrected.

272.    In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein. StoneCo, in turn, controlled the Individual Defendants and all of its employees.

273.    By reason of such wrongful conduct, Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A.    Determining that this action is a proper class action, designating Lead Plaintiff as Lead Plaintiff and certifying Lead Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such other and further relief as the Court may deem just and proper.

## XIV.   JURY TRIAL DEMAND APPLICABLE TO ALL CLAIMS

Lead Plaintiff demands a trial by jury.

Dated:  August 8, 2022                     **LABATON SUCHAROW LLP**

By: /s/ *Michael P. Canty*
Michael P. Canty
Thomas G. Hoffman, Jr.
James T. Christie
Michelle V. Cooper
140 Broadway
New York, New York 10005
Telephone: 212-907-0700
Facsimile: 212-818-0477
Email:   mcanty@labaton.com
            thoffman@labaton.com
            jchristie@labaton.com
            mcooper@labaton.com

*Lead Counsel for Lead Plaintiff Indiana Public*
*Retirement System and the Proposed Class*