MAEBRAYC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

RONALD F. RAY, *individually
and on behalf of others
similarly situated*,

                 Plaintiff,

          v.                         21 Civ. 9620 (GHW)

STONECO. LTD, *et al*,

                 Defendants.
                                     Conference
------------------------------x
                                     New York, N.Y.
                                     October 14, 2022
                                     9:00 a.m.

Before:

                    HON. GREGORY H. WOODS,

                                     District Judge


                         APPEARANCES

LABATON & SUCHAROW, LLP
     Attorneys for Plaintiffs
BY:  MICHAEL P. CANTY
     JAMES T. CHRISTIE

QUINN EMANUEL URQUHART & SULLIVAN
     Attorneys for Defendants
BY:  MICHAEL B. CARLINSKY
     LEIGHA EMPSON
     JACOB J. WALDMAN

MAEBRAYC

THE COURT:  Let me begin by taking appearances from the parties.  I'll begin with counsel for plaintiff.  Who's on the line for plaintiff?

MR. CANTY:  On behalf of the plaintiffs, you have Michael Canty from Labaton & Sucharow.

Good morning, your Honor.

THE COURT:  Thank you.

MR. CHRISTIE:  You also have James Christie from Labaton & Sucharow on behalf of the plaintiffs as well.

THE COURT:  Good. Thank you very much.  Who's on the line on behalf of the defendants?

MR. CARLINSKY:  Good morning, your Honor. It's Michael Carlinsky from Quinn Emanuel. I'm with here with two of my colleagues.  I'll introduce them, Jacob Waldman and Leigha Empson, both from Quinn Emanuel.

THE COURT:  Good.  Thank you.  Let me begin with a few brief instructions about the rules that I'd like the parties to follow during this conference.  At the outset, please remember that this is a public proceeding.  Any member of the public or press is welcome to dial into this call.  I'm not presently monitoring whether or not people are auditing the conference, so I just ask you to keep that possibility in mind.

Second, please state your name each time that you speak.  Do that even if you've spoken previously.  Third, please keep your devices on mute at all times, except when

MAEBRAYC

you're speaking to me or to a representative of a party. Fourth, please abide by instructions from our court reporter that are designed to help her do her job. And finally, I'm ordering that there be no recording or rebroadcast of all or any portion of today's conference.

Counsel, with that out of the way, let's talk about the issue that brings us here; namely, the application by counsel for defendants for leave to file a motion to dismiss the complaint. Counsel, I've read each of your respective letters, so I think I have a sense of the issues that you expect to bring to me. Still, it can be helpful for me to hear from the parties about the grounds for the motion as we set a schedule.

So counsel for defendants, what are the grounds for the proposed motion to dismiss?

MR. CARLINSKY: Thank you, your Honor. It's Michael Carlinsky. With the Court's indulgence, there are two main issues. One is that the statements that are alleged to be false and misleading are not for various reasons. The second main argument is the failure to plead scienter. And with the Court's indulgence, I would have Ms. Empson, my colleague, address the Court on that issue. And I'd like to start briefly giving the Court a preview with respect to the first issue, the lack of falsity with regards to the statements.

THE COURT: Thank you. Please proceed.

MAEBRAYC

MR. CARLINSKY:  Thank you, your Honor.  Just by way, I know the Court has some familiarity.  I'm just going to mention again, the defendant company here is StoneCo.  It is a Fintech, a financial technology company located in Brazil.  It's primary business was, it sold point-of-sale devices like cash registers and credit card processing systems.  And its main source of revenue is it would generate a percentage for transactions that were run through its credit processing system.

In 2019, the company began offering a credit product, so it would make small, relatively small loans to businesses that it was processing for.  And the way in which it would recoup those loans, both principal and interest, was by charging a higher percentage of the processing.  So where you might charge two percent, for example, on processing, if there were a loan made, the company might charge five or six percent and the delta being repayment over time of the amount of those loans.

The statements here I think can be described as, or at least what the plaintiffs alleging, is that StoneCo made false and misleading statements regarding its credit product because it allegedly made changes to its due diligence standards that it applied to credit applicants during the 2020 through 2021 time period.

And again just briefly, one of the allegations is that the company channeled its look-back period.  That's the length

MAEBRAYC

of time that a borrower had been using StoneCo's devices or credit processing systems, and that that period changed from six months to three months.  That StoneCo also stopped using third-party credit checking company, and instead began performing certain checks internally; that customers who had taken loans stopped using StoneCo's processing systems -- that was really the way to recoup the loan as I mentioned, and started using other companies credit processing systems to avoid having to pay back those loans.

