**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE STONECO LTD. SECURITIES LITIGATION | No. 1:21-cv-09620(GHW)(OTW) |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ....................................................................................................... iii

I.      INTRODUCTION ........................................................................................................... 1

II.     STATEMENT OF FACTS ............................................................................................... 5

        A.      Defendants Knew the Changed Credit Due Diligence Standards Resulted
                in Increased Delinquencies ................................................................................ 6

        B.      Defendants Made False and Misleading Statements About the Safety and
                Profitability of the Credit Product...................................................................... 7

        C.      The Truth Is Revealed When StoneCo Pulls the Credit Product and the
                Company's Loan Portfolio Loses Half its Value ................................................ 9

III.    THE COMPLAINT ADEQUATELY STATES A § 10(b) CLAIM ................................. 9

        A.      THE COMPLAINT SUCCESSFULLY PLEADS FALSE AND
                MISLEADING STATEMENTS AND OMISSIONS ......................................... 10

                1.      Misstatements and Omissions Concerning Credit Origination................. 11

                2.      Misstatements and Omissions Concerning Increased NPLs and
                        Delinquencies........................................................................................ 13

                3.      Defendants Had a Duty to Disclose Issues with the Credit Business ....... 14

                4.      Defendants' Misstatements Were Not Puffery ........................................ 15

                5.      Defendants' Misstatements are Not Protected by the Safe Harbor........... 16

                6.      Defendants' Statements Were Not Opinions ........................................... 17

                7.      StoneCo's Boilerplate Disclosures Were False and Misleading............... 17

        B.      THE COMPLAINT PLEADS SCHEME LIABILITY ....................................... 18

        C.      THE COMPLAINT PLEADS A STRONG INFERENCE OF SCIENTER ........ 18

                1.      Defendants Had Actual Knowledge or, at Minimum, Acted with
                        Recklessness When They Made the Misstatements.................................. 19

                2.      The Importance of the Credit Product Supports an Inference of
                        Scienter Under the Core Operations Doctrine ........................................ 22

3.   Defendants' Statements Themselves Bolster a Strong Inference of Scienter ..................................................................................... 23

D.      THE COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION............. 24

IV.    LEAD PLAINTIFF HAS ADEQUATELY STATED A § 20(a) CLAIM ........................ 25

V.     CONCLUSION................................................................................................................ 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)...................................................................................17

*In re Adient plc Securities Litigation*,
2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020)...........................................................21

*In re Ambac Fin. Grp., Inc. Sec. Litig*,
693 F. Supp. 2d 241 (S.D.N.Y. 2010).....................................................................15

*In re Barrick Gold Sec. Litig.*,
2015 WL 1514597 (S.D.N.Y. Apr. 1, 2015)...........................................................10

*In re Chi. Bridge & Iron Co. Sec. Litig.*,
2018 WL 2382600 (S.D.N.Y. May 24, 2018) ..................................................12, 16

*In re CIT Grp., Inc. Sec. Litig*,
2010 WL 2365846 (S.D.N.Y. June 10, 2010) ........................................................12

*City of North Miami Beach Police Officers' and Firefighters' Retirement Plan v.
National General Holdings Corp.*,
2021 WL 212337 (S.D.N.Y. Jan. 21, 2021) ...........................................................21

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
450 F. Supp. 3d 379 (S.D.N.Y. 2020).....................................................................18

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012).....................................................................24

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*,
423 F. Supp. 2d 348 (S.D.N.Y. 2006).....................................................................20

*Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*,
794 F.3d 297 (2d Cir. 2015)...............................................................................18, 20

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017).....................................................................23

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010).....................................................................15

*Garber v. Legg Mason, Inc.*,
537 F. Supp. 2d 597 (S.D.N.Y. 2008).....................................................................20

*In re Gen. Elec. Co. Sec. Litig.*,
  857 F. Supp. 2d 367 (S.D.N.Y. 2012)..................................................................23-24

*Greco v. Qudian*,
  2022 WL 4226022 (S.D.N.Y. Sept. 13, 2022)....................................................15, 20

*In re Hi-Crush Partners L.P. Sec. Litig.*,
  2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) .............................................................22

*In re IndyMac Mortg. Backed Sec. Litig.*,
  718 F. Supp. 2d 495 (S.D.N.Y. June 2010) ..............................................................13

*In re Initial Public Offering Securities Litigation*,
  399 F. Supp. 2d 261 (S.D.N.Y. 2005).......................................................................25

*Inter-Local Pension Fund GCC/IBT v. Gen. Elec. Co.*,
  445 F. App'x 368 (2d Cir. 2011) ...............................................................................20

*Jackson v. Abernathy*,
  960 F.3d 94 (2d Cir. 2020).........................................................................................22

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015).......................................................................................24

*Lorenzo v. S.E.C.*,
  139 S. Ct. 1101 (2019)...............................................................................................18

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
  518 F. Supp. 3d 772 (S.D.N.Y. 2021)........................................................................21

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
  761 F.3d 245 (2d Cir. 2014).................................................................................10, 14

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
  982 F. Supp. 2d 277 (S.D.N.Y. 2013)........................................................................17

*N.J. Carpenters Health Fund v. Residential Cap., LLC*,
  2010 WL 1257528 (S.D.N.Y. Mar. 31. 2010) ..........................................................11

*New Orleans Emps Ret. Sys. v. Celestica, Inc.*,
  455 Fed. App'x 10 (2d Cir. 2011)..............................................................................23

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000).......................................................................................18

*In re Omega Healthcare Invs., Inc. Sec. Litig.*,
  563 F. Supp. 3d 259 (S.D.N.Y. 2021)........................................................................24

*Plumbers' Union Loc. No. 12 Pension Fund v. Swiss Reinsurance Co.*,
  753 F. Supp. 2d 166 (S.D.N.Y. 2010)........................................................................14

*Sacerdote v. N.Y. Univ.*,
  9 F.4th 95 (2d Cir. 2021) ..........................................................................................25

*In re Salix Pharms, Ltd.*,
  2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016).............................................................23

*Slayton v. Am. Exp. Co.*,
  604 F.3d 758 (2d Cir. 2010).......................................................................................16

*Speakes v. Taro Pharm. Indus., Ltd.*,
  2018 WL 4572987 (S.D.N.Y. Sept. 24, 2018)............................................................23

*Tellabs v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).........................................................................................4, 15, 19

*In re Wachovia Equity Sec. Litig.*,
  753 F. Supp. 2d 326 (S.D.N.Y. 2011)........................................................................15

*Wilson v. LSB Indus., Inc.*,
  2017 WL 7052046 (S.D.N.Y. Mar. 2, 2017) .............................................................16

