UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                      :

RONALD F. RAY, *individually and on behalf of all* : 
*others similarly situated*,                        :
                                        :

                          Plaintiff,    :

                                        :

                    -v-             :

STONECO LTD., *et al.*,                  :
                                        :

                        Defendants.  :
                                        :
------------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   9/25/2024

1:21-cv-9620-GHW

<u>MEMORANDUM OPINION &
ORDER</u>

## I.    INTRODUCTION

StoneCo Ltd. ("StoneCo") is one of the largest financial technology and payment processing companies in Brazil.  In 2019, StoneCo began offering its merchant customers working capital loans and revolving lines of credit.  As StoneCo continued to expand its credit portfolio, the company and its executives told investors that the portfolio was conservative, that it was focused on low delinquency rates, and that the credit scoring process was being continually improved.  However, Plaintiff alleges that over the course of 2020 and 2021, StoneCo significantly loosened its lending standards and became aware that its merchant borrowers were able to avoid repayment by using competitors' payment processing devices.  As a result, Plaintiff claims that Defendants' statements about the credit program's risk were false and misleading, in violation of Section 10(b) and Section 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

StoneCo moves to dismiss all claims pursuant to Fed. R. Civ. P. 12(b)(6), arguing that Plaintiff fails to allege that Defendants' statements were false or misleading, that Defendants had the requisite scienter, or that Plaintiff's loss was caused by the statements.  StoneCo's motion to dismiss

is GRANTED IN PART and DENIED IN PART.  Defendants' statements about the conservativeness and opportunity of the credit program are inactionable puffery and optimism; their statements about the portfolio's returns and delinquency rates were not false or misleading; and Plaintiff has not alleged that the risks identified in Defendants' risk disclosures had already transpired.  However, Plaintiff has adequately alleged scienter and loss causation with respect to the plausibly misleading statements about the selectivity of the credit scoring process over time and the company's statements blaming rising delinquency rates on regulatory changes.

## II.    BACKGROUND

### A.    Facts[1]

#### 1.    StoneCo Develops a New Credit Product

Defendant StoneCo is a financial technology and payment processing company incorporated under the laws of the Cayman Islands with its head office located in the Cayman Islands.  Dkt. No. 55, Amended Class Action Complaint (the "Amended Complaint"), ¶ 48.  StoneCo's stock trades on the NASDAQ market.  *Id.*  Defendants Thiago dos Santos Piau, Lia Machado de Matos, Rafael Martins Pereira, Marcelo Bastianello Baldin, André Street de Aguiar, and Eduardo Cunha Monnerat Solon de Pontes (collectively, the "Individual Defendants") were senior executives at StoneCo "at all relevant times."[2]  *Id.* ¶¶ 49–54.

StoneCo provides payment processing through online software and physical point-of-sale ("POS") devices (i.e., cash registers and credit card processing terminals), "primarily in Brazil."  *Id.*

---

[1] At the motion to dismiss stage, the Court accepts the following facts set forth in the Amended Class Action Complaint ("Amended Complaint"), Dkt. No. 55.

[2] "Thiago dos Santos Piau was the Chief Executive Officer ("CEO") of StoneCo at all relevant times."  Am. Compl. ¶ 49.  "Lia Machado de Matos was the Chief Strategy Officer ("CSO") of StoneCo at all relevant times."  *Id.* ¶ 50. "Rafael Martins Pereira was the Vice President ("VP") of Finance and Investor Relations Officer of StoneCo at all relevant times."  *Id.* ¶ 51.  "Marcelo Bastianello Baldin was the VP of Finance of StoneCo at all relevant times."  *Id.* ¶ 52. "André Street de Aguiar is the co-founder of StoneCo and was Chairman of the Board of Directors of StoneCo at all relevant times."  *Id.* ¶ 53.  "Eduardo Cunha Monnerat Solon de Pontes is the co-founder of StoneCo and was Vice Chairman of the Board of Directors of StoneCo at all relevant times."  *Id.* ¶ 54.

¶ 66.  In early 2019, StoneCo rolled out a "Credit Product" that "offer[ed] its [merchant] customers credit such as working capital loans and revolving lines of credit in addition to the Company's traditional credit card transaction services."  *Id.* ¶¶ 68–71.  The Credit Product allowed clients to "pay back the credit loans through automatic retention of a percentage of their sales."  *Id.* ¶ 69.  "Therefore, in addition to paying a fee for each transaction processed through a StoneCo POS device as well as subscription and equipment rental fees, merchants would also pay an additional percentage fee on each transaction in order to pay back the loan from StoneCo."  *Id.* ¶ 70.  The Credit Product "represented, by far, the largest economic opportunity for StoneCo going forward"; StoneCo viewed the expansion of this credit program to be a R$75 billion opportunity.  *Id.* ¶¶ 71– 72.  Therefore, on March 2, 2020, StoneCo announced that it would expand the credit program.  *Id.* ¶ 75.

### 2.  StoneCo Loosens Its Lending Standards and Experiences Collection Issues

After announcing the expansion, StoneCo "materially loosened . . . its due diligence standards in order to issue as much credit as possible and expand the [c]ompany's market share during the [p]andemic."  *Id.* ¶ 78.  Prior to the expansion, "StoneCo would look at recurring sales for a six-month period . . . to determine if the customer was stable" before offering credit.  *Id.* ¶ 82. However, "[i]n late 2019 / early 2020," StoneCo reduced the look-back period from six months to three months.  *Id.*  Eventually, StoneCo reduced the look-back period further and started "offering credit to individuals based on just days of transaction information."  *Id.* ¶ 89.  "[C]ustomers were getting approved for lines of credit after being customers for only 5, 10, or 15 days."  *Id.*  "[T]here was almost no review at all, and it just took a few days for the credit to extend."  *Id.*  Additionally, prior to the expansion, StoneCo would use a "third-party entity to conduct the review of merchant customers' credit history . . . when determining creditworthiness."  *Id.* ¶ 83.  However, "in March 2020, [StoneCo] removed the third party and was handling the due diligence internally" and thus "no

longer had the capabilities to conduct the real-time credit verification that they had previously relied upon." *Id.* ¶ 84. StoneCo thus extended credit without "looking into the amount of debt that these customers already had." *Id.* ¶ 85.

After the expansion, StoneCo also increasingly realized that its merchant borrowers were using competitors' POS devices "in order to avoid having to pay the increased per-transaction fee associated with" the Credit Product. *Id.* ¶ 78. "StoneCo could not collect any fees on transactions that were performed on competitor POS devices, meaning once a customer started using a competitor's POS system to perform transactions, the likelihood of the borrower defaulting was almost certain." *Id.* ¶ 93.

### 3. StoneCo's Internal Reporting and Discussions About the Credit Product

StoneCo had an internal "reporting program known as *Marco Polo*," through which StoneCo could track customers' sales activity, utilization of StoneCo's and competitors' POS machines, "as well as necessary information related to credit." *Id.* ¶ 18. *Marco Polo* was configured "to automatically conduct a three-month review of a customer's POS transactions." *Id.* ¶ 88. It generated "alerts . . . when merchant customers used a competitor's POS machine." *Id.* ¶ 103. And it "indicated whether that customer had borrowed from StoneCo." *Id.* ¶ 104. StoneCo employees "up through [the] chain of command," including Aguiar and Pontes, had access to *Marco Polo*'s data. *Id.* ¶ 105. StoneCo also had internal credit delinquency data, created by its credit division, which "made it up the chain of command to the senior executives," like Mateus Biselli, the head of the credit division, the commercial division, and the inside sales division. *Id.* ¶¶ 89–90.

"[S]enior leadership, including named Defendants, [also] tracked losses through weekly, monthly, quarterly, and annual reports." *Id.* ¶ 106. These reports included "weekly" reports provided by the "Risk Analysis group" that "analyzed all risk at StoneCo, which were broken down by the three types of losses (fraud, business risk, and POS)." *Id.* ¶ 107. "[S]ome loss reports were

also reviewed at quarterly meetings with CEO Thiago dos Santos Piau present . . . ." *Id.* "Baldin led all conferences on the POS and the credit business." *Id.* ¶ 108.

