```
                  UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF NEW YORK
----------------------------:
RONALD F. RAY, individually :Case No.: 21-cv-9620
and on behalf of others     :
similarly situated,         :
               Plaintiff,   :
      v.                    :
STONECO LTD.,               : New York, New York
                            : December 18, 2024
               Defendants.  :
----------------------------:
```

TRANSCRIPT AND STATUS CONFERENCE HEARING

BEFORE THE HONORABLE ONA T. WANG

UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| For Plaintiff: | LABATON KELLER SUCHAROW LLP<br>BY:  MICHAEL ROGERS, ESQ.<br>     JACQUELINE MEYERS, ESQ.<br>140 Broadway<br>New York, New York 10005 |
| For Defendant:<br>StoneCo | QUINN EMANUEL URQUHART & SULLIVAN<br>BY:  Leigha Empson, Esq.<br>     Jesse Bernstein, Esq.<br>295 5th Avenue<br>New York, New York 10016 |

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

AMM TRANSCRIPTION SERVICE - 631.334.1445

THE DEPUTY CLERK:  This is 21-cv-9620; In Re StoneCo Ltd. before the Honorable Ona T. Wang.

Please state your appearances for the record.

MR. ROGERS:  Good morning, Your Honor. Michael Rogers from Labaton Keller Sucharow LLP on behalf of Indiana Public Retirement System and the class.

And my colleague will introduce herself, but I believe she'll be doing most of the speaking today unless Your Honor has questions for me.

THE COURT:  Okay.

MS. MEYERS:  Good morning, Your Honor.  My name is Jacqueline Meyers, also with Labaton Keller Sucharow on behalf of lead plaintiff, Indiana Public Retirement System and the class.  Thank you.

MS. EMPSON:  Good morning, Your Honor. Leigha Empson from Quinn Emanuel on behalf of defendant, StoneCo.

MR. BERNSTEIN:  Good morning, Your Honor. Jesse Bernstein, Quinn Emanuel Urquhart & Sullivan, on behalf of defendant, StoneCo.

THE COURT:  All right.  Good morning.

All right.  This is an initial case management conference, I think, in a 2021 case,

understandably, because there's been so much motion practice.

Ms. Meyers, why don't you talk to me a little bit about what this case is about.  I've read the 26(f) report, but let's hear it in your own words.

Yeah.  You can also -- one of the things I do -- not everybody does it.  You can also stay seated and just talk into the microphone if you want.  It's up to you.

MS. MEYERS:  Sure.  I think, for purposes of the recording, it might be a bit more logistically easy to have the microphone at this height.

Good morning, Your Honor.  This is a putative class-action federal securities case brought on behalf of all purchasers of StoneCo common stock from March 2, 2020 through November 16, 2021, inclusive.

We are specifically alleging against defendant, StoneCo, violations of § 10(b) of the Securities and Exchange Act of 1934 and Rule 10(b)(5) promulgated thereunder.  More specifically, the claims here relate to misstatements and omissions made by defendant, StoneCo, during the

class period regarding the safety and profitability of its loan portfolio and credit product.  Investors incurred market losses following a series of disclosures by StoneCo revealing significantly increased credit delinquencies due to StoneCo's undisclosed risky lending practices and collectability issues.

Judge Woods issued an order on defendant's motion to dismiss on September 25, 2024, which granted in part and denied in part defendant's motion.  As a result, the sustained misstatements in this action fall into two categories; first, statements asserting that StoneCo's credit product was becoming more selective and its credit scoring process was improving over time; and second, that statements blaming rising loan delinquencies on Brazil's new registry system and COVID-19 restrictions were false and misleading.

THE COURT:  Okay.  All right.  So you've got all of your scheduling in.

Are there any potential disputes about the process or about discovery or timing?  It doesn't look like it, but I wanted to make sure that you all had an opportunity to bring it up right now if you do.

MR. ROGERS:  Your Honor, if I may, and I'll be brief.  As you might notice, in one of the items in the proposed CMP -- I'm sorry.  I'm old school. I cannot talk to a judge sitting.  Just my voice doesn't --

THE COURT:  That's fine.

MR. ROGERS:  My voice doesn't work.

THE COURT:  I actually was kind of the same, so ...

MR. ROGERS:  Yeah.