And so what the complaint alleges is that of these developments rendered prior statements that StoneCo had made.  For example, statements that its credit product was, "conservative," or "resilient," or that the company was selective into whom it made -- or to whom it made these loans, they were rendered false and misleading.  When later on in 2021 -- and I'll talk about what the alleged corrective disclosures were -- that the company started to have some negative financial results attributed, at least in part, to the credit product itself.

Now, just to be clear, your Honor -- and of course if I'm going too fast -- and your Honor will interject at any point in time, but also I'm mindful of the court reporter.  If I'm going too fast, please just have me slow down.

But the complaint does not allege that the company ever told the market that it was using a six-month look-back

MAEBRAYC

period, when it allegedly was using only a three month.  The complaint does not allege that the company ever represented it was using a third-party credit check service when it changed to using internal credit checks.

And perhaps most importantly, there's no allegation that any of the financial metrics or the historical financial results were false or inaccurate.  What the complaint really takes issue with is adjectives, adjectives, the way in which the company described the status of its credit product.  And we think that this amounts to a typical fraud by hindsight complaint where what the plaintiff is alleging is the company must have made misrepresentations regarding this product because later on this product wind up performing worse than had been expected.

Just a quick word on the corrective disclosures, and then I really will try to get right to the point.  In June of 2021, in Brazil the law changed such that there was something called a registry system.  It was first disclosed in June of -- well, it was first implemented officially in June of 2021.  There were prior indications that it would be coming.  And what it did was, it required that every loan be registered pursuant to a registry; and so that a first priority loan would be repaid irrespective of whose processing system was being used.

And in August of 2021, StoneCo issued a Teachn, T-E-A-C-H-N, paper as it was called which talked about this new

MAEBRAYC

registry system and how it had flaws that were negatively impacting the company.  The company announced that it had stopped disbursing credit in June in part because of this new system and that it was revising downward its potential recovery rate from credit clients.

And plaintiffs allege, well, this must have then meant that all of the prior statements were misleading because the company must have been loosening its credit or due diligence standards.  In August of 2021, the company announced 35 percent of the loans would not likely be repaid and then revise that to a higher percentage in November of 2021, and then of course the company stock was impacted.

So with regard to the statements here.  As I said, your Honor, at the outset, the plaintiffs have not identified materially false or misleading statements.  The first point -- and I think your Honor's decision in the *Greco* case, which the Court decided, in fact, just a month ago, is really a great analogue for this case.  But with regard to this case, statements, of course, like the credit product was, "conservative," "resilient," "selective," "under tight control," those are classic puffery, and they cannot give rise to actionable misstatements.

Similarly, statements of optimism, like the credit product was a huge opportunity or perceived to be a huge opportunity, again fall into the category of puffery.  There

MAEBRAYC

are a number of statements that are identified that we think are pure opinion. So aside from puffery -- and some of them overlap. They fall into both categories -- but are statements of opinion. An example would be, "We are very optimistic about the prospects," of the credit product, or describing that product as a huge opportunity -- statements of opinion. There are no allegations in the complaint that those views were not honestly believed at the time they were made.

A third category are forward-looking statements. And of course here, as the Court well knows, and as the *Greco* case points out, when those statements are accompanied as cautionary language, as they are here in the 20(f) in the press releases and the annual filings, they can't be actionable.

And then just lastly, some of the statements -- and I gave the Court a few examples. There's just no allegation that they were materially false. So the allegation that the company went from a six-month to a three-month look-back period, there's no falsity because there was no statement prior that the company was using a six-month look-back period, or the same for the third-party credit checks.

So we think that when the Court has the opportunity to consider the various alleged misstatements in context as the Court did in the *Greco* case -- and is of course warranted. Those statements all fall into one or multiple buckets which are not actionable misstatements. I'll pause for a moment,

MAEBRAYC

your Honor. I'd like to hand off the baton to Ms. Empson to address the scienter or the lack thereof.  I don't know if the Court had any questions for me.  But if not, I'll pass the baton.

THE COURT:  Thank you.  Please feel free to do so.

MR. CARLINSKY:  Thank you, your Honor.