*Woodward v. Raymond James Financial., Inc.,*
  732 F. Supp. 2d 425 (S.D.N.Y. 2010)........................................................................15

*In re WorldCom, Inc. Sec. Litig.*,
  294 F. Supp. 2d 392 (S.D.N.Y. 2003)........................................................................10

*Yannes v. SCWorx Corp.*,
  2021 WL 2555437 (S.D.N.Y. June 21, 2021) ...........................................................19

**Statutes**

PSLRA, Pub. L. 104–67, 109 Stat. 737 (1995)..............................................................16

Section 10(b), 15 U.S.C. §78j(b) ...............................................................................9, 25

Section 20(a), 15 U.S.C. §78t(a)......................................................................................25

**Rules**

Fed. R. Civ. P. 8..............................................................................................................24

Lead Plaintiff Indiana Public Retirement System ("Lead Plaintiff" or "Plaintiff") respectfully submits this memorandum of law in opposition to Defendants'[1] Motion to Dismiss[2] the Amended Class Action Complaint.[3]

## I. INTRODUCTION

This securities class action arises out of a credit card and online transaction processing company—StoneCo—launching a supposedly game-changing loan business with seemingly unlimited upside and growth potential. However, throughout the Class Period StoneCo misled investors about the low risk and profitability of the supposedly "conservative" loan product based on what Defendants claimed was a "rigorous" and "selective" credit scoring process. In reality, and unbeknownst to investors, in an attempt to maximize growth of the Company's loan portfolio, Defendants did the opposite of what was conservative or rigorous. Prior to the start of the Class Period, StoneCo drastically cut the amount of customer data it reviewed when assessing creditworthiness from six months to three months and later slashed the period to only a few days. While this meant the risk of default on those loans went through the roof, StoneCo made the loans anyway because it resulted in what appeared to be growth of the new credit product.

Defendants' misleading statements worked as investors relied on Defendants' false claims that the credit product was low-risk and highly profitable. For example, on March 2, 2020, Credit Suisse issued an analyst report parroting the purported safety of the new credit product stating: "Stone[Co] expects credit portfolio to expand fast but always keeping delinquency under control."

---

[1] Defendants are StoneCo Ltd. ("StoneCo," "Stone," or the "Company"), Thiago dos Santos Piau ("Piau"), Lia Machado de Matos ("Matos"), Rafael Martins Pereira ("Pereira"), Marcelo Bastianello Baldin ("Baldin"), André Street de Aguiar ("Street"), and Eduardo Cunha Monnerat Solon de Pontes ("Pontes") (the "Individual Defendants," and collectively with StoneCo, "Defendants").

[2] "MTD" refers to the Memorandum of Law in Support of StoneCo's Motion to Dismiss (ECF No. 68).

[3] Lead Plaintiff's pleading is referred to herein as the "Complaint" (cited as "¶__"). ECF No. 55.

Likewise, a March 13, 2020 Cantor Fitzgerald analyst report noted that StoneCo management "notes an extremely selective process for loan" opportunities, "with only 5% of total merchants with outstanding loans as merchants (must be with [StoneCo] for 6mo+)."

During the Class Period Defendants portrayed the credit business as low risk even though they knew they had made their loan portfolio far riskier by cutting the creditworthiness review. For example, Defendant Piau boasted "*[w]e keep tight control over our supply of credit looking very closely at [non performing loan] levels as we continue to improve our solution and credit scoring*" and "*[w]e are very conservative in the way that we have built our scoring process.*" However, Defendants knew the opposite was true.

Indeed, Defendants knew that its customers were frequently defaulting on their risky loans because they had knowledge that customers started using competitors' POS machines for transactions to avoid paying StoneCo back. Specifically, Defendants knew of and had access to information contradicting their statements regarding the low risk and profitability of the credit product through a reporting program known as *Marco Polo*, attendance at regular Company meetings, and through loss charts that were sent to the highest levels of the Company. Nonetheless, Defendants continued touting the credit product to investors stating, "*We continue to enhance our credit scoring model . . .we are being even more selective while disbursing new credit.*"

Defendants' fraud came crashing down on August 25, 2021, when Defendants unveiled that the Company had decided to "[t]emporarily stop disbursing credit at [the] beginning of June [2021]" as a result of increased credit delinquencies. In response, StoneCo's stock price dropped 4%. However, Defendants continued to hide the true reasons behind pulling credit. Defendants shifted blame onto Brazil's newest credit law governing the registry of loan accounts, stating: ". . . *given the problems the market has faced with the accurate registration of receivables . . . we*

2

*are seeing higher delinquencies than what we expected*. . ." Defendants knew this was false as they decided to pull the credit product long before the new registry law went into effect due to the defaulting loans issued on highly risky or almost nonexistent credit reviews. Only five days later, StoneCo issued another press release announcing specific numbers underlying the increased delinquencies, namely, that 35% of StoneCo's credit clients were unable to pay back any principal in the last 60 days and at least 19% were unable to pay either interest or principal—far above what investors had expected. In response, StoneCo's stock dropped another 6%.

Then, on November 16, 2021, StoneCo filed its 3Q 2021 earnings results and disclosed "a reduction in the expected cash flows, especially due to the reduction of observed recovery rates in delinquent loans," and that the Company had again "reviewed downwards the fair value of our loan portfolio." This time, StoneCo conceded that 48% of StoneCo's credit clients were unable to pay back any principal on their loans. Defendants also acknowledged during the call that they could not confirm when StoneCo would be issuing credit at scale again, if at all. On this news, Stone's share price fell $10.96, or 34%, to close at $20.70 per share on November 17, 2021. **Over the course of the three stock drops, the price of StoneCo shares lost over 43% of their value**.

Defendants' motion attempts to overcome these well-pled allegations of fraud by cherry-picking words and allegations from the Complaint to suit their arguments, taking allegations out of context, and conveniently recharacterizing the fraud into seven disparate theories that do not resemble Plaintiff's well-pled theory of liability. None of Defendants' arguments have merit.

*First*, Defendants attack falsity by claiming that nearly all the statements are either forward-looking statements, opinions, or puffery and therefore, inactionable. But even a cursory review of the statements demonstrate that they are not puffery because when read in context Defendants detailed factual misstatements about the conservative nature and improvements to its

3

credit scoring process were something that investors would (and in fact did) consider material as evidenced by the Complaint's numerous allegations of analysts monitoring the supposed low risk of the credit product.  Nor are any of the statements opinions because almost none of the statements contain the words "I think" or "I believe" and none of them indicate in any way that they are subjective statements.  Rather they are statements of fact that gave investors the objectively false impression that the Company's loans were safe when in fact they were extremely risky.  Finally, none of the statements are forward-looking.  Defendants pluck single words that might arguably imply the future from lengthy misstatements about *past and current* changes to the credit scoring process and then erroneously conclude the entire statement is forward-looking.  In addition to mischaracterizing the Complaint's allegations, this tactic misapplies Second Circuit law holding that where there are "mixed" statements that include forward and non-forward-looking aspects; the non-forward-looking aspects of the statement are not protected by the safe harbor.  In any event, the safe harbor does not protect omissions of current fact such as those at issue here—namely Defendants' decision to slash the Lookback Period from six months to three months and then to mere days without telling investors.