Further, there were calls "every Friday . . . attended by the top brass and the rest of [StoneCo]," during which "the problems with the credit product and the registry were brought up." *Id.* ¶ 92. Piau, Matos, Pereira, Baldin, and Aguiar were "regular participants." *Id.*

### 4. Brazil Announces a New Registry System and Delinquency Rates Rise

"[O]n June 7, 2021, the Brazilian government enacted a new law governing the registry of receivables system that was meant to protect borrowers from the exact issues StoneCo was facing—namely the use of competitor POS devices to avoid repaying loans." *Id.* ¶ 120. "As soon as they became effective, financial-based institutions such as StoneCo had to ensure that receivables used as collateral for credit transactions (i.e. the credit fees StoneCo's customers paid to the Company each time it made a sale) had to be recorded in registration systems, operated by a registry authorized by the Central Bank." *Id.* "Unlike before, the new registry system ensured that whatever lender had first perfected an interest in a borrowers' future accounts receivable (i.e., future transactions) was entitled to repayment regardless of what POS system the merchant used to perform a transaction." *Id.* ¶ 121. The new registry system also required that StoneCo and its competitors "put[] all of their transactions in the registry and that they all, including [StoneCo], would have access to that information in the registry." *Id.* ¶ 122. "In other words, if StoneCo adhered to the new registry laws it would have to register of all the loans it had made since it launched the credit product in 2019." *Id.* ¶ 123.

On August 25, 2021, StoneCo announced that it had decided to "[t]emporarily stop disbursing credit at the beginning of June 2021." *Id.* ¶ 127. StoneCo "had decided to pull the credit product well in advance of the new registry's effective date." *Id.* ¶ 124. StoneCo further disclosed that it was "seeing higher delinquencies than what [it] expected and observed in prior periods,

especially due to more difficult collections and considerably worse recoveries from non-performing clients." *Id.* ¶ 127. "In response to this news, shares of StoneCo common stock dropped 4%." *Id.* ¶ 128. Over the next several months, StoneCo disclosed worsening results from the Credit Product. For example, on November 16, 2021, StoneCo disclosed "a reduction in the expected cash flows, especially due to the reduction of observed recovery rates in delinquent loans" such that StoneCo had to "review[] downwards the fair value of [its] loan portfolio." *Id.* ¶ 138. The percentage of non-performing loans ("NPLs")—"loans that the Company did not expect to be repaid"—"was now up to 48% from the 35% . . . the previous quarter." *Id.* "On this news, [StoneCo's] share price fell $10.96, or 34%, to close at $20.70 per share on November 17, 2021." *Id.* ¶ 140. As of June 2, 2022, StoneCo had still not reintroduced the Credit Product. *Id.* ¶ 146.

### 5.    Defendants' Statements About the Credit Product

Between March 2, 2020 and November 16, 2021 (the "Class Period"), *id.* ¶ 1, StoneCo and its executives made several public statements about the Credit Product and its performance. The Court groups these statements into five categories, based on Plaintiff's allegations: (1) statements describing the Credit Product as "conservative" and expressing enthusiasm for it;[3] (2) statements

---

[3] This category contains the following statements: Am. Compl. ¶ 156 ("We keep tight control over our supply of credit looking very closely at NPL levels . . . ."); *id.* ¶ 161 ("Our credit approach, which includes a rigorous credit-scoring system . . . ."); *id.* ¶ 165 ("We are very conservative in the way that we have built our scoring process, and we invest a lot to keep evolving the intelligence behind our algorithms on a daily basis."); *id.* ¶ 169 ("Our product remains fairly conservative . . . ."); *id.* ("We remain very focused on balancing risk and profitability . . . ."); *id.* ("We see a huge opportunity ahead of us, and we will leverage our distribution and proprietary credit scoring model to continue to serve merchants with our working capital solutions."); *id.* ¶ 178 ("[W]e have decided to increase provisions for expected losses . . . . Despite that, we believe the COVID crisis has demonstrated the resiliency of our credit business . . . ."); *id.* ¶ 180 ("[I]it does not change our appetite for credit for growing our solution. We remain very optimistic about the prospects there. So just to remind you, the market is really, really big. So our credit solution is really in the early beginning. So the opportunity is big."); *id.* ("[W]e remain very enthusiastic about that solution, working capital solutions for our clients."); *id.* ¶ 181 ("I think that, that's done. It do[es] not reduce our appetite for this product. . . . It's actually the opposite . . . . It increase[s] your ability to provide more working capital to your clients. . . . So actually very confident with working capital solutions and credit.").

These correspond with statements #2, #5, #9, #11, #12, #24, #25, #26, #27, #28, and #29 in Defendant's Memorandum of Law in Support of Its Motion to Dismiss ("Defendant's Memo"). Dkt. No. 68-1.

disclosing the Credit Product's returns and delinquency rates;[4] (3) StoneCo's risk disclosures;[5] (4)

statements asserting that the Credit Product was becoming more selective and that the credit scoring

---

[4] This category contains the following statements:  Am. Compl. ¶ 151 ("The growth of our credit solution is being ruled by low delinquency rates, currently at mid-single digits."); *id.* ¶ 157 ("So we are doing very well in terms of NPL management with low single-digit NPLs . . . ."); *id.* ¶ 161 ("Our credit approach . . . has also proven to be more resilient than even we expected, providing a return on asset of 2.7% per month even after COVID-19- related provisions."); *id.* ¶ 164 ("We've reached more than BRL 386 million in total outstanding balance in the end of April, presenting a return on assets of 2.7% per month even after a conservative increase in provision for potential COVID impact.  In fact, we have seen our April cohorts performing very well, which demonstrates our ability to adapt our credit policy to a new riskier environment."); *id.* ¶ 169 ("We remain very focused on balancing risk and profitability, which is reflected in our relatively stable ROA and low expected losses."); *id.* ¶ 171 ("The economics of our credit solution have continued to be strong, with healthy risk-return levels.  The product has been presenting an ROA2 ranging from 2.0% to 2.5%, risk-adjusted-return, or RAR3, from 2.1% to 2.6% and risk-adjusted return after funding costs from 1.6% to 2.1% per month."); *id.* ¶¶ 173–74 ("Our credit portfolio reached 1.5 billion reais, distributed among nearly 90 thousand clients, with healthy monthly returns ranging from 2% to 2.5%. . . .  And we are very positive.  We are very happy to see the healthy level of the returns and the growth of this balance."); *id.* ¶ 178 ("[O]ur credit portfolio grew and remains healthy, reaching a risk-adjusted-return ('RAR') net of funding costs between 1.5% and 1.9% on a monthly basis."); *id.* ¶ 180 ("And the returns, even net of those delinquency, expected delinquencies that we have, we see returns around 2% a month net of delinquency.  So this is a very healthy return, and we remain very enthusiastic about that solution, working capital solutions for our clients."); *id.* ¶ 181 (" . . . when you go through such difficult environment and you can operate with healthy level of returns, you can see that the worst cohort is 0.5% amount of return.").
    These correspond with statements #1, #3, #5, #8, #11, #14, #20, #22, and #27 in Defendant's Memo.  Dkt. No. 68-1.

[5] This category contains the statements from StoneCo's 2019 and 2020 Form 20-F disclosures.  The first such risk disclosure was StoneCo's Form 20-F for Fiscal Year 2019, dated April 29, 2020.  Plaintiff alleges the following statements from this disclosure were materially misleading:

> We may not be able to effectively manage individual or institutional credit risk, or credit trends that can affect spending on card products and the ability of customers and partners to pay us, which could have a material adverse effect on our results of operations and financial condition.  We are exposed to institutional credit risk, principally from loans to our clients.  Clients may default on their obligations to us due to bankruptcy, lack of liquidity, operational failure or other reasons.  General economic factors, such as the rate of inflation, unemployment levels and interest rates, may result in greater delinquencies that lead to greater credit losses.  We rely principally on the client's creditworthiness and their ability to generate receivables for repayment of the loan, and therefore have no other collateral embedded.  Our ability to assess creditworthiness may be impaired if the criteria or models we use to manage our credit risk prove inaccurate in predicting future losses, which could cause our losses to rise and have a negative impact on our results of operations.  Further, our pricing strategies may not offset the negative impact on profitability caused by increases in delinquencies and losses; thus any material increases in delinquencies and losses beyond our current estimates could have a material adverse impact on us.  Rising delinquencies and rising rates of bankruptcy are often precursors of future write-offs and may require us to increase our reserve for loan losses.  Although we regularly review our credit exposure to specific clients and counterparties and to specific industries that we believe may present credit concerns, default risk may arise from events or circumstances that are difficult to foresee or detect, such as fraud.  In addition, our ability to manage credit risk may be adversely affected by legal or regulatory changes, such as restrictions on collections or changes in bankruptcy laws.  Increased credit risk, whether resulting from underestimating the credit losses inherent in our portfolio of loans, deteriorating economic conditions (particularly in Brazil), increases in the level of loan balances, changes in our mix of business or otherwise, could require us to increase our provisions for losses and could have a material adverse effect on our results of operations and financial condition.