So we've been in the process of negotiating an ESI protocol.  I think it's generally going well. There is one issue that I fear may be ripe.

So just to answer your question, there's been a little bit of give and take and push and pull about whether text messages, ESI on personal devices, IMs -- in a case where there's overseas, it could be WeChat, you know, those sort of what I would call non-ESI -- I don't want to say that --

THE COURT:  Non-ESI ESI?

MR. ROGERS:  Exactly.  Yeah.  Or I was going to say, "non-e-mail," but you beat me to the punch.

THE COURT:  Yeah.

MR. ROGERS:  I don't want to say it's ripe,

but it's not unripe.  So I just want to give the Court the heads-up that if the defendants take the position that they're allowed to address, let's say, on a willy-nilly or "request for production by request for production basis" -- that they sometimes will produce texts and other times won't, we're going to have a motion in front of Your Honor sooner than later.

THE COURT:  Wait.  Wait.  So meaning you want it to be broadly all text and messages, ephemeral messaging is included or not and just have it --

MR. ROGERS:  Well, again, to put a finer point on it, obviously it would be subject to negotiations over custodians, negotiations over search terms.  You know, we're dealing with whether we're going to have to or -- we're not going to bother you with those details.

But, yeah, our position would be that to the extent that ESI is contemplated under Rule 26, the commentary notes there of *Sedona* and specifically Rule 34, that just as e-mails and hard copies will as almost a default be part of the universe, we would say that text messages, IMs and those other, perhaps, non-traditional forms would be

in play.

Again, in fairness to the defendants, they haven't drawn a line in the sand and said, no way, but the lines in the sand are starting to form, and I fear that we could be in front of the Court. So just to answer your question, that could be ripe.

THE COURT: Okay.

MR. ROGERS: Thank you, Your Honor.

MS. EMPSON: Thank you, Your Honor.

MS. MEYERS: Sorry.

Your Honor, I, of course, want to give defendant the opportunity to respond, but your initial question related to certain areas where the parties might have a divergence in their positions.

THE COURT: Well, let's -- I mean, now, we have one, so let's talk about it.

MS. MEYERS: Sure. Here you go.

THE COURT: Okay.

MS. EMPSON: Thank you, Your Honor.

Defendant's position at this point is that this discussion is premature. We've indicated that we will discuss whether the production of text messages is appropriate and, if so, for which custodians after we've progressed further in those discussions. RFPs have not been exchanged. We

don't have a custodian list.  We're hoping we won't have any disputes that we'll have to submit to the Court, but at this point our proposal is that the parties continue to meet and confer on this issue.

THE COURT:  Right.  Okay.

And as you're familiar with *Sedona* and many of the other -- and in a lot of the cases now, this is usually something that counsel who have experience in this area, which I think with -- both of these firms do, you work it out.  And quite often -- and I've actually ruled from the bench or maybe even written on other cases where certain individuals' text messages or IMs need to be produced.  It's not always tit for tat, right?  And so take a flexible approach.  Take a good-faith meet and confer approach.

I think I'm thinking about -- it might be the *JPMorgan Chase v. Tesla* case, that one CEO's messaging and messages were supposed to be produced and the others maybe not so much because there was ample evidence that one used ephemeral messaging and ephemeral forms of communication more frequently, much more frequently than the other, and that they were positioned differently in terms of the facts of the case.  But I think I might have ruled from the

bench on that one, so ...

But, yeah, I agree, I think it's premature. I hope we don't go looking for problems. But, you know, as in that case, that was worked out ultimately.

I actually thought you were going to raise another one, but since you're standing up, why don't you go ahead. And if you have anything else that you foresee ...

MS. EMPSON: Thank you, Your Honor.

I anticipate that what plaintiff was going to raise next is the number of depositions, which is the only dispute the parties have as to the content of the case management order at this point.

Plaintiff's position, as we understand it, is that they cannot know how many depositions they will need until discovery begins. Defendant's position here is that there should be a maximum number included in the case management plan as indicated in the Court's model order, and that 15 is appropriate here. Limitations on discovery are set in nearly every case before discovery begins, and that includes the number of depositions, and plaintiff indicated it may need more than 10. We proposed 15, and plaintiff has not proposed a reason

why 15 would not be sufficient in this case, so defendant's proposal is that the case management plan reflect that 15 limitation.