MS. EMPSON:  This is Leigha Empson also for StoneCo. Your Honor, we also intend to move to dismiss the complaint for the additional reason that it fails to allege fraudulent intent, because there are no allegations in the complaint that establishes strong inference that any defendant knew that any public statement was false or misleading at the time they made the complaint -- at the time they made the statement rather.

Generally scienter can be established by motive or knowledge of contrary facts.  And in this particular case, plaintiff did not even attempt to allege a unique motive to defraud, which means that plaintiff's burden to plead facts showing defendant's knowledge of contrary information is even greater.  And to establish scienter this way, plaintiffs must provide specific instances where the defendants received information contrary to their public statement.

But looking at plaintiffs' allegations, the complaint fails to allege what specific contrary information the company supposedly knew that contradicted its public statements, let alone when it had that information, and this is despite

MAEBRAYC

allegedly having access to ten confidential witnesses.

The complaint does mention certain reports and meetings. But when you look closely, the allegations don't identify what metrics were discussed in those meetings or contained in those reports when or how they would have rendered any of the company's statements misleading. So really plaintiffs' allegations amount to the claim that people within the company had access information about the credit product, which is just not enough to allege scienter. I'll address just a couple examples of how the complaint falls short, but of course I'm happy to discuss any of the other allegations in the complaint.

So first the complaint alleges that certain executives at the company had access to the company's internal operational reporting program, which was called Marco Polo. And this program allegedly tracked information about sales activity and information related to credit. But the complaint doesn't include what specific information was reflected in reports generated by Marco Polo, or how that information contradicted any of the company's statements, and the complaint also doesn't allege that the defendants reviewed these reports or when.

And that's really like alleging that because the company keeps records, all defendants should be presumed to have reviewed those details records, which is just not how companies operate and not how scienter is pleaded. And

MAEBRAYC

plaintiffs also alleged that there were weekly calls during which problems with the credit product were brought up, but the complaint doesn't specify what problems were discussed on these calls or when they were discussed, let alone how those discussions would have alerted defendants that any statements were misleading.

And similarly, the complaint alleges that there were charts showing that delinquencies existed, but there aren't any allegations that the delinquency charts showed numbers contrary to the delinquency rates that were disclosed to investors, let alone when.  And this is really a recurring problem in the complaint.  It mentions the existence of reports and meetings, but there are just no details about what contrary information was contained in the reports or discussed at the meetings, let alone why that information would have rendered any disclosures misleading.  And this failure to allege scienter is a separate and independent reason that the complaint should be dismissed

THE COURT:  Good.  Thank you very much, Ms. Empson. Let me turn to counsel for plaintiff.  I may have some specific questions for each of the parties, but first let me turn to you, counsel, for plaintiff.  You've heard a summary of some of the arguments that defendants expect to mount.  What would you care to share in anticipation of your opposition.

MR. CANTY:  Thank you, Judge.  This is Michael Canty from Labaton & Sucharow.  It's difficult to respond piecemeal.

MAEBRAYC

They brought up a few examples.  I think some discrete examples, but left out some critical facts.  For example, they say that the period went from six months to three months, and that somehow is not material.  We've alleged with specificity -- I cite to paragraph 89 -- where a confidential witness said that the look-back period went to as low at five, ten or fifteen days by the end of 2021, so that was during the class period.  And the CW alleged that it was only a few days that they were looking at that material.  Some of the statements --

THE COURT:  Counsel, can I pause you on that.  The argument as I understood defendant's comment here was that there was no public statements, that there's a longer period of look-back previously; and therefore, there is no falsity.  Can you respond to that?

MR. CANTY:  Yes, paragraph 8, your Honor, where a Cantor Fitzgerald analyst cites to the fact that they understood the six-month due diligence period "noted an extremely selective process for loan opportunity with only five percent of total merchants with outstanding loans must be with StoneCo for six plus months."  So we have alleged with specificity that these loans were being made with just a few days of look-back.

Moreover, I think we have to look at it in the totality of everything that was going on.  Simply saying, well,

MAEBRAYC

they loosened the look-back period.  You can't look at that in a vacuum.  That needs to be looked at in the context of the fact that they did not have exclusivity.  The risk was even higher because according to the Marco Polo analysis, which counsel has just stated we haven't pled with specificity that they had access to.  We have.  Paragraph 237, CW indicated that all executives all the way up to senior level executives of the named defendants had access to that.