*Second*, Defendants' attacks on scienter fare no better.  Defendants ignore the Complaint's well-pled allegations demonstrating Defendants' knowledge or reckless disregard for the falsity of their statements and instead try to pick apart each individual allegation in contravention of the Supreme Court's instruction in *Tellabs* to assess scienter allegations holistically.  Here, the Complaint provides evidentiary support including describing charts, loss reports, weekly calls, and standing meetings where Defendants were kept informed on issues regarding the credit product.  Likewise, the Complaint adequately alleges that credit was a critical core operation of StoneCo and thus, it would be absurd to suggest Defendants were not aware of the significant loosening of

4

credit standards and collectability issues, especially given the fact that Defendants spoke in detail and at length about those issues when they made their misstatements to the market. Considering Plaintiff's scienter allegations holistically, the Complaint creates a strong inference of scienter.

*Third and finally*, Defendants claim that the Complaint fails to plead loss causation because there is supposedly a "glaring disconnect" between the misstatements and the corrective disclosures. However, it strains credulity to argue that their own statements touting the purported low risk and profitability of the credit product were totally unrelated to StoneCo's disclosures on: (1) August 25, 2021, when it announced it was pulling the credit product and making a "downward adjustment in the fair value" of its credit portfolio; (2) August, 30, 2021 when the Company revealed that as high as 35% of the total credit portfolio consisted of customers who had not repaid their loans in months; and (3) November 16, 2021, when the Company disclosed that the total number of non-paying customers actually made up 48% of its total value (not the 35% it last reported) and accordingly, the Company was unsure if it would ever issue credit again.

Defendants' Motion to Dismiss should be denied in full.

## II.   STATEMENT OF FACTS

StoneCo is a Brazilian financial technology solutions provider. The Company generates revenue by charging its customers payment processing fees on each transaction that uses StoneCo's point-of-sale ("POS") devices or its online transaction processing program. ¶66.

In order to leverage its expansive customer base and maximize growth potential, beginning in 2019, StoneCo began offering its customers working capital loans and revolving lines of credit. ¶¶68, 71. On November 21, 2019, Defendants boasted to investors that StoneCo had "already provided over R$185.0 million in credit to ~13,400 clients" by October 2019, which according to Defendants came with very low risk as evidenced by "mid-single digit NPLs [i.e., nonperforming loans]." *Id.* Defendants touted the credit opportunity telling investors, that, "[t]he prospect for

lending in Brazil is really big. For [StoneCo], it is a 200 billion reais opportunity." ¶73.

A.    Defendants Knew the Changed Credit Due Diligence Standards Resulted in Increased Delinquencies

Investors believed that the Company had a safe and effective credit checking process based on Defendants' representations.  For example, a Cantor Fitzgerald analyst report published on March 13, 2020 highlighted StoneCo's supposedly "extremely selective process for loan[s]" and requirement that borrowers were with Company "for 6mo+" (i.e. more than six months). ¶80.

However, the credit product was far less safe and profitable than Defendants had indicated. Specifically, according to Confidential Witness ("CW") 10, in 2020, StoneCo accelerated extending credit to more merchant clients by loosening the previous creditworthiness standard, where instead of looking at six months of recurrent sales, they only looked at three months. ¶82. Likewise, in early 2020, CW 7 explained that Stone traditionally reviewed the previous six months of POS activity when determining approval on a line of credit or how much the line could be, and that Stone shortened this to around three months of POS activity. ¶86.  CW 3 recounted how at the end of 2020, Stone customers were getting approved for lines of credit after being customers for "only" 5, 10, or 15 days.  ¶89.  He explained that essentially there was almost no review at all, and it just took a few days for the credit to be extended. *Id.*   In addition, StoneCo unexpectedly fired the third-party verification company it used to access the creditworthiness of its potential borrowers and no longer had the capabilities to conduct the real time credit verification that they had previously relied upon. ¶¶84, 87.

Unbeknownst to investors, Defendants knew that the changed due diligence standards had an adverse effect on the credit product and delinquency rates.  For example, CW 3 stated that every Friday there was a separate weekly call attended by the "top brass" and the rest of the Company, including CW 3, with the Individual Defendants Thiago dos Santos Piau, Lia Machado de Matos,

6

Rafael Martins Pereira, Marcelo Bastianello Baldin, and André de Aquiar Street as being regular participants. ¶92.  According to CW 3, the problems with the credit product were brought up on these weekly Friday calls. *Id.*  Likewise, CW 7 explained that it was "very common" that customers were using the POS machines from StoneCo's competitors while also using StoneCo's machines. ¶95.  Similarly, CW 9 confirmed that when StoneCo increased its rates and terms due to delinquencies, its customers took the lines of credit but just used the competitors' POS machines so as to not have to pay back Stone's line of credit with the increased rates. ¶100.

During the Class Period, Defendants had access to and knowledge of the risky credit portfolio and increased default rates from internal meetings and StoneCo's internal operational reporting program known as *Marco Polo*. ¶102.  CW 1 explained that *Marco Polo* could track the volume of transactions on each POS machine, and also tracked the value of each transaction, as well as transactions conducted by those merchants' customers on the POS machines provided by StoneCo's competitors. ¶103.  CW 1 added that StoneCo received "alerts" from *Marco Polo* when the merchant customers used a competitor's POS machine. *Id.*  Furthermore, he, his supervisors, and everyone up through his chain of command, including Defendants André Street de Aguiar and Eduardo Cunha Monnerat Solon de Pontes, had access to *Marco Polo* and "the data." ¶105.  In addition, senior leadership tracked losses through weekly, monthly, quarterly, and annual reports. ¶106.  According to CW 6, some loss reports were reviewed in weekly meetings that he and the entire risk team attended and were also reviewed at quarterly meetings with CEO Thiago dos Santos Piau present. ¶107.

**B.    Defendants Made False and Misleading Statements About the Safety and Profitability of the Credit Product**

Throughout the Class Period, Defendants continued to mislead investors about the purported safety and profitability of the credit product.  For instance, on May 26, 2020, Defendants

stated in a press release: "*[o]ur credit approach*, *which includes a rigorous credit scoring system, receivables lock-up, and pay-as-you-sell model, has also proven to be more resilient than even we expected . . .*" and "*[w]e have improved significantly our scoring system over time, with daily enhancements to our algorithms . . .*" ¶¶112-113.