Am. Compl. ¶ 159.  The second challenged risk disclosure was StoneCo's Form 20-F for Fiscal Year 2020, dated April 17, 2021.  Plaintiff alleges the following statements from this disclosure were materially misleading:

---

> We may not be able to effectively manage individual or institutional credit risk, or credit trends that can affect spending on card products and the ability of customers and partners to pay us, which could have a material adverse effect on our results of operations and financial condition. We are exposed to institutional credit risk, principally from credits provided to our clients. Clients may default on their obligations to us due to bankruptcy, lack of liquidity, operational failure or other reasons. General economic factors, such as the rate of inflation, unemployment levels and interest rates, may result in greater delinquencies that lead to greater credit losses. A client's ability and willingness to repay us can be negatively impacted not only by economic, market, political and social conditions but by a customer's other payment obligations, and increasing leverage can result in a higher risk that customers will default or become delinquent in their obligations to us. . . . Our ability to assess creditworthiness may be impaired if the criteria or models we use to manage our credit risk prove inaccurate in predicting future losses . . . . Thus, any material increases in delinquencies and losses beyond our current estimates could have a material adverse impact on us. Rising delinquencies and rising rates of bankruptcy are often precursors of future write-offs and may require us to increase our reserve for credit losses. Although we regularly review our credit exposure to specific clients and counterparties and to specific industries that we believe may present credit concerns, default risk may arise from events or circumstances that are difficult to foresee or detect. . . . In addition, our ability to manage credit risk may be adversely affected by legal or regulatory changes, such as restrictions on collections or changes in bankruptcy laws. Increased credit risk, whether resulting from underestimating the credit losses inherent in our portfolio, deteriorating economic conditions (particularly in Brazil), increases in the level of credit balances, changes in our mix of business or otherwise, could require us to increase our provisions for losses and could have a material adverse effect on our results of operations and financial condition.

*Id.* ¶ 176.

These correspond with statements #4 and #21 in Defendant's Memo. Dkt. No. 68-1.

process was improving over time;[6] and (5) statements blaming rising delinquencies on Brazil's new registry system and COVID-19 restrictions.[7]  There are two challenged statements that do not fit neatly into these categories.[8]

---

[6] This category contains the following statements:  Am. Compl. ¶ 162 ("We have improved significantly our scoring system over time, with daily enhancements to our algorithms, new talents brought in 2019 and a requirement of a minimum relationship period (data) that help us to be more assertive on the credit scoring."); *id.* ¶ 167 ("[O]ur delinquency rates are trending downwards as we implemented a more conservative credit policy during COVID."); *id.* ¶ 171 ("On credit, our differentiated solution allowed us to keep growing our outstanding balance at a strong pace while constantly improving our scoring model and risk management tools . . . ."); *id.* ¶ 173 ("We continue to enhance our credit scoring model, provisioning and collection tools, especially as we experience a second wave of Covid in Brazil, with lockdowns being imposed in some areas.  For this reason, we are being even more selective while disbursing new credit."); *id.* ¶ 178 ("On credit, we have been improving our credit scoring model . . . .").

The statements at Am. Compl. ¶¶ 173–74 regarding "new metrics" appear to refer to return metrics for tracking profitability rather than credit scoring metrics, but at the motion to dismiss stage without engaging in fact-finding, the Court accepts Plaintiff's allegation that these statements refer to credit origination.  *See* Dkt. No. 73, Lead Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Plaintiff's Opp."), at 7–8; Am. Compl. ¶ 174 ("[W]e are not changing the way that we book this operation . . . we have exactly the same methodology since the beginning.  What we are doing here is that we are showing new operational metrics in order to help everyone to track these operations. . . .  So everybody will understand the size of the outstanding balance, how much we have sold, risk-adjusted return and risk adjusted return net of cost of funding and the duration of the outstanding balance.  So I think that with these KPIs, everything can track the performance of our credit solutions."); *id.* ¶ 173 ("We have also started to manage new metrics, such as risk-adjusted return and risk-adjusted return net of funding costs.").

These correspond with statements #6, #10, #13, #15, #16, #17, #18, #19, and #23 in Defendant's Memo. Dkt. No. 68-1.

[7] This category contains the following statements:  Am. Compl. ¶ 178 ("Higher provisions for expected delinquency in our credit operations were influenced by more commerce restrictions in Brazil in the first quarter of 2021 amid a second wave of COVID."); *id.* ¶ 185 ("[G]iven the problems the market has faced with the accurate registration of receivables (as described in the prior sections), we are seeing higher delinquencies than what we expected and observed in prior periods, especially due to more difficult collections and considerably worse recoveries from non-performing clients."); *id.* ¶ 190 ("[O]ur credit product was designed to be fully collateralized.  So when we saw that the new registry system was not working properly, we saw that we could not enforce those collaterals.  So given the methodology that we have been using, the fair value methodology, and we saw this happening, what we did is we decreased our expectation of recovery of nonperforming loans."); *id.* ¶ 191 ("Although we recognize that our underwriting capabilities and collection process still have to evolve given the early stage of our credit solution, we believe that the malfunctioning of the providers of registry of receivables services has played an important role in the poorer-than-expected results, as it has enabled merchants to shift transactions to other acquiring services that in practice bypassed the collateral guarantees they had given to us."); *id.* ¶ 192 ("Our credit business remains in the early stages and we made some mistakes in our execution, especially not foreseeing how the malfunctioning of the registry system could harm our business.").

These correspond with statements #22, #30, #31, #32, and #34 in Defendant's Memo.  Dkt. No. 68-1.

[8] These miscellaneous statements are the following:  Am Compl. ¶ 157 ("So first, we expect to accelerate a lot credit through 2020.  So we are very focused on that.  So we will accelerate a lot, but it will be with a lot of focus on NPLs control."); *id.* ¶ 162 ("Our business model works in a merchant cash advance mode, in which clients pay with their sales; the deduction of a percentage of clients' daily processed volumes provide both alignment of our interests with theirs and protection for us, as we receive down payments immediately when they engage in electronic transactions, regardless of their payment provider.").

These correspond with statements #3 and #7 in Defendant's Memo.  Dkt. No. 68-1.

### B. Procedural History

Plaintiff commenced this action on November 19, 2021, Dkt. No. 1, and filed the Amended Complaint on August 8, 2022, Dkt. No. 55. Plaintiff brings claims against StoneCo, Piau, Pereira, Matos, and Baldin for violations of Section 10(b) of the Exchange Act and Rule 10b-5 for making allegedly material misrepresentations and omitting material information about the risks and problems associated with the Credit Product. Am. Compl. ¶¶ 262–69. Plaintiff also brings claims against the Individual Defendants for exercising their control over StoneCo to induce it to make the allegedly material misrepresentations and omissions. *Id.* ¶¶ 270–73. On November 7, 2022, StoneCo moved to dismiss the Amended Complaint for failure to state a claim. Dkt. No. 67. Plaintiff filed an opposition to the motion to dismiss on January 6, 2023. Dkt. No. 73. StoneCo filed its reply on February 13, 2023. Dkt. No. 74.

The main issues for the Court to address are (1) whether Plaintiff has sufficiently pleaded that the challenged statements and omissions are false or misleading; (2) whether Plaintiff has sufficiently pleaded that Defendants knew or recklessly disregarded that the statements were false or misleading; and (3) whether Plaintiff has sufficiently pleaded loss causation.