THE COURT:  Okay.  Anything you'd like to add, Ms. Meyers?

MS. MEYERS:  Yes, Your Honor.  As defendant stated, lead plaintiff's position is that a cap on the number of depositions should not be imposed at this time, as it is premature and too early to tell.

Our firm's experience in cases of this type, this magnitude, this complexity, shows us that anywhere from 10 to 30 depositions may be appropriate.  I want to urge to the Court that we have no incentive on behalf of the class to over-litigate the case, and that really our goal is to prove the case.  And in that same vein, we would request that no cap on the number of depositions be imposed at this time and that the parties meet and confer as soon as practical after discovery has begun.

THE COURT:  Okay.  Look, as you both just said, very, very early stages of this case, and particularly from class plaintiff's perspective. They don't know what they don't know, right?  And then you don't know who has the knowledge, where the

AMM TRANSCRIPTION SERVICE - 631.334.1445

knowledge is found.  I actually thought you were going to have another question, but that's the next section of the case management plan.

Let's do this, let's say 15 presumptively for now.  I was going to say stick -- you know, when you can't agree, you stick with the rules until you need more, right?

Stick with 15 for now.  I think having a number in mind, even if it gets changed later, helps everybody, and especially on plaintiff's side, really kind of corral how you're thinking about it, how you're going to plan your depositions, because it just provides a little bit of an incentive to be -- a little bit more incentive to be efficient.

I take all of you at your word that you do not want to spend years in discovery.  And yet, I have cases that have spent years in discovery.

So why don't you start with that view that you're going to try to keep it to 15 without prejudice to, you know, meeting and conferring, expanding that number if it turns out that you find something during discovery.  I mean, that's the whole point about discovery being flexible and fluid, right?

If the parties are able to meet and confer

in good faith and get along and understand that, you know -- what I'd like to say is, yeah, you don't want to leave any stone unturned.  Some pebbles may go unturned, but often I see -- sometimes I see -- I won't say "often" -- but sometimes I see some of the biggest litigation fights over pebbles and grains of sand and whether they need to be unturned.

So let's focus on the big picture first. See if you get a list of 15.  And look, if there's more witnesses that come out later, that are not duplicative, that have something unique and that you really need, you should try to talk to each other. I mean, my concern about having unlimited is that you have a big list, and it's going to be really hard to figure out which ones -- where to draw the line to let go of them if you don't have a number -- if you don't have a number you're at least aiming for.

Okay.  So it's going to be 15 without prejudice to later discussions.

MR. ROGERS:  Your Honor, just a very minor point.

THE COURT:  Yes.

MR. ROGERS:  If it turns out that we meet and confer in good faith and the parties agree --

I'm making up a number -- that 17 is fine, do you need us to come back, or do you trust us to just proceed as --

THE COURT:  Proceed.

MR. ROGERS:  I figured as much, but wanted to ask.

THE COURT:  If you agree on things -- the adversary system is actually pretty good about that. If you agree on things and you agree how you're going to proceed, things run really smoothly.  I don't need to be there putting my finger and being like, oh, great idea.  Okay.  That way, you also have some incentive because you don't spend a lot of time, you know, talking about things that don't need to be talked about.  And you will get some of that at the end.

I actually thought that you were going to have some concerns about location of depositions, particularly with defendant and, likely, witnesses not being in the U.S.  And I see defense counsel side nodding.

So is this also something that you hope you can work out, but there might be an issue?

MS. MEYERS:  Your Honor, through our series of meet and confers, we have taken defense counsels'

representations in good faith that it would be an impossibility for U.S. attorneys to conduct certain depositions in Brazil, and that has really informed lead plaintiff's position on this matter.

Our position also acknowledges the difference between party witnesses that are under defendant, StoneCo's, control and nonparty witnesses.  And our position really hinges on the fact that we believe party witnesses should be subject to deposition procedures under the Federal Rules of Civil Procedure, where possible, to avoid unnecessary delays that may be caused by service issues through the Hague Convention on those witnesses in Brazil.