And that they knew that they were using other point-of-sale machines.  In essence, they were taking the credit products from StoneCo, and StoneCo was left with an unsecured loan.  They pitched this to the market as a secured loan, similar to what we have here in the United States a secured transaction.  They said, look, rest assured, market, that these are good loans because they're secured with a higher percentage return on our point-of-service machines.  Their internal number shows that that was false, that they had loans that were 30 days where the point-of-sale machine that somehow was never being used.

Additionally, it was a core product.  The market was very keen on the fact that StoneCo was marketing itself as a credit provider, and this is a core aspect of their business. We're happy to respond to each one, but I think that our response will certainly, I think, illuminate the fact that a lot of these issues are inextricably intertwined.  Some of the

MAEBRAYC

puffery statements, we have to look at the other facts that we pled in the complaint as well.  So on those two specific issues, whether or not the market knew about the six-month period and whether or not the period was as short as a few days, we've pled that with specificity in the complaint.

THE COURT:  Let me just ask briefly about one of the arguments suggested by counsel for defendant regarding the statements by the plaintiff constitute puffery.  They assert that this is brought by hindsight and say that the facts that you're pointing to in the complaint show -- that are challenging the statement developed after the statements were made.  Can you comment on that?

MR. CANTY:  Yes.  For example, the period of look-back period, that was at the end of 2020.  We've alleged that in paragraph 89.  The CW alleged that the period was as short as five, ten or fifteen days, and that was at the end of 2020, not the December of 2021.

I could go through specific examples in the complaint, but I think we -- again, it's very difficult to point to specific responses when they've made the general statement that these statements are puffery.  I think that also in the context of other statements they made; for example, I believe they made comments about having high expectations for credit.  Or in response to the statements, the market or analyst say that they have high expectations for the credit, and that the credit was

MAEBRAYC

strategically important for Stone.  Opinion statements when there are underlying facts that belie those opinions, those are actionable.

THE COURT:  Thank you, and I don't want to require the parties to debate particular piece of language which I'll see in the briefing.  You highlighted in your comment, counsel for plaintiff, a statement that credit line is, "strategically important" to the company.  Are you asserting that such a statement is actionable here?

MR. CANTY:  I believe that we cited that in our letter.  That was a statement that an analyst made.  I think that what that does is, it clearly indicates that this was material information that the market was consuming in analyzing what the price of the stock should be.

THE COURT:  As to materiality, you're not thus pointing that statement to the company to the effect.

MR. CANTY:  That's not a statement of the company, your Honor.  That's correct.  Sorry to interrupt you.

THE COURT:  That's fine. Ms. Empson commented on the submissions through the allegations regarding scienter.  Can you respond to those?

MR. CANTY:  Yes.  One, we don't allege that this is the cooperation of StoneCo.  They have this credit product, had talked about how they wanted to move into the credit-product market.  And we've alleged with specificity the Marco Polo

MAEBRAYC

internal metric system that everybody had access to.  We can certainly respond in our opposition to motion to dismiss on what level of specificity we need to plead.  We have confidential witnesses pled that these materials and the metrics were available to the highest levels of the company. And since it was a core aspect of the business, something that we're looking to go into -- and that's simply supported by how the market perceived it as well -- that they undoubtedly would have had knowledge of this.

THE COURT:  Thank you. Let me just ask you to respond to one of Ms. Empson's last comments which relates to what you just said.  You said that they had access to this information. They had knowledge of this, using that term "this".  The argument that was presented by counsel for defendants, but with having access to information and records by itself does not suffice.  Instead they argue you have to show that the records showed something to them, so access to records is not enough. Can you comment on that argument?

MR. CANTY:  Yes.  Thank you, your Honor.  I should have been clear.  This data that we're referring to are the rates in which the loans were being paid back.  And, for example, on paragraph 238, CW6 explained that there were three types of losses; fraud, business risk and point-of-sale losses in those reports.

What we do know and we pled with specificity is that

MAEBRAYC

they were -- these reports specifically showed that the POS machine for StoneCo was not being used sometime for 30 days where they were sending out teams to find out what was going on.  And that was the knowledge that they were using other machines to process sales because it was a much lower risk, and there was no obligation for them to use that.

So the inference is that when you see a machine that's not being used for 30 days or more, and somebody has a loan, that they're obviously using something else, so that was a risk to the company.  And those metrics were included in the Marco Polo system, and that was pled in the complaint.

THE COURT:  Looking at 238, can you expand on the argument.  Just looking at that paragraph, can you expand your argument just pointing me to the specific language there that you have in mind.