Likewise, on October 29, 2020, during an earnings call, Defendants attested to their "conservative" credit approach: "[m]ore than 73,000 merchants now use these working capital loans, which they seamlessly pay by deducting a small percentage of their sales every day. *Our product remains fairly conservative…We remain very focused on balancing risk and profitability . . .*" ¶115.  Thereafter, on March 11, 2021, StoneCo issued a press release stating: "*The economics of our credit solution have continued to be strong*, with *healthy risk-return levels*" and during the earnings call that day, claimed the Company was *"being even more selective while disbursing new credit.*" ¶¶116-117.  In reality, Defendants loosened their credit standards and were *less selective* by issuing loans to borrowers based on only a couple of days' worth of data and not the six months that investors understood the Company to be relying on.

On June 7, 2021, the Brazilian government enacted a new law governing the registry of receivables.  ¶¶120-121.  The new registration system required StoneCo and its competitors to ensure all prior credit agreements were migrated to one of the three new registries authorized by the Central Bank. ¶122.  This meant that StoneCo had to register all the loans it had made since it launched the credit product in 2019 (many of which the Company knew were in default). ¶123.

Numerous CWs confirmed that the Company had decided to pull the credit product well in advance of the new registry law's effective date. ¶125.  For example, when asked when StoneCo knew the Company was going to temporarily stop disbursing credit, CW 5 recalled that it was being discussed in March, April, or May of 2021. *Id.*  Similarly, CW 8, stated that sometime

between March-May 2021 he was ordered to halt sales of the same products that he was told to push less than five months prior. *Id.*

**C.      The Truth Is Revealed When StoneCo Pulls the Credit Product and the Company's Loan Portfolio Loses Half its Value**

The failure of the credit product began to unravel on August 25, 2021. ¶127.  On that day, StoneCo disclosed that the Company had decided to "[t]emporarily stop disbursing credit at [the] beginning of June [2021]" as a result of increased credit delinquencies. *Id.*  In response to this news shares of StoneCo dropped 4% to close at $52.88 from its prior closing price of $55.05. ¶128.

Then, on August 30, 2021, StoneCo issued another press release filed on SEC Form 6-K detailing that 35% of StoneCo's credit clients were unable to pay back any principal in the last 60 days and at least 19% were unable to pay either interest or principal—far above what investors had expected. ¶132.  In response to this news, the Company's share price dropped another 6% to close at $46.54 per share on August 31, 2021.  ¶133.

Finally, on November 16, 2021, StoneCo disclosed that the percentage of non-performing loans—loans that the Company did not expect to be repaid—was now up to 48% from the 35% the Company had disclosed the previous quarter. ¶138.  During the call, Defendant Piau also stated StoneCo is "not ready to provide a specific guidance in terms of scaling the credit." ¶139.  On this news, the Company's share price fell $10.96, or 34%. ¶140.  Analysts were shocked by this news. So much so that on November 17, 2021, an analyst from Morgan Stanley reported, "Weak results from Stone[Co] …On the back of the complicated lending issues this year, we think the market expects/needs more transparency and specificity from management." ¶144.

**III.    THE COMPLAINT ADEQUATELY STATES A § 10(b) CLAIM**

To state a claim for securities fraud under Section 10(b), plaintiffs must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection  between

the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Barrick Gold Sec. Litig.*, 2015 WL 1514597, at *5 (S.D.N.Y. Apr. 1, 2015).  The Court must "accept all factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff." *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 406 (S.D.N.Y. 2003) (citation omitted).  The Complaint meets these requirements.

### A.    THE COMPLAINT SUCCESSFULLY PLEADS FALSE AND MISLEADING STATEMENTS AND OMISSIONS

Throughout the Class Period, Defendants misled investors about the state of the Company's credit product and left them in the dark regarding Defendants' undisclosed decision to significantly loosen StoneCo's credit standards.  ¶213.  In their Motion to Dismiss, Defendants arbitrarily divide each misstatement into self-serving categories to distract the Court and distort the Complaint's well-pled allegations of fraud.[4]  For each category, Defendants then cherry-pick words to argue that the entire category of statements were either not false or were inactionable opinions, puffery, or forward-looking statements.  MTD at 2.  The Court should reject this attempted misdirection. To assess falsity, the Court must review Defendants' statements "*taken together* and *in context*." *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250-51 (2d Cir. 2014).

Here, the Complaint adequately alleges false and misleading statements and omissions regarding: (1) StoneCo's credit origination, including statements touting the Company's underwriting practices, low delinquency rates, and improved credit scoring model  (¶¶151, 156, 157, 161, 162, 164, 165, 167, 169, 171, 173, 174); (2) increased non-performing loans ("NPLs")

---

[4] The Court should disregard Defendants' MTD Appendix A as improper.  Defendants' Appendix of misstatements improperly categorizes and misconstrues the alleged misstatements in order to best suit their flawed legal arguments. Attached hereto as Appendix 1 is a chart of misstatements that accurately sets forth the misstatements as they were pled in the Complaint.

and delinquencies resulting from StoneCo's credit product (¶¶178, 180, 181, 185, 190, 192); and (3) the Company's purported risk disclosures (¶¶159, 176).

### 1. Misstatements and Omissions Concerning Credit Origination

Throughout the Class Period, Defendants touted the "[t]he growth of [their] credit solution" and how the credit product was purportedly a safe and profitable business for the Company because of its "***tight control over [its] supply of credit***," "***rigorous credit scoring system***" and claims that the Company was "***very conservative in the way that we have built our scoring process***." *See, e.g.*, ¶¶156, 161, 165. Such statements were materially false and misleading because, unbeknownst to investors, StoneCo: (i) was relying on significantly reduced due diligence look-back periods; and (ii) had stopped using a third-party credit check provider to provide real time credit checks for borrowers. ¶152. Contrary to Defendants' arguments numerous reliable CWs all uniformly allege that Defendants cut the lookback period and stopped using an outside credit check prior to and at the start of the Class Period in March 2020 rendering their statements touting its conservative credit scoring process misleading. *See* ¶82 (CW 10: in late 2019/early 2020, recurrent sales review went from six to three months); ¶¶83-84 (CW 3: in March 2020 Stone removed the third-party and was handling due diligence internally); ¶86 (CW 7: in early 2020 Stone eased Lookback Period from six months to around three months); ¶89 (CW 3: by the end of 2020, Stone customers were getting approved for lines of credit after being customers for only 5, 10, or 15 days).