## III. LEGAL STANDARDS

### A. Rule 12(b)(6)

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)). To determine plausibility, courts follow a "two-pronged approach." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills*, 572 F.3d 66, 72

(2d Cir. 2009) (alterations and internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678). Second, a court determines "whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679). Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Because claims under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder sound in fraud, they are subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"). *Novak v. Kasaks*, 216 F.3d 300, 306–07 (2d Cir. 2000). Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To satisfy that requirement, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citing *Novak*, 216 F.3d at 306). The PSLRA imposes similar requirements on claims brought under the Exchange Act: "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The PSLRA further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each alleged misstatement or omission. 15 U.S.C. § 78u-4(b)(2)(A). A complaint will survive under that heightened standard "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

In resolving a motion to dismiss under Rule 12(b)(6), courts generally may not consider materials extrinsic to the complaint. Fed. R. Civ. P. 12(d). However, that rule is not absolute. In addition to the facts alleged in the complaint, courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI*, 493 F.3d at 98. Courts may also consider "matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citation omitted). Furthermore, on a motion to dismiss, the Court can consider statements made in a company's public filings with the SEC. *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991). However, the Court can consider them "'only to determine what the documents stated,' and 'not to prove the truth of their contents.'" *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).

### B. Section 10(b) and Rule 10b-5 Liability

Under Section 10(b) and Rule 10b-5, it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b); *see also* 15 U.S.C. § 78j(b). To state a claim under Section 10(b) and Rule 10b-5 for fraudulent misrepresentations, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *GAMCO Invs., Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)).

## IV.    DISCUSSION

### A.    Actionable Material Misrepresentations or Omissions

Defendants' statements about the conservativeness of the credit program and their enthusiasm for it were not misleading because they are inactionable puffery and optimism. Their statements about the portfolio's returns and delinquency rates were not false or misleading because Plaintiff does not challenge their accuracy, and Defendants did not have to disclose cross-cutting facts. Defendants' Form 20-F risk disclosures were not false or misleading because Plaintiff has not alleged that the risks identified in the disclosures had already transpired. However, Plaintiff has adequately alleged that the following two categories of statements were misleading: (1) statements asserting that the Credit Product had gotten more selective over time, and (2) statements blaming rising delinquency rates on Brazil's regulatory changes.

### 1.    Legal Standard

"A statement is misleading if a reasonable investor would have received a false impression from the statement." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010) (citation omitted). When a company does not have an obligation to speak but does so anyway, it assumes "a duty to be both accurate and complete." *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002); *see also In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) (explaining that once a corporation makes "a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate" (quotation omitted)). And "literally true statements" are actionable if they "create a materially misleading impression . . . ." *SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd and remanded on other grounds*, 568 U.S. 442 (2013). "The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context." *Morgan Stanley Info. Fund*, 592 F.3d at 366 (internal quotation marks omitted). Accordingly, plaintiffs "may not cherry pick certain public

statements for [their] complaint and divorce them from the universe of disclosed information to plausibly allege fraud." *Stichting Depositary APG Developed Mkts. Equity Pool v. Synchrony Fin. (In re Synchrony Fin. Sec. Litig.)*, 988 F.3d 157, 171 (2d Cir. 2021).

"Silence, absent a duty to disclose, is not misleading under Rule 10b-5[,]" *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988), but omissions can also be actionable under Section 10(b). An omission is actionable if the omitted information was subject to "an affirmative legal disclosure obligation" or the omitted information is "necessary to prevent existing disclosures from being misleading." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715–16 (2d Cir. 2011). The key is the "presence of a prior statement that otherwise is or will become materially misleading" because of the omission. *DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 206 (S.D.N.Y. 2019).

To incur liability, misrepresentations or omissions must be material. An omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Levinson*, 485 U.S. at 240 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)) (internal quotation marks omitted). "At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Caiola*, 295 F.3d at 329 (internal quotation marks and citation omitted).

### a. Statements of Opinion

As a general principle, "[t]o be actionable, a misrepresentation must be one of existing fact, and not merely an expression of opinion, expectation, or declaration of intention." *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 507 (S.D.N.Y. 2009) (internal quotation marks and citation omitted). Statements of opinion must be examined in the context in which they arise. "[T]he

investor takes into account the customs and practices of the relevant industry." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190 (2015). "[A]n omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame." *Id.*

Statements of opinion can give rise to liability in two distinct ways, even if they are sincerely believed: if they contain false embedded statements of fact or if they "omit[ ] material facts about the [speaker's] inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself . . . ." *Id.* at 189; *see Tongue v. Sanofi*, 816 F.3d 199, 209–10 (2d Cir. 2016) (applying *Omnicare* beyond Section 11 claims to claims arising under Section 10(b) and Rule 10b-5).

First, "liability for making a false statement of opinion may lie if either 'the speaker did not hold the belief she professed' or 'the supporting fact she supplied were untrue.'" *Tongue*, 816 F.3d at 210 (quoting *Omnicare*, 575 U.S. at 185–86). "It is not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, [or] not borne out by subsequent events." *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 24 (S.D.N.Y. 2016) (quoting *In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d 477, 489 (S.D.N.Y. 2004)) (internal quotation marks omitted). The Second Circuit has firmly rejected the "fraud by hindsight" approach. *See Stevelman v. Alias Rsch., Inc.*, 174 F.3d 79, 85 (2d Cir. 1999) (internal quotation marks and citation omitted).

Second, "opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Tongue*, 816 F.3d at 210 (citing *Omnicare*, 575 U.S. at 188–89). A reasonable investor "expects not just that the [speaker] believes the opinion (however irrationally), but that it fairly aligns with the information in the [speaker]'s possession at the time." *Omnicare*, 575 U.S. at 188–89. However, "[r]easonable investors understand that opinions sometimes rest on a

weighing of competing facts," and "do[ ] not expect that *every* fact known to [a speaker] supports its opinion statement." *Tongue*, 816 F.3d at 210 (quoting *Omnicare*, 575 U.S. at 194) (internal quotation marks omitted). Therefore, a statement of opinion "is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way." *Id.* (quoting *Omnicare*, 575 U.S. at 194) (internal quotation marks omitted).

At the pleading stage, a plaintiff "must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 209 (quoting *Omnicare*, 575 U.S. at 194) (internal quotation marks omitted). The "core inquiry is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'" *Id.* at 210 (quoting *Omnicare*, 575 U.S. at 194). The Supreme Court emphasized that this "is no small task for an investor." *Omnicare*, 575 U.S. at 194.

### b. Corporate Optimism and Puffery

General statements of optimism and puffery are non-actionable under federal securities laws because they are not "sufficiently specific that a reasonable investor could rely on [them] as a 'guarantee of some concrete fact or outcome.'" *Lopez*, 173 F. Supp. 3d at 29 (quoting *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014)); *see also In re Vale S.A. Sec. Litig.*, No. 1:15-cv-9539, 2017 WL 1102666, at *22 (S.D.N.Y. Mar. 23, 2017) (statements regarding "what [the defendant] is 'seeking' to do, what it is 'committed' to doing, what it is 'focused on,' what it is 'aiming' to do, and what its 'priorities' are" were non-actionable). Even "misguided optimism is not a cause of action, and does not support an inference of fraud" because, as stated above, the Second Circuit has "rejected the legitimacy of 'alleging fraud by hindsight.'" *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) (quoting *Denny v. Barber*, 576 F.2d 465, 470

16

(2d Cir. 1978)).  Allegations that a defendant should have been "more alert and more skeptical" are

insufficient; speakers are "not required to take a gloomy, fearful or defeatist view of the future . . . ."

*Id.*

However, like opinion statements, statements of optimism and puffery can be actionable

where they "contradict facts that are known to a defendant," *In re Virtus Inv. Partners, Inc. Sec. Litig.*,

195 F. Supp. 3d 528, 537 (S.D.N.Y. 2016), or where they amount to "'misrepresentations of existing

facts' that were made even though the speaker 'knew that the contrary was true,'" *Galestan v.*

*OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 298 (S.D.N.Y. 2018) (quoting *Novak v. Kasaks*, 216 F.3d

300, 315 (2d Cir. 2000)).