I want to also point out that on our initial meet and confer, defense counsel and my colleague, Mr. Rogers, had gone through this possibility and had discussed StoneCo presenting certain party witnesses in the United States, for example.  That was a location that was brought up by defense counsel.  We even offered other locations that might make more sense, like Argentina and Uruguay, just given some of the restrictions in Brazil.

So we just wanted to make sure that we

raised to the Court that our position is that party witnesses should be taken in the U.S., as represented by defense counsel.

THE COURT:  Okay.  You can say what you want to say, and then I have some opinions with a little "O," not an Opinion on it, but if there's anything you want to raise, you can; otherwise, I can speak hypothetically about different situations.

MS. EMPSON:  Sure.  Thank you, Your Honor.

Just briefly, we think that this dispute is premature at this stage, not knowing exactly who they intend to depose.  And we're obviously willing to meet and confer with them in good faith on where each deposition makes sense to take each deposition when we know that list of deponents and to discuss whether it makes sense for the depositions to occur either in Brazil by a judicial authority or in a country that permits depositions and any sort of cost shifting that may be necessary for travel for those depositions.  But at this point, Your Honor, without knowing what the list looks like, we're hoping we can resolve this without intervention.

THE COURT:  Okay.  Here's my, sort of, conversation that's going to be slightly hypothetical, but maybe it will give you a little

bit of guidance.

I worked on a very big case that involved assets around the world and recovery of assets around the world from the bankruptcy estate of someone named Bernie Madoff.  There were people all over the world.  There was an active criminal investigation and, in fact, criminal prosecutions.  There were, you know, former associates, employees, investors and the like.  Some of you may have familiarity or have worked on some parts of the case.

And what we ended up having to do -- there were some individuals who represented that they either would not or would strongly prefer not to be deposed in the U.S., and we worked out places where we could depose them.  And we worked out procedures, for example, to avoid the lengthy processes by going through the Hague.  Sometimes we had to find "neutral territory," you know, where, say, a deponent's home country or proposed location actually had laws precluding or prohibiting them from providing certain testimony.  We had to interview witnesses this way.

In a completely different case, not Madoff, which I will not name, there were individuals who

were associated with and potentially under investigation, or potentially subjects of an investigation who were residing abroad.  In some instances -- in one instance, we got a -- what do they call it -- like a safe passage letter from the DOJ so that the person could come to the United States so that we could interview them.

Another time, the DOJ said we can't provide a safe passage letter.  So guess what?  I got on a plane and I flew more hours to spend fewer hours in another country to meet someone.

So all of those are in the mix, I think, in this case.  And this is one of those situations where if some of those issues are present in the case -- and I'm not suggesting that they are.  I'm not suggesting that anybody knows that they are or they might be.  But it really takes a lot of conversation and meeting and conferring in good faith, understanding when somebody says, you know, this can't happen this way.

And I'm looking at plaintiffs because you're the side that's likely going to have that issue if it comes up, is that if they say it can't happen this way, that there may be a point that they can't disclose further for those exact reasons,

okay?

And, you know, you'll figure out a way. You'll figure out a way. There's many, many ways to figure it out. And I actually know that your firm has dealt with a case that I had where certain plaintiffs wanted to be deposed in France, and they were based on representations that the deponent made that later turned out to be untrue. But the process until the deponent did something they promised not to do -- this is all public, so -- there's something -- up until the point where the deponent did the thing that they had promised they weren't going to do, you know, that process was actually another avenue.

So that's just my very, very general guidance. I know you understand where I'm coming from. Okay. So all of these may come up, but we're not quite there yet.

Anything else? All right.

All right. So I'm happy to see that you don't have another deadline until after the new year.

All right. So I am going to -- I will enter your case management plan. And is there anything else we need to do right now before I give

you my last, sort of, sendoff?

MR. ROGERS:  I just want to -- if I may add just a little clarification on the last point that Your Honor made, I clearly understand how that relates to nonparty witnesses.  I do wonder, however, in the case of clearly party-controlled witnesses who -- and all likely will be represented by Quinn Emanuel and who are of the level that they bind the company.

I just want to make sure I understand.  It would seem that those would be the kind of witnesses where, given the choice of having to go through some kind of procedure of judicial examination in Brazil -- which, in fairness, I don't understand, and it sounds like it would be incredibly time-consuming, as opposed to, frankly, a company that has availed itself of the capital markets. That's --

THE COURT:  Well, let me -- before you do this -- like, my vague speaking in hypotheticals, for example -- and, again, I'm not suggesting that this is the case, right, but one could have a situation where an individual could be target of an investigation here or somewhere else where DOJ or -- like, you could conceive of many things like this.