MR. CANTY:  I think the first sentence, "In addition to Marco Polo's, senior leadership had access to and tracked losses through weekly, monthly, quarterly, and annual reports, and thus, knew and had intimate knowledge of the failure of the credit product. For example, CW6 explained the risk analysis group monitored the three types of losses; fraud, business risk, and point-of-sale-losses in the five biggest losses reports.

THE COURT:  Let me ask just though, what I understand defendant to be saying is -- let me just put it hypothetically.

MAEBRAYC

Imagine that the company was doing fantastic work and there were very few losses in the loans, why wouldn't you say exactly the same thing in the allegations about such a company.  Senior leadership had access to and track losses...  What is it about the fact that they tracked losses, which I assume any credit organization does, that infers -- that leads me to infer scienter, as opposed to normal business practices for a lender?

MR. CANTY:  Well, I certainly think normal business practices could be indicia of scienter.

THE COURT:  Counsel, just to be very clear.  Is your argument going to be that any bank that tracks whether or not its credit is doing well must be intending to defraud the public?

MR. CANTY:  No, of course not.

THE COURT:  What's the nature of the allegation here -- just because in response to the argument raised by Ms. Empson that I expect to see developed in the briefing -- the argument as I understand it is that this just says that they are looking at credit risk.  The question is, Why does that tell us anything about scienter as opposed to just that they were doing what a company does to review their books?

MR. CANTY:  I think it's the content of the material.  So here, it shows delinquency rates.  It shows the point-of-sale machines were not being used.

THE COURT:  Thank you.  Is the "not being used" in a

MAEBRAYC

different paragraph?

MR. CANTY:  Your Honor, I believe we had -- and I have to find it.  There's a paragraph where we allege they sent out individuals to speak to vendors that were not using it for 30 days or more, and those visits were keyed off of the Marco Polo reports.  I don't want to speak definitively on that.  I have the complaint in front of me.  I'd have to find that.

THE COURT:  Thank you. There's a note in paragraph 236.  It maybe that.  Anything else counsel for plaintiff?

MR. CANTY:  No, your Honor.

THE COURT:  Good.  Thank you.  I'm happy to set the schedule for briefing the motion.  I look forward to seeing the parties' briefing on these issues.  Just a brief comment. Thank you for reading my decision in *Greco*.  Just based in part of my experience there, I'd like to encourage briefers to look at individual statements and to give me your arguments with respect to individual statements.  As you can see from that opinion, I think that I'm supposed to look at individual statements as part of my analysis.

So purely categorical argument would then require me to hunt and peck through each of the statements to figure out which arguments apply to which statement may my work harder. So I just encourage you if you can assist me by making it clear what arguments apply to what statements and why.  I won't tell you how that would best be presented, but I just highlight this

MAEBRAYC

as a challenge for the Court and the cases such as this, and ask if you can help me to solve it; and as a result, hopefully focus the parties' briefing clearly on the issues that are presented.

Counsel, I know that the order that was signed by Judge Wang has a briefing schedule here that is, I'll call it, a default schedule. I'm happy to engage in a conversation now about the proper timing for submission of the proposed motion and from that the deadline for the opposition and reply.

So counsel for defendants, let me turn first to you. The default is that the motion is due 15 days after the conference. Again, that's just a default. Let me know if you would like to propose an alternative date. Counsel for defendant?

MR. CARLINSKY: Thank you, your Honor. With the Court's permission, we would ask if we could file our opening brief on November 7th, so that would push out 15 days to roughly three weeks from this coming Monday. I think that's right looking at the calendar. If the Court would permit, we would file our opening brief on November 7th.

THE COURT: Thank you. Yes, that's's fine. From there, the remainder of the schedule will flow as the parties have proposed and Judge Wang endorsed. The only difference will be the start date. So the motion itself will be due no later than November 7. Any opposition will be due no later

MAEBRAYC

than 60 days following the date of service of the motion, and the reply will be due no later than 37 days after the date of the service of the opposition.  Very good.

Anything else for us to take here before we adjourn? First, counsel for plaintiff.

MR. CANTY:  No.  Thank you, your Honor.

THE COURT:  Counsel for defendant?

MR. CARLINSKY:  Thank you, your Honor.  We have nothing further.  We appreciate the Court's patience with us.

THE COURT:  Very good.  Thank you very much.  This proceeding is adjourned.

(Adjourned)