Courts routinely find statements touting conservative underwriting practices actionable where, as here, there are allegations that the underwriting was riskier than the Company stated. *See N.J. Carpenters Health Fund v. Residential Cap., LLC*, 2010 WL 1257528, at *5-6 (S.D.N.Y. Mar. 31. 2010) (sustaining claims that lender misstated underwriting practices where "details of aggressive loan underwriting practices [were] described by a former [] employee," and loans

suffered widespread credit impairments); *In re CIT Grp., Inc. Sec. Litig*, 2010 WL 2365846, at *2-3, *6-7 (S.D.N.Y. June 10, 2010) (sustaining claims where defendants "tout[ed] ... CIT's conservative lending standards" while failing to disclose lowering of underwriting standards.).

Defendants try to explain away StoneCo's decision to halve (and later further reduce to mere days) the Lookback Period because they claim the Complaint "fails to plead how the 'scoring system' worked as a whole." MTD at 13. But this is a red herring. As an initial matter, the Complaint alleges that, according to CW 2, the three-month review was "**the only**" due diligence required by StoneCo in determining a customer's credit worthiness—directly contradicting its baseless assertion that there was more to the credit review. ¶88. And in any event, logic dictates that reducing the total universe of data being considered from six months to only a handful of days cannot possibly mean that the Company's credit scoring model was "***being even more selective while disbursing new credit***," which is the unmistakable impression Defendants' statements left with investors. ¶117; ¶80 (Cantor Fitzgerald analyst report noting StoneCo's supposedly "extremely selective process . . . only 5% of total merchants with outstanding loans (must be with [StoneCo] for 6mo+))."

Likewise, Defendants' attempts to characterize the misstatements as "statements about improving its scoring system" should be rejected. MTD at 13. The statements were not about ongoing improvements but misleading by omission of past and current ***reductions in the credit standards rendering StoneCo's credit product more risky not more conservative***—a fact that any investor who was being sold a supposedly conservative loan portfolio would consider as having significantly altered the "total mix" of information. *In re Chi. Bridge & Iron Co. Sec. Litig.*, 2018 WL 2382600, at *6 (S.D.N.Y. May 24, 2018) ("[a] statement or omission is materially misleading

12

when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information. . .").

### 2.    Misstatements and Omissions Concerning Increased NPLs and Delinquencies

The Complaint also adequately alleges Defendants made material misstatements and omissions regarding increased NPLs and delinquencies because the Company reduced its due diligence standards to obtain as many customers as possible which was not disclosed to the market. During the Class Period, Defendants falsely attributed the increase in loan delinquencies to the new Brazilian registry system or COVID-19 as opposed to the true reason for the losses: the Company's loosened underwriting standards and collectability issues. ¶190.

Defendants claim that "the Complaint never alleges that delinquency rates were ***not*** low or that the Company was ***not*** experiencing low single-digit NPLs." MTD at 11.  But this argument misses the point.  The statements were not false and misleading because NPLs were higher than Defendants actually claimed, but because the real reason for the increase in NPLs and delinquencies was due to the Company's undisclosed practice of reducing the Lookback Period to mere days and the ongoing collectability issues, which in turn rendered Defendants' positive statements about the source of low delinquency rates false and misleading.  ¶89.

Similarly, Defendants challenge Defendant Piau's misleading statement about how the Company was reporting its credit metrics.  MTD at 12; ¶174.  Such statements were not false because the Company was reporting the wrong metrics but because the statements, touting the supposed transparency related to the reporting of credit metrics, omitted material information about the loosening of credit standards as well as collectability issues that were necessary to make those statements not otherwise misleading. *See In re IndyMac Mortg.-Backed Sec. Litig.,* 718 F. Supp. 2d 495, 509 (S.D.N.Y. 2010) (sustaining claims where CWs reported that lender "'embarked

13

on a path of aggressive growth,' and 'routinely [made] loans' . . . with 'little, if any, review of borrower qualifications'" and loans defaulted in large numbers).

Finally, Defendants' attempt to attribute the increase in delinquent loans to an increase in credit issuances is non-sensical. MTD at 14.  The Complaint makes clear that the way the Company was able to issue more loans was by lowering its credit standards.  *See*, *e.g.*, ¶82 ("StoneCo accelerated extending credit in 2020 to more merchant clients by loosening the previous due diligence standard.").  Accordingly, the increase in loan delinquencies was directly attributable to the change in credit standards.

### 3.    Defendants Had a Duty to Disclose Issues with the Credit Business

Defendants had a duty to disclose the significantly lowered credit standards and known collectability issues because they chose to make positive statements about the credit scoring process and low delinquency rates.  *Meyer*, 761 F.3d at 250-51 ("Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth."); *Plumbers' Union Loc. No. 12 Pension Fund v. Swiss Reinsurance Co.*, 753 F. Supp. 2d 166, 180 (S.D.N.Y. 2010) ("once a party chooses to speak, it has a 'duty to be both accurate and complete.'").

For instance, Defendants touted the Company's "***enhance[d] . . . credit scoring model***" and claimed that Stone was "***very conservative in the way that we have built our scoring process***" without disclosing the necessary opposing fact that they actually drastically reduced the Lookback Period. ¶¶165, 173.  Likewise, Defendants spoke at length about the supposed reasons for the increased delinquency rates while failing to disclose the fact that they knew the Company's customers were using competitor POS devices to avoid repaying their loans.  Accordingly,

14

disclosure of these facts was necessary to make "the [other] statements made . . . not misleading."

*Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318 (2007).

### 4.    Defendants' Misstatements Were Not Puffery

Defendants attempt to avoid liability by broadly claiming that entire categories of statements are inactionable puffery. MTD at 8-9, 11-13.  To accomplish this, Defendants rely on cherry-picking single words such as "rigorous" and "selective" to make it seem like corporate optimism.[5] *Id*. at 8.  But, when read in the context of Defendants touting that the credit product was a safe and profitable endeavor *because* StoneCo purportedly had a "***rigorous credit scoring system [that has] proven to be more resilient than expected***" and was "***being even more selective in disbursing new credit***," such statements took on increased importance to investors and therefore were not inactionable puffery ¶¶161, 173.[6]  *See Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 189 (S.D.N.Y. 2010) ("misstatements regarding risk management, discipline, monitoring and credit quality are not 'puffery'" where, as alleged here, they were 'misrepresentations of existing facts.'); *In re Ambac Fin. Grp., Inc. Sec. Litig*, 693 F. Supp. 2d 241, 271 (S.D.N.Y. 2010) ("[when] a defendant represents that its lending practices are 'conservative' . . . the securities laws are clearly implicated").