### 2. Statements About the Conservativeness of the Credit Product and About Defendants' Enthusiasm for It Are Inactionable Optimism and Puffery

The statements describing the Credit Product as "conservative" are inactionable puffery, and

the statements about the "opportunity" the Credit Product presented are inactionable optimism.

The adjectives "conservative," "resilient," and "rigorous" alone are too vague for a reasonable

investor to rely on them as a "concrete fact" about the risk profile of StoneCo's credit portfolio.

*Lopez*, 173 F. Supp. 3d at 29.  Likewise, the statements about "tight control over [the] supply of

credit," Am. Compl. ¶ 156, and "balancing risk and profitability," *id.* ¶ 169, "did not, and could not,

amount to a guarantee that [the company's] choices would prevent failures in its risk management

practices," *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 205–

06 (2d Cir. 2009) (analyzing a statement regarding "highly disciplined" risk management strategies).

These are merely "[v]ague positive statements regarding a corporate entity's risk management

strategy, asset quality, and business practices," which "are 'too general to cause a reasonable investor

to rely upon them' and therefore are 'precisely the type of puffery that this and other circuits have

consistently held to be inactionable.'"  *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 170 (2d Cir. 2021)

(quoting *ECA, Loc. 134*, 553 F.3d at 206); *see also Greco v. Qudian Inc.*, No. 1:20-CV-577-GHW, 2022

17

WL 4226022, at *14 (S.D.N.Y. Sept. 13, 2022) ("[G]eneric statements that Qudian's [loan risk]

strategy was 'conservative' and that Qudian 'expected to continue a conservative approach' are non-

actionable puffery." (citing *In re Sec. Cap. Assur. Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 597 (S.D.N.Y.

2010))); *Woodward v. Raymond James Fin., Inc.*, 732 F. Supp. 2d 425, 434–435 (S.D.N.Y. 2010) (holding

that statements about "commitment to risk management and conservative lending practices" are

"nothing more than a general platitude that accompanies nearly every press release or public

statement issued by a financial institution—it defines the term 'puffery.'").

The cases cited by Plaintiff are inapposite. In *Freudenberg v. E*Trade Financial Corp.*,

statements about asset "quality" were not mere puffery because "in [that] context," the defendants

were making statements about "specific credit characteristics" like "FICO scores and LTVs." 712 F.

Supp. 2d 171, 190 (S.D.N.Y. 2010). They were not describing "an amorphous concept"; they were

asserting that a *measurable* level of risk had not *increased*. *Id.* By contrast, the statements made by

Defendants describing the Credit Product as merely "conservative" and "resilient" are not

sufficiently concrete as to "be measured or verified." *Oklahoma Firefighters Pension & Ret. Sys. v. Xerox

Corp.*, 300 F. Supp. 3d 551, 570 (S.D.N.Y. 2018), *aff'd sub nom. Arkansas Pub. Emps. Ret. Sys. v. Xerox

Corp.*, 771 F. App'x 51 (2d Cir. 2019); *see also In re IndyMac Mortg.-Backed Sec. Litig.*, 718 F. Supp. 2d

495, 509 (S.D.N.Y. 2010) (holding that a company that "embarked on a path of aggressive growth,"

making loans "with little, if any, review of borrower qualifications," made false statements by

specifically outlining underwriting standards and "factors like loan-to-value ratios, debt-to-income

ratio," etc. that it failed to consider (internal quotation marks omitted)).

Further, the statements about the "opportunity" that the Credit Product presented as well as

Defendants' statements of their "confiden[ce] with" and "appetite for" the Credit Product are all

vague statements of optimism. None provide "concrete and measurable areas of the defendant

company's performance." *See Oklahoma Firefighters*, 300 F. Supp. 3d at 570 (holding that statements

18

that "things are going well" and "that the company is 'well positioned'" are inactionable).  All are

"textbook cases of corporate optimism." *Robeco Cap. Growth Funds SICAV – Robeco Glob. Consumer*

*Trends v. Peloton Interactive, Inc.*, 665 F. Supp. 3d 522, 540 (S.D.N.Y. 2023) (holding that statements

about a "fantastic year" ahead, about "a trend that's here to stay," and about "continued

momentum" are inactionable optimism).

These statements of optimism and corporate puffery are not actionable here because

Plaintiff does not allege that Defendants made these statements with the actual knowledge that they

were untrue.  Plaintiff only alleges that Defendants knew that the look-back periods had been

shortened, that the third-party credit checks were ended, that its due diligence standards were

reduced, and that some borrowers were avoiding repayment.  Am. Compl. ¶¶ 152–55.  These facts,

assumed true, do not support the allegation that Defendants knew that the Credit Product could

not, in their opinion, be characterized as "resilient," "rigorous," or "conservative."  *In re Wachovia*

*Equity Sec. Litig.*, 753 F. Supp. 2d 326, 355 (S.D.N.Y. 2011) ("Plaintiffs here supply no particularized

allegations that Defendants knew or should have known that their underwriting standards were *not*

conservative while publicly maintaining the opposite.").  That StoneCo had "*loosened*, not tightened,

its due diligence standards" shows only that the product became *less* selective, not that it became *un*-

selective.  Am. Compl. ¶ 78 (emphasis added).  Further, Plaintiff fails to allege that these loosened

standards meant that Defendants "did not sincerely believe" their optimistic statements.  *See In re*

*AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 258 (S.D.N.Y. 2023) ("[T]he fact that Lee may have had

reasons to be less-than-optimistic about AppHarvest's current operations does not necessarily mean

that Lee did not sincerely believe that AppHarvest's early performance provided reason to be

optimistic that the Company could work and be successful . . . .").  Defendants' statements about

the conservativeness and opportunity of the Credit Product are thus inactionable optimism and

puffery.

### 3. Positive Statements Disclosing the Credit Product's Returns and Delinquency Rates Were Not Misleading

Defendants' positive statements disclosing the Credit Product's "healthy" returns and "low" delinquency rates are not adequately alleged to be misleading because (1) the factual assertions regarding the returns and delinquency rates are not alleged to be inaccurate, and (2) Defendants' characterizations of the data are puffery that do not mislead investors about underlying credit standards.

### a. Statements Disclosing Returns and Delinquencies

At no point does the Amended Complaint allege the falsity of any of the disclosed delinquency rates or return-on-investment ("ROI") statistics disclosed by StoneCo. Rather, Plaintiff argues that "positive statements about [StoneCo's] business" that were "literally true" were nonetheless misleading because "Defendants failed to disclose material facts." Am. Compl. ¶¶ 148, 150. Again, these facts are that in 2020, the look-back period was reduced, third-party credit checks were terminated, due diligence standards were reduced, and some borrowers used competitor POS devices to avoid repayment. *Id.* ¶ 152. While these facts do support concerns about the Credit Product's future prospects or its change in risk over time, *see* Section IV.A.5 below, they do not render the ROI statistics and the delinquency rates, which only convey the performance of the portfolio *at that time*, misleading. Nor do these statistics give investors the impression that there were no cross-cutting forces underlying the healthy returns and low delinquency rates. *See In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 270 (S.D.N.Y. 2023) ("Defendants' failure to disclose certain negative impacts on its sales in conjunction with [statements reporting net sales] was not misleading. . . . Defendants' factual statement on net sales for the first quarter of 2021 did not leave investors with the misleading impression that AppHarvest faced no challenges impacting its sales for that quarter . . . ." (internal citations and quotation marks omitted)).

### b. Characterizations of the Return and Delinquency Data

Further, Plaintiff fails to allege that Defendants' characterizations of this data as "healthy" and "resilient" are false or misleading; nor did Defendants assume an obligation to disclose cross-cutting facts when they chose to characterize the data in this way.