AMM TRANSCRIPTION SERVICE - 631.334.1445

And indeed, in many of the investigations I worked on before, those were issues.  That's exactly what I'm saying, right.

If the person faces a choice between coming to the United States or having a deposition somewhere where they potentially could be extradited for something else, like not even related to this case, that's not -- that doesn't help, right.  And it's not going to help if you end up in litigation over this when what you really want to do is get some sworn testimony from this person.  You're going to try to find the more efficient way to get the testimony from the person, and sometimes they may be facing pressures that are not disclosed to you that make it impossible for them to do the thing, do the something that seems like it would be really easy to do.

I can imagine that defense counsel also doesn't really want to go through an entire process in Brazil or to go do some -- you know, or to present testimony somewhere else.  I mean, that's why I took a trip to Panama one year on very, very short notice for 24 hours.  Another time, I went to South Korea for that.

So that's what I'm saying, that there's

reasons that may not be disclosed to you why things that seem perfectly possible, that the company has legal control over these employees, may not actually be possible. And I'm asking you to work with them and work in good faith to try to find the most efficient way to get the testimony, okay, or if you're in litigation over where a certain individual should be deposed. And that's why I'm suggesting, right, find a way to do it that doesn't involve my getting involved. Every time I get involved, it just slows things down, okay, because it's a dispute that you can't resolve yourselves.

All right. Anything else?

MS. MEYERS: Nothing further from lead plaintiff. Thank you.

MS. EMPSON: Nothing further from defendant.

THE COURT: Okay.

So my last thing is going to be -- I may not see you in person again for a long time because you do have a lot of work to do. Sounds like you're working together really well. I'm going to put you on a periodic status letter schedule. Even though a monthly letter may be too frequent for you all, it helps keep me because I lose track if it's quarterly

or more infrequent than that.

So let's start with the last business Friday of the month, which, for January, might be the 31st.  Last business Friday of the month, joint status letter filed on the docket.  So, obviously, don't disclose anything that isn't appropriate to be disclosed.

So starting in January, monthly joint status letters.  And each status letter is a snapshot of point in time, right.  What have you done to this point?  What do you plan to do in the next month?  Where you are now as far as anything brewing?  Or if there is actually something ripe, let me know about it.

It doesn't have to be long, and it doesn't need to be argumentative.  I really just want to make sure that you're proceeding and that, if you think that there's something coming up, you give me a little bit of a runway, and then maybe the next letter will be like, actually, we resolved that, or that we're still talking about this, but it's not ripe to talk about, you know, not ripe to bring to you yet so that if and when it does become ripe it's not completely new to me, and I see where it is in the context of the whole case and the whole

discovery. Okay.

And if you do have disputes that need Court intervention, what I'll try to do is, if you can't bring it up in your status letter, to the extent that I can actually memo endorse it one way or the other, like you need a quick answer.

The other thing is to file one round of letter each. So whoever is making the motion with a little "M," file a letter motion, lay it out, lay out the dispute. Other side files a responsive letter. And I'll try to resolve it on those letters alone. And if not, then I'll have you in for a conference, or I may direct some additional briefing or something like that. But I'll really try to get to your small "P" problems as quickly as I can so that you can keep moving, okay.

All right. Anything else we need to do at this time?

MR. ROGERS: No, Your Honor. Thank you very much.

MS. MEYERS: Thank you.

MS. EMPSON: No. Thank you, Your Honor.

THE COURT: All right. Thank you very much. We are adjourned. Have a wonderful holiday and happy new year.

MR. ROGERS:  You as well, Your Honor.

THE COURT:  Thank you.


0o0

C E R T I F I C A T E

I, Adrienne M. Mignano, certify that the foregoing transcript of proceedings in the case of In Re StoneCo Ltd. Securities Litigation; Docket #21CV9620 was prepared using digital transcription software and is a true and accurate record of the proceedings.


Signature  *Adrienne M. Mignano*
           _____
              ADRIENNE M. MIGNANO, RPR


Date:       January 17, 2025