---

[5] Likewise, Defendants selectively quote the words "performing. . . well" and "healthy" but omit the fact that those statements included additional language and context that rendered them misleading. MTD at 8 (citing ¶¶164, 171). For example, Defendants completely ignore the second part of the sentence in paragraph 164 which misleadingly credited the Company's purported success to its credit policy: "***we have seen our April cohorts performing very well, which demonstrates our ability to adapt our credit policy to a new riskier environment.***"

[6] Defendants rely on *Greco* to argue that terms like "conservative" or "selective" are always puffery (MTD at 2), however, the statements there did not go as far as the statements here that described in detail the conservative nature of the credit selection process. *Greco v. Qudian*, 2022 WL 4226022, at \*14, \*19 (S.D.N.Y. Sept. 13, 2022).  Nor did *Greco* include the same level of allegations demonstrating that analysts cared greatly about the supposed safety of the credit product.  *See*, *e.g*., ¶¶79-80.  For the same reasons *In re Wachovia Equity Securities Litigation*, 753 F. Supp. 2d 326, 354 (S.D.N.Y. 2011) and *Woodward v. Raymond James Financial, Inc.*, 732 F. Supp. 2d 425, 434-35 (S.D.N.Y. 2010) are inapposite.

**5.    Defendants' Misstatements are Not Protected by the Safe Harbor**

Next, Defendants argue that certain statements are not actionable because they are forward-looking and protected by the PSLRA safe harbor. MTD at 9-10.  However, again Defendants improperly cherry pick certain parts of statements that even faintly reference the future while ignoring the present and past tense parts of the statement.  For example, Defendants quote the language "[w]e see a huge opportunity ahead of us. . ." as support for the entire statement being forward-looking (MTD at 9) but misleadingly omit the present parts of the statement that the credit product "*remains fairly conservative*" and "*[w]e remain very focused on balancing risk and profitability*."  The non-forward-looking parts of the statements are not protected by the safe harbor. *Chi. Bridge & Iron*, 2018 WL 2382600, at *8 ("'when an allegedly false statement has both a forward-looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply' to the non-forward-looking part.").

Moreover, forward-looking statements are only protected by the safe harbor if they are: (1) "identified and accompanied by meaningful cautionary language," or (2) "immaterial," or (3) where plaintiffs fail to prove the statement was "made with actual knowledge that it was false or misleading." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010).  Here, the safe harbor does not apply because: (1) Defendants' cautionary language was not meaningful to investors because they warned of already materialized risks (*see* Section III.7, *infra*); and (2) the Complaint adequately alleged that the statements were made with actual knowledge that they were false and misleading (*see* section III.C.1, *infra*).

In any event, "[courts] in this circuit have consistently held that neither the PSLRA safe harbor, nor the bespeaks-caution doctrine protects material omissions" such as those alleged in this case. *See Wilson v. LSB Indus., Inc.*, 2017 WL 7052046, at *3 (S.D.N.Y. Mar. 2, 2017).

16

### 6. Defendants' Statements Were Not Opinions

Defendants also argue that certain of the misstatements were inactionable opinions. MTD at 10-11. As an initial matter, almost none of the statements Defendants challenge contain the phrases "I think" or "I believe" and thus, are not opinion statements. *See* ¶¶156, 157, 169, 173, 180. *See Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 176 (2d Cir. 2020) (statement was not an opinion because it did not include "language like 'I believe' or 'in my estimation.'"). These non-subjective statements of fact were false and misleading because Defendants omitted the fact that the Company had drastically cut its underwriting standards and was experiencing significant collectability issues.

Moreover, even if the Court were to consider these statements opinions (they are not), the Second Circuit has held that in such instances opinion statements are nonetheless actionable. *Id.* at 177 ("[w]hen omitted contrary facts substantially undermine the conclusion a reasonable investor would reach from a statement of opinion, that statement is misleading and actionable.").

### 7. StoneCo's Boilerplate Disclosures Were False and Misleading

Defendants' allegations about StoneCo's weak credit risk disclosures were false and misleading because the "***credit trends***" that Defendant claimed "***could have a material adverse effect on [StoneCo's] results of operations and financial condition***" already occurred. ¶176. As explained in detail throughout the Complaint, purported warnings such as "***we may not be able to effectively manage individual or institutional credit risk***" were false and misleading because they failed to warn investors of the specific risk that halving the Lookback Period (and later cutting it to mere days)—a risk that had already materialized. ¶¶81-92, 159, 176. *See In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 304 (S.D.N.Y. 2013) ("Vague disclosures of general risks will not protect defendants from liability. Instead, the relevant cautionary language must be

17

'prominent and specific,' and must directly address 'exactly the risk that plaintiffs claim was not disclosed.'").  Likewise, Defendants' supposed warning that "***Clients may default on their obligations to us***" was false and misleading since StoneCo knew its customers were already defaulting on their loans by using competitor POS devices.  ¶¶93-101, 159, 176.  *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 409 (S.D.N.Y. 2020) (citing *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004)) ("[w]arning of risks that could occur at some future date does not warn investors that those risks have already come to pass.").

### B.    THE COMPLAINT PLEADS SCHEME LIABILITY

Defendants argue that the Complaint requires "something beyond" false statements and omissions to plead scheme liability. MTD at 17.  That, however, exists here.  Unbeknownst to investors, Defendants not only made misstatements but also took specific actions to further the fraudulent scheme.  Namely, Defendants lowered StoneCo's underwriting standards (and continued to do so during the Class Period) without informing investors.  Such actions, which are not statements but rather a scheme to defraud investors are sufficient to establish a scheme under the Supreme Court's decision in *Lorenzo*. *See Lorenzo v. S.E.C.*, 139 S. Ct. 1101, 1102 (2019).  Therefore, the Complaint adequately pleads scheme liability.

### C.    THE COMPLAINT PLEADS A STRONG INFERENCE OF SCIENTER

Scienter may be pled either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000).  Recklessness occurs when Defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015).  The test is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in

18

isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23.  The scienter allegations need not be "irrefutable" or "of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324.  Rather, the allegations must be merely "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*  That is, "a tie on scienter goes to the plaintiff." *Yannes v. SCWorx Corp.*, 2021 WL 2555437, at *6 (S.D.N.Y. June 21, 2021).

### 1.    Defendants Had Actual Knowledge or, at Minimum, Acted with Recklessness When They Made the Misstatements

Defendants' motion ignores the Supreme Court's instructions in *Tellabs*, to assess "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23 (emphasis in original).  Despite this, Defendants try to poke holes in each individual allegation of scienter MTD at 18-20.  But when viewed holistically, as the Court must, the Complaint's scienter allegations are cogent and at least as compelling as any opposing inference.