The characterizations of "healthy," "strong," "very positive," and "resilient" are inactionable puffery because they "conveyed no meaningful, objective data that an investor would rely upon." *Oklahoma Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 569–70 (S.D.N.Y. 2018), *aff'd sub nom. Arkansas Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019) ("Another set of similarly ineligible statements are those that vaguely and enthusiastically described Xerox's performance . . . ."). Additionally, the loosened credit standards and collection issues do not contradict any statement asserting that the Credit Product's *returns* were "healthy" or "resilient" or that NPLs were "low" at the time the statements were made. *See Tongue v. Sanofi*, 816 F.3d 199, 214 (2d Cir. 2016) (holding that the "[p]laintiffs fail to demonstrate any conflict between" the company's characterization of the data and the FDA's criticisms of the methodology). For example, Plaintiff has not alleged that two percent monthly returns "*net of those delinquency*" is not "a very healthy return" even if there existed certain headwinds. Am. Compl. ¶ 180 (emphasis added). Likewise, Plaintiff has not adequately alleged that it was misleading for StoneCo in March of 2020 to characterize "mid-single digits" delinquency rates as "low" because Plaintiff does not assert that mid-single-digit delinquency rates are anything other than low. *Id.* ¶ 151.

Nor does the portfolio's overall return or delinquency rate create a false impression about any of the specific underlying fundamentals, like credit standards or collectability. *See In re Dynagas LNG Partners LP Sec. Litig.*, 504 F. Supp. 3d 289, 318 (S.D.N.Y. 2020) (holding that the plaintiffs failed to plead that statements about a company's overall cash flow misled investors regarding the revenues from specific contracts). Therefore, concerns about the underlying credit standards do not

render Defendants' vague, positive statements about the portfolio's overall returns and delinquency rates false or misleading.

### 4. StoneCo's Risk Disclosures Were Not Misleading

Plaintiff fails to adequately allege that StoneCo's risk disclosures were materially misleading because they fail to allege that any of the stated risks had already transpired when the disclosures were made. The "test" for "when a risk disclosure will constitute a material misrepresentation" is "whether a 'reasonable investor could have been misled about the nature of the risk when he invested.'" *In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 267 (S.D.N.Y. 2023) (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002)). "Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004); *see also In re Coty Inc. Sec. Litig.*, No. 14-CV-919, 2016 WL 1271065, at *11 (S.D.N.Y. Mar. 29, 2016) ("[A] company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized." (quoting *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013)). "[T]he potential for the disclosure to mislead often turns on the specificity of the disclosure. The more specific the caution, the closer it comes to an implied representation of fact and the more likely it is to mislead." *In re AppHarvest*, 684 F. Supp. 3d at 268.

Plaintiff fails to allege that any of the risks identified in the challenged disclosures had already transpired when they were issued. The risk disclosures warn of "individual [and] institutional credit risk" that would "have a material adverse effect on our . . . financial condition"—"[c]lients may default on their obligations to us due to bankruptcy, lack of liquidity, operational failure, or other reasons." Am. Compl. ¶¶ 159, 176. The disclosures also warn that StoneCo's models could "prove inaccurate in predicting future losses." *Id.* Plaintiff contends that these "warnings about what 'may' or 'could' pose a risk . . . had already transpired." *Id.* ¶ 160.

However, Plaintiff fails to allege that clients *were* unable to pay StoneCo, that clients *had* defaulted on their obligations, or that the models *had* proved inaccurate at the time these statements were made. Plaintiff's allegations that "a lot of customers [were] taking the line of credit and not paying it back" is not sufficient to say that the risk of default Defendants disclosed had transpired. *Id.* ¶ 100. First, Plaintiff does not allege at what time these collection issues occurred. Second, Plaintiff does not allege the extent of the collection issues and therefore how the collection issues rendered the disclosures misleading. No ordinary investor would read StoneCo's general disclosures to mean that not a single borrower had experienced an inability or unwillingness to pay off their loan, so Plaintiff must do more than simply allege that a few defaults had occurred. *See In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 268 (S.D.N.Y. 2023) ("No ordinary investor would understand such general disclosures to signify that AppHarvest had been able to retain *all* of its employees or that *all* of its products were flawless." (emphasis added)); *Chapman v. Mueller Water Prod., Inc.*, 466 F. Supp. 3d 382, 406 (S.D.N.Y. 2020) ("It is evident and would have been evident to the ordinary investor that Mueller was not warranting that every one of its newer technologies was defect-free . . . . Thus, *the risk disclosure language can be understood to convey* that . . . there was a risk that Mueller would incur *additional 'significant' expenses* in connection with defects." (emphasis added)). Plaintiff has failed to allege that the general disclosures misrepresented the amount of credit defaults or credit risk that then existed.

Likewise, Plaintiff does not allege the extent to which the lending standards and collection issues caused significant portfolio losses, whether Defendants knew about those losses, or whether those losses occurred *prior* to the risk disclosures. *See Chapman*, 466 F. Supp. 3d at 406 n.6 ("Plaintiffs have not adequately alleged that the product failures did in fact result in lost revenue, significant warranty and other expenses, and harm to our reputation at the time of these statements and before the two warranty charges, or that Defendants knew that these risks had materialized."

(internal quotation marks omitted)).  To the contrary, Plaintiff cites and does not contest that as late as June 2021, over a month after the second Form 20-F risk disclosure, StoneCo saw returns of "around 2% a month net of delinquency."  Am. Compl. ¶ 180.  All that Plaintiff alleges is that, by the time the statements were made, StoneCo's lending standards had been significantly loosened and that some number—an amount Plaintiff fails to specify—of customers were avoiding repayment by using competitor POS devices.  *Id.* ¶¶ 152–55.  However, the allegations that lending standards were loosened and that collection slowed—to an unspecified degree—do not, alone, show that StoneCo suffered the significant credit problems cautioned in the disclosures.  Thus, Plaintiff has failed to allege that the risk disclosures made misleading representations about credit risks that had already transpired.

### 5.  Statements About Improvements to the Credit Product and Increased Selectivity Over Time Were Plausibly Misleading

Plaintiff plausibly pleads that it was misleading for Defendants to assert that they were improving the Credit Product's scoring system over the Class Period.  Plaintiff provides numerous specific allegations, supported by information from confidential witnesses whose competence has not been challenged, that during the Class Period, StoneCo made decisions that lowered borrowing standards.  Am. Compl. ¶¶ 81–89.  Specifically, StoneCo reduced the look-back period from six months to three months, *id.* ¶¶ 82, 87–88, and after ending third-party due diligence, StoneCo could no longer conduct real-time credit verifications, *id.* ¶ 84.  These facts, which indicate that StoneCo's credit analysis took *less* data and history into account, contradict Defendants' statements that the credit scoring system was "improved" or "enhanced."  *Id.* ¶¶ 162, 171, 173, 178.  While Defendants argue that Plaintiff has inadequately pleaded "how the scoring system worked as a whole," Defendant's Memo. at 13, the Amended Complaint does allege that the three-month review was "the only" assessment of creditworthiness required by StoneCo, Am. Compl. ¶ 88.  If the look-back period became the only assessment of credit (after previously doing real-time credit checks),

particularly if this period was increasingly shortened, Plaintiff plausibly pleads that the scoring

system was neither enhanced nor otherwise made more selective.

Further, Plaintiff alleges that StoneCo stopped "looking into the amount of debt that [its]

customers already had," *id.* ¶ 85, and began "offering credit to individuals based on just days of

transaction information" with "almost no review at all," *id.* ¶ 89.  These allegations surely contradict

Defendants' statements that StoneCo's credit policy got "more conservative" and "more selective"

over the Class Period.  *Id.* ¶¶ 167, 173.  *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 190

(S.D.N.Y. 2010) ("Defendants denied that E*TRADE's real estate loan portfolio had become more

risky—even though it is alleged that the risks had increased."); *In re Ambac Fin. Grp., Inc. Sec. Litig.*,

693 F. Supp. 2d 241, 270, 276 (S.D.N.Y. 2010) (holding that it is materially misleading to state that

an underwriter has "maintained the same conservative standards over the years" while

simultaneously lowering the underwriting standards).  Thus, Plaintiff has plausibly pleaded that

Defendants materially misled investors by asserting that credit scoring was improving and that credit

distribution was becoming more conservative during the Class Period.