**Marco Polo:**  Defendants argue that the Complaint fails to specify what contrary data was available in *Marco Polo* or that any Defendants reviewed the reports.  MTD at 19.  But as with Defendants' other scienter arguments, they fail to consider the Complaint's allegations holistically. Defendants fail to acknowledge: (i) *Marco Polo* was set up to conduct the review of the three-month Lookback Period and that data was the only due diligence used to make creditworthiness decisions (¶88); (ii) *Marco Polo* could track the volume of transactions on each POS machine that StoneCo's merchant customers used, and also alerted StoneCo if a customer stopped using Stone's POS machine.  (¶¶103, 104); and (iii) that *Marco Polo* was used "throughout StoneCo—including by everyone in CW 1's chain of command including Defendants Street and Pontes (¶105).[7]  When

---

[7] Defendants' argument that CW 1 was not in a position to know the information attributed to him fails.  MTD at 19-20 n.12.  The fact that CW 1 worked for StoneCo beginning in September 2020 does not render his allegations regarding *Marco Polo* uncredible, especially where here his allegations are corroborated by two other CWs who were

19

read in conjunction with the other half of the equation—that StoneCo slashed the Lookback Period and was experiencing increased delinquencies as high as 48% of the total loan portfolio by the end of the Class Period—there is a strong inference that Defendants either knew or acted recklessly when they touted the safety and profitability of the credit product when contradictory information was sent to them via alerts or was available to them.[8] *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 361 (S.D.N.Y. 2006) ("'[a]n egregious refusal to see the obvious, or to investigate the doubtful" may also give rise to an inference of recklessness.).[9]

Finally, Defendants claim that the Complaint fails to allege that any Defendant reviewed the *Marco Polo* data must be rejected. MTD at 19. This defense is solely based on Defendants' baseless factual assertion that the Complaint contains CW allegations regarding Defendants Street and Pontes' access to *Marco Polo* that are "demonstrably false." MTD at 19, n.11.[10] The Court must accept as true, the CW allegation that Defendants Street and Pontes had access to *Marco Polo*. ¶105; *Blanford*, 794 F.3d at 307 ([o]n a motion to dismiss, a court must "accept all factual claims in the complaint as true and draw all reasonable inferences in the plaintiff's favor.").

**Reports Showing Losses:** [11] The Complaint adequately pleads particularized allegations that Defendants tracked losses from risky loans through weekly, monthly, quarterly, and annual

---

there throughout the Class Period. ¶64 (CW9); ¶¶57, 88 (CW2). Likewise, the Complaint contains detailed allegations from CW1 about the inner workings of *Marco Polo* which would put him in a position to know that it was accessible to Defendants Street and Pontes. ¶¶56, 103, 105.

[8] Further, Defendants argue that *Greco* holds that scienter cannot be inferred solely from access to internal documentation. MTD at 20. However, the facts of that case involved defendants outsourcing credit assessments rather than conducting independent ones and thus, could potentially not have access to material information. Here, all credit assessments were conducted internally and thus, are distinguishable. *Greco*, 2022 WL 4226022, at *26.

The detailed allegations about what information was contained in *Marco Polo* and the fact it was used to perform the three month due diligence review take the Complaint's allegations beyond the "vague and general averments" of access in *Inter-Local Pension Fund GCC/IBT v. General Electric Co.*, 445 F. App'x 368, 370 (2d Cir. 2011).

[10] If the Court credits Defendants' improper factual assertions is should order discovery on the issue so Defendants' contradictory factual assertions can be fairly tested.

[11] Therefore, contrary to Defendants' claims, the Complaint's allegations are aligned with *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 615 (S.D.N.Y. 2008).

reports and thus, were aware of StoneCo's risky loans and collectability issues. ¶106. Specifically, CW 6 explained that the Risk Analysis group analyzed all risk at StoneCo, which were broken down by the three types of losses (fraud, business risk, and POS) and there were reports provided on a weekly basis containing information on some losses and that loss reports were also reviewed at quarterly meetings with CEO Thiago dos Santos Piau present. ¶107. Moreover, CW 5 added that he was aware of customers not meeting the credit product payments in his region because he presented the performance numbers for his region to corporate . . ." ¶¶60, 100.[12]

Defendants' arguments that the Complaint is "devoid of allegations as to the contents of the loss reports" should also be rejected. As an initial matter, the Complaint alleges that the reports were broken down by the three types of losses (fraud, business risk and POS) and included information on losses. *Id.*[13] Moreover, Defendants again miss the point. The existence of these losses (and what they meant for the safety and profitability of the Company's loan portfolio) must be read in conjunction with the fact that the Company also cut its underwriting standards by half and down to a few days at the beginning of the Class Period. ¶¶81-92.

**Delinquency Charts:** Defendants assert that the charts showing delinquency rates were not alleged to be different than what was disclosed to investors. MTD at 20. However, Defendants mischaracterize what was contained in the charts. According to CW 3, "it was clear," based on what he saw in these charts, that merchants were becoming Stone customers to just get "easy credit." ¶89. And specifically, that the charts showed that customers were getting approved for lines of credit after being customers for "only" 5, 10, or 15 days. *Id.* Accordingly, the charts

---

[12] *In re Adient plc Securities Litigation*, 2020 WL 1644018, at *28 (S.D.N.Y. Apr. 2, 2020) is inapposite as here the Complaint demonstrates that employees "rais[ed] the flags" about "their concerns."

[13] Thus, Defendants' reliance on *City of North Miami Beach Police Officers' & Firefighters' Retirement Plan v. National General Holdings Corp.*, 2021 WL 212337, at *9 (S.D.N.Y. Jan. 21, 2021) and *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 722, 780 (S.D.N.Y. 2021) should be ignored.

included information on the loosened underwriting standards, not just delinquencies as Defendants contend.  Critically, the Complaint alleges the information in these charts made it up the chain of command to Mateus Biselli, Stone's Chief Operating Officer.  ¶90.[14]

**Weekly Friday Calls:** Defendants allege that the Complaint provided no further information other than that weekly calls with "top brass" including CW 3, with the Individual Defendants Piau, Machado de Matos, Pereira, Baldin, and Street. MTD at 22. ¶92.  However, Defendants' convenient citation to the introduction (¶15) only scratches the surface.  For example, CW 3 recalled that PowerPoint presentations were displayed on the video screen, and he described the calls as being a "very open dialogue and sometimes harsh." ¶92.  Critically, the Complaint alleges that according to CW 3, the problems with the credit product and the registry were brought up on these weekly Friday calls.  *Id.*  Accordingly, Defendants were aware or at the very least reckless when they made their false statements.