### 6. Statements Blaming Rising Delinquencies on Brazil's Registry System and COVID-19 Were Plausibly Misleading

Plaintiff has sufficiently alleged that Defendants' statements blaming rising credit

delinquencies on Brazil's new registry system and COVID-19 were misleading because Defendants

were under an obligation to also discuss the loosened credit standards and the collectability issues as

factors contributing to greater delinquencies.  When a company does not have an obligation to speak

but does so anyway, it assumes "a duty to be both accurate and complete."  *Caiola v. Citibank, N.A.,*

*N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002); *see also In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347,

366 (2d Cir. 2010) (explaining that once a corporation makes "a disclosure about a particular topic,

whether voluntary or required, the representation must be complete and accurate" (internal

quotation marks omitted)).  When StoneCo and its executives chose to put out statements about the

reasons for rising delinquencies, they assumed an obligation to provide complete and accurate information to investors by including other material reasons known to them.  *See DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 206 (S.D.N.Y. 2019) (Woods, J.) ("[A] corporation may be compelled to disclose[] uncharged wrongdoing . . . when a corporation puts the reasons for its success at issue, but fails to disclose that a material source of its success is the use of improper or illegal business practices.") (citing *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 581 (S.D.N.Y. 2016)).  Otherwise the explanations given for rising delinquencies "become materially misleading."  *Id.*

Plaintiff alleges that Defendants knew that "the true reason the Company was seeing increased delinquencies was not due to the change in the registry system but because of the loosened credit standards and collectability issues that the Company experienced during the Class Period and knew about all along."  Am. Compl. ¶ 130.  Assuming this to be true, StoneCo's statements omitting loosened credit standards and collection issues as possible explanations for the rise in delinquencies are materially misleading.  Even if these are considered statements of opinion, Plaintiff alleges facts showing that Defendants had many reasons to believe that delinquencies were not due to the registry system:  the reduced look-back periods, the termination of third party due diligence and real-time credit checks, and the trend of borrowers using competitor POS devices to avoid repayment. *Id.* ¶ 152.  "[O]pinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor."  *Tongue*, 816 F.3d at 210 (citing *Omnicare*, 575 U.S. at 188–89).  A reasonable investor "expects not just that the [speaker] believes the opinion (however irrationally), but that it fairly aligns with the information in the [speaker]'s possession at the time."  *Omnicare*, 575 U.S. at 188–89.  Because Plaintiff adequately pleads that Defendants had information regarding loosened lending standards, the propagation of "easy credit," and collection issues, all of which implicate

rising delinquencies, Plaintiff adequately pleads that Defendants' statements blaming the delinquencies solely on Brazil's new registry system were misleading.

### 7. The Two Remaining Statements Were Not Misleading

Piau's March 2, 2020 statement that StoneCo "will accelerate [credit] a lot . . . with a lot of focus on NPLs control" is a forward-looking statement that is protected by the PSLRA's safe harbor. Am. Compl. ¶ 157. The PSLRA defines forward-looking statements as, among others, statements of "the plans and objectives of management for future operations" and statements of "future economic performance." 15 U.S.C. § 78u-5(i)(1)(B)–(C). To plead scienter for a forward-looking statement, a plaintiff must allege that the statement was made "with actual knowledge" of its falsity. 15 U.S.C. § 78u-5(c)(1)(B); *see also Slayton v. Am. Exp. Co.*, 604 F.3d 758, 776 (2d Cir. 2010) ("[T]he scienter requirement for forward-looking statements is stricter than for statements of current fact. Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity."). The statement that StoneCo "*will* accelerate credit" and "focus on" minimizing NPLs is certainly a statement about the plans and objectives of management for future operations. *See In re Vale S.A. Sec. Litig.*, No. 1:15-CV-9539-GHW, 2017 WL 1102666, at *22 (S.D.N.Y. Mar. 23, 2017) (statements regarding "what [the defendant] is 'seeking' to do, what it is 'committed' to doing, what it is 'focused on,' what it is 'aiming' to do, and what its 'priorities' are" were non-actionable). Plaintiff does not allege that Piau knew that StoneCo did not intend to minimize NPLs. Plaintiff only alleges that Piau knew that the look-back periods had been shortened and that there were some collection problems. As discussed above, this allegation is not equivalent to showing that Piau had actual knowledge at the time the statement was made that NPLs would get out of control.[9]

---

[9] Additionally, this statement was made in March of 2020. The pleadings allege that in March 2020, the look-back period was only shortened to three months and that StoneCo had only "started building up [its] own versions of the customer profiles and shifting away from using the third-party" due diligence. Am. Compl. ¶¶ 82–83. These facts do not support

StoneCo's May 26, 2020 statement describing the Credit Product's repayment process was factual and not misleading. *See* Am. Compl. ¶ 162 ("[T]he deduction of a percentage of clients' daily processed volumes provide both alignment of our interests with theirs and protection for us, as we receive down payments immediately when they engage in electronic transactions, regardless of their payment provider."). This statement merely describes the how StoneCo's merchant borrowers repay their loans. Plaintiff alleges that this is indeed how the Credit Product works. *Id.* ¶ 5. Merely explaining the loan product's design does not create a misleading impression that there would be no issues with collection or that the product would be successful. *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 579 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) (holding that factual statements about the company's third-party testing process did not mislead investors about potential defects in the product).

## B. Scienter

### 1. Legal Standard

Under the heightened pleading standards of Fed. R. Civ. P. 9(b) and the PSLRA, a plaintiff alleging securities fraud must allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A); *see also Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007). The question "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322–23.

An "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. If an inference of fraudulent intent is not "at least as compelling" as a contrary

---

the inference that Piau knew that StoneCo was not focusing on NPL control when the statement was made. Further, the Amended Complaint does not specifically state *when* the loosened standards and collection issues were raised to Piau, only that they were raised at meetings and in reports "[d]uring the Class Period." Am. Compl. ¶¶ 102–10.

inference, it is inadequate, even in a "close case." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 777 (2d Cir. 2010). An inference of scienter need not be "irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324 (quotation omitted); *see also City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) ("[A]t the motion to dismiss stage, a tie on scienter goes to the plaintiff."). "But generic and conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standard." *Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 336 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x 212 (2d Cir. 2010). "Thus, a complaint 'which fails to adduce any specific facts supporting an inference of knowledgeable participation in the alleged fraud, will not satisfy even a relaxed standard.'" *Faulkner v. Verizon Comm'ns, Inc.*, 156 F. Supp. 2d 384, 393 (S.D.N.Y. 2001) (quoting *Devaney v. Chester*, 813 F.2d 566, 569 (2d Cir.1987)).

"While 'the absence of a motive allegation is not fatal,' motive can be a relevant factor, and 'personal financial gain may weigh heavily in favor of a scienter inference.'" *Slayton*, 604 F.3d at 776 (quoting *Tellabs*, 551 U.S. at 325). Absent a showing of motive, "the strength of [Plaintiff's] circumstantial allegations must be correspondingly greater." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 199 (2d Cir. 2009) (quoting *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)). In sum, "[t]he inquiry on a motion to dismiss is as follows: 'When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?'" *In re Scot. Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 383 (S.D.N.Y. 2007).

### 2. Plaintiff Adequately Pleads Scienter

Plaintiff has pleaded enough circumstantial evidence to sufficiently allege that StoneCo's executives knew of or recklessly disregarded the loosening credit standards and collectability issues. Plaintiff not only pleads that the Individual Defendants had access to internal company data and

reports, Am. Compl. ¶¶ 90, 105, 107, but also pleads that the Individual Defendants attended weekly Friday calls where problems with the Credit Product were raised, *id.* ¶ 92.

Plaintiff describes the contents of the available data: *Marco Polo* was created "to automatically conduct a three-month review of a customer's POS transactions," *id.* ¶ 88; it generated "alerts . . . when merchant customers used a competitor's POS machine," *id.* ¶ 103; and it "indicated whether that customer had borrowed from StoneCo," *id.* ¶ 104. *Contra Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 299–300 (S.D.N.Y. 2010) ("[B]road reference to raw data is not sufficient. . . . Plaintiff has not specifically identified any reports or statements or any dates or time frame in which Defendants were put on notice of contradictory information." (internal citations and quotation marks omitted)). Plaintiff alleges that StoneCo employees "up through [the] chain of command," including Aguiar and Pontes, had access to this data. *Id.* ¶ 105. Plaintiff further alleges that credit delinquency data "made it up the chain of command to the senior executives." Am. Compl. ¶ 90. These facts support the inference that these defendants were aware that customers were "getting approved for lines of credit after being customers for only 5, 10, or 15 days" and that StoneCo's borrowers were using competitors' machines to avoid repayment. *Id.* ¶¶ 89, 84. *Contra Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021) ("[T]he complaint fails to specify exactly what information was contained in the report or how said information contradicted [d]efendants' public statements, as is required to show scienter." (internal quotation marks omitted)).