### 2.    The Importance of the Credit Product Supports an Inference of Scienter Under the Core Operations Doctrine

The Complaint is replete with specific claims contradicting Defendants' assertion of "vague" and insufficient allegations to establish scienter under the "core operations" theory. MTD at 22-23.  The core operations doctrine allows the Court to presume "that a company and its senior executives have knowledge of information concerning the 'core operations' of a business." *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at \*26 (S.D.N.Y. Dec. 2, 2013).  Since the success for the credit product was undeniably important to Defendants, who touted that "**[t]he prospect for lending in Brazil is really big. For [StoneCo], it is a 200 billion reais**

---

[14] The scienter of Biselli—a C-suite officer who presumably communicated with the other Individual Defendants— "may also be imputed to the corporation, even if they themselves were not the actual speaker" of the alleged statements. *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020).

**opportunity**," then Defendants knew about any such issues that could negatively impact the development of the credit product and its effect on StoneCo's overall operations, revenue, and growth. ¶232; *see In re Salix Pharms, Ltd.*, 2016 WL 1629341, at *16 (S.D.N.Y. Apr. 22, 2016) (scienter pled where fraud involved company's core operations). Further, contrary to Defendants' assertion that the Complaint pled a "naked assertion" that a product is "key" (MTD at 23), the market understood that StoneCo relied on the credit product's success.[15] For example, JP Morgan reported right before the Class Period on February 27, 2020, "Stone[Co]'s new lending venture, in our view, could yield additional substantial revenues. Stone[Co]'s cross-selling abilities should continue to foster new revenue streams." ¶233. Likewise, on February 4, 2021, Credit Suisse published a report stating: "**High expectations for credit.**" ¶234. Moreover, on April 13, 2021, UBS published an analyst report, which noted that it is "**strategically important for Stone**" to increase cross-sell of its products, such as offering more than one solution to their clients. ¶235. Therefore, the Complaint adequately pled scienter under the "core operations" theory.

### 3. Defendants' Statements Themselves Bolster a Strong Inference of Scienter

Defendants also ignore the argument that their statements themselves suggest scienter. MTD at 23. However, the fact that Defendants spoke in detail about the credit product and the credit scoring process bolsters the inference that they had knowledge and were informed about such topics (and if they were not informed, were reckless). *See Speakes v. Taro Pharm. Indus., Ltd.*, 2018 WL 4572987, at *9 (S.D.N.Y. Sept. 24, 2018) (strong inference of CEO and CFO's scienter where they spoke specifically to the issues on earnings calls); *In re Gen. Elec. Co. Sec.*

---

[15] *See New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 & n.3 (2d Cir. 2011) (scienter pled where subject of fraud was "key to measuring . . . performance and . . . a subject about which investors and analysts often inquired"); *Fresno Cnty. Emps.' Ass'n v. comScore Inc.*, 268 F. Supp. 3d 526, 553 (S.D.N.Y. 2017) (fraud concerned "a subject about which investors and analysts often inquired," which "reinforces the inference of scienter").

*Litig.*, 857 F. Supp. 2d 367, 395 (S.D.N.Y. 2012) (inference of knowledge where CFO made misleading statements about the portion of the business, he was responsible for); *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) (scienter found where "strong circumstantial evidence that [defendants] were receiving some form of specific information" on the topic existed.).

### D.    THE COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION

Plaintiff's burden of pleading loss causation "is not a heavy one." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)). "The complaint must simply give [d]efendants 'some indication' of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations." *Id.* At the motion to dismiss stage, plaintiffs "need not establish that the disclosure of the truth underlying the alleged fraud was the sole cause of their losses nor must they conclusively rule out the role of potentially intervening events in the causal chain, as those are issues of proof reserved for the merits stage of the case." *In re Omega Healthcare Invs., Inc. Sec. Litig.*, 563 F. Supp. 3d 259, 266 (S.D.N.Y. Sept. 28, 2021) (citing *Loreley*, 797 F.3d at 187, 189). Moreover, loss causation allegations are subject to less stringent Rule 8 pleading requirements. *Id.* ("[T]he vast majority of courts in this district have required that loss causation meet only the requirements of Rule 8.").

Here, Plaintiff has sufficiently alleged that Defendants' statements touting the purported safety and profitability of the credit product caused investor losses when it was revealed on August 25, 2021 that StoneCo was no longer offering the credit product and was making a "downward adjustment in the fair value" of its credit portfolio and on August, 30, 2021 when the Company

24

revealed the extent of the impairment to the credit portfolio was 35%, and later on November 16, 2021, 48% of its total value. ¶¶ 208–228.

Defendants' argument that there is a "glaring disconnect" between the misstatements and the corrective disclosures strains credulity. MTD at 24. The Complaint alleges that Defendants' statements falsely concealed the fact that StoneCo had significantly loosened its credit standards and that the Company was experiencing material collectability issues. *See, e.g.*, ¶¶ 152-155. The direct connection between loosened *credit standards* and *collectability* issues on the one hand and downward adjustments to the fair *value of the Company's credit portfolio* (and the extent of that downward adjustment) on the other is clear.[16]

Defendants also claim that "StoneCo's disclosures appropriately disclosed the risks associated with the Credit Product" and that Lead Plaintiff cannot allege that such risk as "concealed." MTD at 24. However, this argument misses the mark. StoneCo's boilerplate disclosures did not come close to warning investors about the fact that the Company had reduced its credit standards to merely looking at a couple days of transaction information or the extent of its collectability issues, which is what the Complaint alleges caused the downward adjustment to the credit portfolio. *See* ¶¶81-89; 93-101; 124-144.

## IV.    LEAD PLAINTIFF HAS ADEQUATELY STATED A § 20(a) CLAIM

Because Plaintiff states a § 10(b) claim, the Court should also sustain the § 20(a) claim.

## V.    CONCLUSION

For the foregoing reasons, the Court should deny StoneCo's Motion in its entirety.[17]

---

[16] The direct connection distinguishes this case from in *In re Initial Public Offering Securities Litigation*, 399 F. Supp. 2d 261, 266-67 (S.D.N.Y. 2005), where the disclosures were mere announcements of poor performance. MTD at 25.

[17] Defendants argue that leave to amend would be futile. MTD at 25. But that goes against long standing precedent that this Court should grant leave to amend "freely . . . when justice so requires" and that it is a "liberal" and "permissive" standard. *Sacerdote v. N.Y. Univ.,* 9 F.4th 95, 115 (2d Cir. 2021). Should the Court grant Defendants' Motion to Dismiss, Lead Plaintiff respectfully requests leave to amend the Complaint.

Dated: January 6, 2023

**LABATON SUCHAROW LLP**

/s/     *Michael P. Canty*

Michael P. Canty
James T. Christie
Michelle V. Cooper
140 Broadway
New York, New York 10005
Telephone: 212-907-0700
Facsimile: 212-818-0477
Email:   mcanty@labaton.com
              jchristie@labaton.com
              mcooper@labaton.com

*Lead Counsel for Lead Plaintiff Indiana Public
Retirement System and the Proposed Class*

26