Plaintiff also alleges that "senior leadership, including named Defendants, tracked losses through weekly, monthly, quarterly, and annual reports" and thus "had intimate knowledge of StoneCo's risky loans and collectability issues." Am. Compl. ¶ 106. While a "general claim of the existence of confidential company sales reports . . . is insufficient to survive a motion to dismiss," *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 812 (2d

Cir. 1996), Plaintiff does identify "who prepared the projected figures, when they were prepared, how firm the numbers were, [and] which officers reviewed them," *Arazie v. Mullane*, 2 F.3d 1456, 1467 (7th Cir. 1993). Plaintiff alleges that weekly reports were prepared by the "Risk Analysis group," that they contained information on losses and transaction fee generation, and that the "senior leader[s]" met weekly to review them. Am. Compl. ¶¶ 106–08; *see also id.* ¶ 107 ("[S]ome loss reports were also reviewed at quarterly meetings with CEO Thiago dos Santos Piau present . . . .").

Plaintiff also alleges that there were meetings "every Friday" that were "attended by the top brass," which regularly included the Individual Defendants. *Id.* ¶ 92. "[T]he problems with the credit product and the registry were brought up on these weekly Friday calls." *Id.* Further, "after problems started with the credit product, André Street de Aguiar also attended the weekly Friday calls." *Id.* These facts support that declining credit standards and collectability issues were directly raised to the Individual Defendants.

All of these alleged facts, "taken collectively," support a strong inference that various senior executives, including the Individual Defendants, knew that StoneCo's lending standards had loosened and that merchants were using competitor POS devices to avoid repayment. *Tellabs*, 551 U.S. at 323. Plaintiff has thus adequately pleaded that Defendants had knowledge that the actionable statements were misleading.

### C. Loss Causation

Because Defendants' allegedly misleading statements concealed an increasing risk of defaults, Plaintiff plausibly pleads loss causation by showing that StoneCo eventually suffered significant defaults. "It is long settled that a securities-fraud plaintiff 'must prove both transaction and loss causation.'" *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005) (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994)); *accord Weiss v. Wittcoff*, 966 F.2d 109, 111 (2d Cir. 1992). To plead transaction causation, a plaintiff must plead simply that "but for

the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction." *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 373 F.3d 189, 197 (2d Cir. 2003). "Loss causation" in the context of a private securities fraud action refers to a "causal connection between the material misrepresentation and the loss." *Dura Pharms, Inc. v. Broudo*, 544 U.S. 336, 342 (2005) (citing 15 U.S.C. § 78u-4(b)(4)). To establish loss causation, "a plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered." *Lentell*, 396 F.3d at 173 (emphasis in original).

A plaintiff may plead loss causation *either* by alleging "(a) 'the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud;' or (b) 'that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'" *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 235 (2d Cir. 2014) (citing *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010) (internal quotation marks omitted)); *see also Lentell*, 396 F.3d at 175 n.4.

Under a risk materialization theory, a misstatement or omission is "the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed 'by the misrepresentations.'" *In re Omnicom Grp.*, 597 F.3d at 513 (quoting *Lentell*, 396 F.3d at 173). A plaintiff's loss must be both a "foreseeable" consequence of the alleged misstatements and omissions, as well as the result of "the materialization of the concealed risk." *Lentell*, 396 F.3d at 173. Therefore, to state a claim under a risk materialization theory, a plaintiff must allege facts to show that the defendant's false statements and omissions concealed the risk that materialized and played "some part in diminishing the market value" of the securities. *Id.* at 176–77. In *Lentell*, the Second Circuit explained:

> where . . . substantial indicia of the risk that materialized are unambiguously apparent on the face of the disclosures alleged to conceal the very same risk, a plaintiff must allege (i) facts sufficient to support an inference that it was defendant's fraud—rather than other salient factors—that proximately caused plaintiff's loss; or (ii) facts

> sufficient to apportion the losses between the disclosed and concealed portions of
> the risk that ultimately destroyed an investment.

*Id.* at 177.

Plaintiff has sufficiently alleged facts supporting loss causation under a risk materialization theory. Plaintiff alleges that the value of their investment decreased after they "relied upon StoneCo's false and misleading claims about the safety and profitability of StoneCo's growing credit portfolio." Am. Compl. ¶ 79. As discussed above, Plaintiff alleges numerous facts supporting the idea that, contrary to Defendants' representations, StoneCo had "materially loosened, not tightened, its due diligence standards" during the Class Period, which concealed the risk that StoneCo's Credit Product would see rising defaults. *Id.* ¶ 78. Then, around August 2021, StoneCo began revealing to investors "higher delinquencies" and "non-performing clients," which caused StoneCo's stock price to fall. *Id.* ¶ 127–30; *see also id.* ¶ 132; *id.* ¶ 138 ("[T]he percentage of non-performing loans—loans that the Company did not expect to be repaid—was now up to 48% from the 35% the Company had disclosed the previous quarter."). Plaintiff has thus adequately alleged facts sufficient to infer that Defendants' misleading statements concealed a risk that ultimately materialized to Plaintiff's detriment. *See Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202–03 (S.D.N.Y. 2010) (finding plausible loss causation where the defendants' "false and misleading statements" about the safety of their loan portfolio "concealed risks" that were revealed when "E\*TRADE partially disclosed a $30 million increased provision for loan losses").

## V.    LEAVE TO AMEND

StoneCo's motion to dismiss is granted in part with leave to amend as described below. "The court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, leave may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)).

The Court dismisses without prejudice the claims arising from Defendants' statements describing the Credit Product as "conservative" and "a huge opportunity," the Form 20-F risk disclosures, and Piau's March 2, 2020 statement that StoneCo "will accelerate [credit] a lot . . . with a lot of focus on NPLs control." The Court does not believe that an amendment with respect to these statements would be futile. Plaintiff might amend these claims such that the statements of optimism and puffery and Piau's forward-looking statement are actionable by alleging adequate scienter. Plaintiff might also be able to allege that the credit risk disclosed in the Form 20-F disclosures had already transpired. The Court therefore grants Plaintiff leave to file a second amended complaint solely to cure the deficiencies identified with respect to these claims no later than 30 days from the date of this order. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 191 (2d Cir. 2015).

However, the Court dismisses with prejudice all statements disclosing StoneCo's return-on-investment statistics and delinquency rates and StoneCo's May 26, 2020 statement describing the Credit Product's repayment process. Plaintiff does not contest that the return-on-investment statistics and delinquency rates are accurate. *See* Plaintiff's Opp. at 13 ("The statements were not false and misleading because NPLs were higher than Defendants actually claimed, but because . . . ."). Nor does Plaintiff contest that the repayment process worked as described in Amended Complaint ¶ 162. Because the Court finds that the accuracy of these statements and the alleged omissions did not render the statements misleading, the Court finds repleading of these claims to be futile. *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 49 (2d Cir. 1991) ("[A]s the nature of the above transaction is undisputed—plaintiffs dispute the legal significance that should be given these facts, not the facts themselves—no facts may be alleged that would cause Westinghouse to be liable.").

## VI.    CONCLUSION

For the foregoing reasons, StoneCo's motion to dismiss is GRANTED IN PART and DENIED IN PART.

Plaintiff has adequately alleged that the statements about the increasing selectivity of the Credit Product over time and the statements blaming rising delinquency rates on Brazil's regulatory changes were misleading; that Defendants knew or recklessly disregarded that those statements were misleading; and that this fraudulent conduct caused Plaintiff's loss.  Claims arising from the remaining statements are dismissed as described above.

The Clerk of Court is directed to terminate the motion pending at ECF No. 67.

SO ORDERED.

Dated:  September 25, 2024
        New York, New York

_____
GREGORY H. WOODS
United States District Judge

35