**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE STONECO LTD. SECURITIES LITIGATION | Civil Action No. 1:21-cv-9620 (GHW)(OTW) |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION FOR CLASS CERTIFICATION, APPOINTMENT**
**AS CLASS REPRESENTATIVE, AND APPOINTMENT OF CLASS COUNSEL**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................................................ iii

I.    INTRODUCTION ....................................................................................................... 1

II.   STATEMENT OF FACTS COMMON TO THE CLASS .................................................. 4

      A.    StoneCo's Business & Credit Product .................................................... 4

      B.    StoneCo Misled Investors about the Safety and Profitability of the Credit
            Product .................................................................................................... 5

      C.    The Truth is Revealed .............................................................................. 5

      D.    The Proposed Class Representative ......................................................... 6

III.  THE PROPOSED CLASS SATISFIES RULE 23 AND SHOULD BE CERTIFIED ....... 7

      A.    The Proposed Class Satisfies the Requirements of Rule 23(a) ............... 7

            1.    Numerosity Is Established ......................................................... 7

            2.    Commonality Is Established ...................................................... 8

            3.    Typicality Is Established ............................................................ 9

            4.    Adequacy Is Established .......................................................... 10

      B.    The Proposed Class Satisfies the Requirements of Rule 23(b)(3) ........ 12

            1.    Predominance Is Established .................................................... 12

                  a.    Lead Plaintiff Is Entitled to the Fraud-on-the-Market
                        Presumption of Reliance ............................................. 13

                  b.    The *Cammer* and *Krogman* Factors Support a Finding of
                        Market Efficiency ........................................................ 15

                        i.    *Cammer* Factor 1: Average Weekly Trading Volume ...... 16

                        ii.   *Cammer* Factor 2: Analyst Coverage ................................ 16

                        iii.  *Cammer* Factor 3: Market Makers ................................... 17

                        iv.   *Cammer* Factor 4: SEC Form S-3 Filing Eligibility ......... 18

i

v.      *Cammer* Factor 5: Cause and Effect Relationship Between Company Information and Stock Prices ............ 18

vi.     *Krogman* Factor 1: Market Capitalization ........................ 20

vii.    *Krogman* Factor 2: Bid-Ask Spread ................................ 21

viii.   *Krogman* Factor 3: Public Float........................................ 21

ix.     Additional Factor: Institutional Ownership ...................... 22

c.      Damages Will Be Calculated Using a Common Methodology .... 23

2.   Superiority Is Established ......................................................................... 24

3.   The Court Should Appoint Labaton as Class Counsel............................. 25

IV.     CONCLUSION.................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated Ute Citizens v. United States*,
406 U.S. 128 (1972) ................................................................................................13, 22, 23

*In re Alstom SA Sec. Litig.*,
253 F.R.D. 266 (S.D.N.Y. 2008) .......................................................................................22

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ...........................................................................................................12

*Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ...........................................................................................7, 12, 13, 22

*In re Aphria, Inc. Sec.Litig.*,
342 F.R.D. 199 (S.D.N.Y. 2022) .........................................................................................9

*Ashe v. Arrow Fin. Corp.*,
2025 WL 487427 (N.D.N.Y. 2025) .....................................................................................8

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
222 F.3d 52 (2d. Cir. 2000) ..........................................................................................10, 11

*In re Barrick Gold Sec. Litig.*,
314 F.R.D. 91 (S.D.N.Y. 2016) .........................................................................................23

*Barrows v. Becerra*,
24 F.4th 116 (2d Cir. 2022) ...............................................................................................10

*Basic Inc. v. Levinson*,
485 U.S. 224 (1998) .................................................................................................3, 12, 13

*Billhofer v. Flamel Techs., S.A.*,
281 F.R.D. 150 (S.D.N.Y. 2012) .......................................................................................16

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
2023 WL 2932485 (D. Conn. 2023) ..................................................................................23

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) .............................................................................. *passim*

*Carpenters Pension Trust Fund of St Louis v. Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015) ...................................................................................15, 17

iii

*Cent. States SE & SW Areas Health & Welfare Fund v. Marck-Medco Managed
     Care, L.L.C.*,
     504 F.3d 229 (2d Cir. 2007)................................................................................8

*Comcast Corp. v. Behrend*,
     569 U.S. 27 (2013)...........................................................................................23

*Denney v. Deutsche Bank AG*,
     443 F.3d 253 (2d Cir. 2006).............................................................................10

*Erica P. John Fund, Inc. v. Halliburton Co.*,
     563 U.S. 804 (2011) (*Halliburton I*).........................................................12, 14

*Erickson v. Jernigan Cap., Inc.*,
     692 F. Supp. 3d 114 (S.D.N.Y. 2023)..................................................... *passim*

*In re Global Brokerage, Inc.*,
     2021 WL 1160056 (S.D.N.Y. 2021)..................................................................21

*Halliburton Co. v. Erica P. John Fund Inc.*,
     573 U.S. 258 (2014) (*Halliburton II*)..................................................... *passim*

*Haw. Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*,
     338 F.R.D. 205 (S.D.N.Y. 2021) ...............................................................10, 23

*Hunter v. Blue Ridge Bankshares, Inc.*,
     346 F.R.D. 16 (E.D.N.Y. 2024)........................................................................25

*In re JP Morgan Chase & Co. Sec. Litig.*,
     2015 WL 10433433 (S.D.N.Y. 2015)................................................................15

*Katz v. Curis Pharmacy, LLC*,
     2023 WL 5769499 (S.D.N.Y. 2023)....................................................................7

*Katz v. Image Innovations*,
     2010 WL 2926196 (S.D.N.Y. 2010)..................................................................12

*Krogman v. Sterritt*,
     202 F.R.D. 467 (N.D. Tex. 2001) ............................................................ *passim*

*In re Literary Works in Elec. Databases Copyright Litig.*,
     654 F.3d 242 (2d Cir. 2011)..............................................................................11

*Marisol A. v. Giuliani*,
     126 F.3d 372 (2d Cir. 1997)................................................................................9

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
     328 F.R.D. 86 (S.D.N.Y. 2018) ........................................................................20

iv

*Micholle v. Ophthotech Corp.*,
    2018 WL 1307285 (S.D.N.Y. 2018)......................................................................................11

*Pa. Pub. Sch. Emps. Ret. Sys. v. Morgan Stanley & Co.*,
    772 F.3d 111 (2d Cir. 2014)...................................................................................................8

*In re Parmalat Sec. Litig.*,
    2008 WL 3895539 (S.D.N.Y. 2008)......................................................................................10

*Passman v. Peloton Interactive, Inc.*,
    671 F. Supp. 3d 417 (S.D.N.Y. 2023)..................................................................................7, 9

*Pearlstein v. Blackberry Ltd.*,
    2021 WL 253453 (S.D.N.Y. 2021).......................................................................................20

*In re Petrobras Sec. Litig.*,
    862 F.3d 250 (2d Cir. 2017).....................................................................................15, 16, 20

*In re Pfizer Inc. Sec. Litig.*,
    282 F.R.D. 38 (S.D.N.Y. 2012) ........................................................................................12, 24

*Roach v. TL.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015)..................................................................................................23

*In re Signet Jewelers Ltd. Sec. Litig.*,
    2019 WL 3001084 (S.D.N.Y. 2019)............................................................................. *passim*

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*,
    552 U.S. 148 (2008)..............................................................................................................12

*Strougo v. Barclays PLC*,
    312 F.R.D. 307 (S.D.N.Y. 2016) ..........................................................................................14

*Vasquez v. A+ Staffing LLC*,
    746 F. Supp. 3d 26 (E.D.N.Y. 2024) ....................................................................................24

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017)........................................................................................... *passim*

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. (2011)......................................................................................................................8

*Wilson v. Comtech Telecomms. Corp.*,
    648 F.2d 88 (2d Cir. 1981)....................................................................................................22

*Wilson v. LSB Indus., Inc.*,
    2018 WL 3913115 (S.D.N.Y. 2018)...........................................................................9, 10, 22

*In re Winstar Commc'ns Sec. Litig.*,
   290 F.R.D. 437 (S.D.N.Y. 2013) .................................................................................16, 17

**Statutes**

Securities Exchange Act of 1934
   Securities Exchange Act Section 10(b)................................................................1, 9, 13, 23

Private Securities Litigation Reform Act (PSLRA)........................................................................11

**Rule and Regulations**

Federal Rules of Civil Procedure

   Rule 23 .................................................................................................................................2, 7

   Rule 23(a).....................................................................................................................1, 2, 7, 10

   Rule 23(a)(1) ...........................................................................................................................7

   Rule 23(a)(2) ...........................................................................................................................8

   Rule 23(a)(3) ...........................................................................................................................9

   Rule 23(a)(4) .........................................................................................................................10

   Rule 23(b) ...............................................................................................................................7

   Rule 23(b)(3)................................................................................................................. *passim*

   Rule 23(g) ...........................................................................................................................1, 25

   Rule 23(g)(1)(A) ...................................................................................................................25

H.R. Conf. Rep. No. 104-369, at 34 (1995)...............................................................................11

SEC Rule 10b-5 ...........................................................................................................................1

Lead Plaintiff Indiana Public Retirement System ("INPRS" or "Lead Plaintiff") respectfully submits this memorandum of law in support of its Motion for Class Certification, requesting that, pursuant to Federal Rules of Civil Procedure ("Rules") 23(a), 23(b)(3), and 23(g), the Court: (i) certify this case as a class action; (ii) appoint Lead Plaintiff as Class Representative; and (iii) appoint Labaton Keller Sucharow LLP ("Labaton") as Class Counsel.[1]

## I.    INTRODUCTION

This is a federal securities fraud class action (the "Action") against Defendant StoneCo Ltd. ("StoneCo" or the "Company").  On May 2, 2022, the Court appointed INPRS as Lead Plaintiff and Labaton as Lead Counsel.  ECF No. 45.  Lead Plaintiff purchased or otherwise acquired StoneCo common stock during the Class Period.  *See* INPRS Decl. ¶3, Ex. A.  Following StoneCo's motion to dismiss, the Court sustained in part and dismissed in part (ECF No. 76), the Consolidated Amended Class Action Complaint (ECF No. 55) (the "Complaint").  The sustained portions of the Complaint allege that between May 27, 2020 and November 16, 2021 (the "Class Period"), Defendant violated Section 10(b) of the Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder by making materially false and misleading statements and omissions regarding the safety and profitability of its loan portfolio, specifically concerning the increasing selectivity of the Company's issuance of credit to its customers and the impact of Brazil's new registry system and COVID-19 on rising delinquency rates.[2]

---

[1] In support of this Motion, Lead Plaintiff submits this memorandum of law; the Declaration of Michael H. Rogers ("Rogers Decl."); the Expert Report of Matthew D. Cain, Ph.D. ("Cain Rpt.," Rogers Decl. Ex. A); the Declaration of Jeffrey Gill on behalf of INPRS ("INPRS Decl.," Rogers Decl. Ex. B); Labaton's firm resume (Rogers Decl. Ex. C); and a proposed order.

[2] Thiago dos Santos Piau, Lia Machado de Matos, Rafael Martins Pereira, Marcelo Bastianello Baldin, André Street de Aguiar, and Eduardo Cunha Monnerat Solon de Pontes (the "Individual Defendants") were previously named defendants to this Action.  The parties entered into a stipulation voluntarily dismissing the Individual Defendants from this action without prejudice (ECF No. 84), which was so-ordered by the Court on November 21, 2024 (ECF No. 85).

Lead Plaintiff respectfully requests certification pursuant to Rule 23 on behalf of a class consisting of all persons and entities that purchased or otherwise acquired the publicly traded common stock of StoneCo during the period from May 27, 2020 through November 16, 2021, both dates inclusive (the "Class Period"), and were damaged thereby (the "Class").[3] Lead Plaintiff also respectfully moves the Court for an order appointing Lead Plaintiff as Class Representative and appointing Labaton as Class Counsel.

This Action is a paradigmatic example of the type of case that is appropriately certified as a class action. Under Rule 23(a), certification of an action for class treatment is proper where:

> (1) the class is so numerous that joinder of all members is impracticable ["numerosity"]; (2) there are questions of law or fact common to the class ["commonality"]; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ["typicality"]; and (4) the representative parties will fairly and adequately protect the interests of the class ["adequacy"].

Fed. R. Civ. P. 23(a). Further, "common" issues of law or fact must "predominate over any questions affecting only individual members," and a class action must be "superior" to other methods of adjudication. Fed. R. Civ. P. 23(b)(3).

Here, the proposed Class easily satisfies the requirements of Rule 23(a): (i) the Class is sufficiently numerous, given that between 178 million and 264 million shares of StoneCo common stock were outstanding throughout the Class Period, during which time the average weekly trading volume for StoneCo common stock was 14.0 million shares on the NASDAQ, *see infra* Section III.A.1; (ii) the Complaint raises significant questions of law and fact common to all members of the proposed Class, including whether Defendant made material misrepresentations and omissions

---

[3] Excluded from the Class are: (i) StoneCo; (ii) any person who was an officer or director of StoneCo during the Class Period; (iii) any firm, trust, corporation, or other entity in which StoneCo has or had a controlling interest; (iv) StoneCo's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (v) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person, in their capacities as such.

in the Company's SEC filings and other public disclosures during the Class Period, Defendant acted with scienter, the price of StoneCo's common stock was artificially inflated and/or artificially maintained during the Class Period by Defendant's fraudulent conduct, and Class members suffered damages, *see infra* Section III.A.2; (iii) Lead Plaintiff's claims are typical because, like all Class members, Lead Plaintiff purchased or acquired StoneCo common stock at prices that were artificially inflated or maintained by Defendant's misstatements, omissions, and deceptive conduct, and suffered damages when Defendant's fraud was revealed, *see infra* Section III.A.3; and (iv) Lead Plaintiff is adequate because its interests are directly aligned with the interests of the Class, and it has retained attorneys with considerable experience in securities class actions and complex litigation, *see infra* Section III.A.4.

This action also satisfies the elements of Rule 23(b)(3). Predominance is satisfied in this action because common questions of law and fact predominate over Class members' potential individual issues. Indeed, the elements of the claims in this Action—falsity, materiality, scienter, loss causation, and damages—all stem from common questions of law and fact. Reliance, the only possible individualized issue, is uniformly addressed through the fraud-on-the-market doctrine established by the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224 (1998), and reaffirmed in *Halliburton Co. v. Erica P. John Fund Inc.*, 573 U.S. 258, 276 (2014) (*Halliburton II*), *see infra* Section III.B.1. Indeed, *Basic* and *Halliburton II* permit the presumption of reliance in this case because, as established in the accompanying Expert Report of Matthew D. Cain, Ph.D., the market for StoneCo common stock, which traded on the NASDAQ, was efficient throughout the Class Period. *See* Cain Rpt. ¶112.

Further, maintaining this Action as a class action is superior to any alternate means of dispute resolution because thousands of geographically dispersed investors who purchased

StoneCo during the Class Period were harmed by Defendant's misconduct.  Due to litigation costs, it is highly unlikely that investors who lost small amounts of money would file individual actions, it is desirable to hear all such claims in one court, and there is no difficulty in maintaining this case as a class action, *see infra* Section III.B.2.

For these reasons, Lead Plaintiff respectfully requests that the Court grant this Motion, appoint Lead Plaintiff as Class Representative, and appoint Labaton as Class Counsel.

## II.    STATEMENT OF FACTS COMMON TO THE CLASS

### A.    StoneCo's Business & Credit Product

StoneCo is a financial technology company that provides payment processing services and operates primarily in Brazil.[4]  ¶2.  Specifically, StoneCo's services, including its physical point-of-sale ("POS") devices, allow merchants and other vendors to conduct electronic commerce across in-store, online, and mobile channels.  *Id*.  StoneCo generates revenue by charging its customers payment processing fees (typically between 1% and 3%) on each transaction that uses StoneCo's POS or its online transaction processing program.  *Id*.

StoneCo's profitability and growth potential were nevertheless limited because its primary source of revenue was simply collecting small payment processing fees, and therefore the Company began to offer customers financial products such as loans and banking services to purportedly generate higher profit margins.  ¶4.  Specifically, beginning in 2019, StoneCo began offering working capital loans and revolving lines of credit (the "Credit Product") in addition to the Company's traditional credit card transaction services.  *Id.*

---

[4] Citations to "¶ __" refer to paragraphs of the Complaint.  Unless otherwise defined herein, capitalized terms have the meaning ascribed to them in the Complaint.

### B.  StoneCo Misled Investors about the Safety and Profitability of the Credit Product

Throughout the Class Period, Defendant made a series of misrepresentations and omissions to investors concerning the Credit Product's safety and profitability.  For example, on May 26, 2020, after market close, Defendant touted the supposed due diligence underlying its loan portfolio, stating "[w]e have improved significantly our scoring system over time, with daily enhancements to our algorithms, new talents brought in 2019 and a requirement of a minimum relationship period (data) that help us to be more asserting on the credit scoring." ¶22.  However, far from improving its credit scoring system over time, in reality, StoneCo loosened its credit standards and was in fact becoming less selective.  ¶25.  Moreover, the Company knew that delinquencies and defaults were increasing because of its customers using competitors' POS devices to process transactions to avoid repaying StoneCo.  *Id*.  StoneCo also misled investors through misstatements and omissions blaming rising delinquencies on changes in Brazil's registry system and COVID-19, rather than its own reduced due diligence.  For example, on June 1, 2021, StoneCo issued a press release stating, "[h]igher provisions for expected delinquency in our credit operations were influenced by more commerce restrictions in Brazil in the first quarter of 2021 amid a second wave of COVID."  ¶118.  Unbeknownst to investors, StoneCo's increasing delinquencies resulted from the Company's loosening of its credit standards.  ¶119.

### C.  The Truth is Revealed

StoneCo began to reveal facts about the extent of its failed Credit Product on August 25, 2021, when it abruptly disclosed that it would "[t]emporarily stop disbursing credit at [the] beginning of June [2021]" as a result of increased credit delinquencies.  ¶31.  In response to this news, shares of StoneCo common stock dropped 4% to close at $52.88 from its prior closing price of $55.05.  ¶32.  However, instead of disclosing the full extent of increased delinquencies and the

impact of its decision to pull the Credit Product, Defendant misleadingly attributed the problems to a new Brazilian registry system that required StoneCo to register all loans it had made since launching the credit product in 2019 (many of which the Company knew were in default).  ¶27. In fact, Defendant had decided to pull the credit product long before the new registry law, and the true cause of the increased delinquencies was Defendant's undisclosed risky lending practices and collectability issues.  ¶34.

On August 30, 2021, StoneCo issued another press release regarding increased delinquencies, which led to the Company's share price dropping 6% to close at $46.54 per share on August 31, 2021.  StoneCo once again misleadingly attributed the increased delinquencies to the new Brazilian registry law.  ¶¶35-38.  On November 16, 2021, the full truth was revealed when StoneCo announced further poor results and missed guidance while simultaneously confirming that the Company was still not issuing new credit and could not confirm when it would issue new credit at scale again.  ¶39.  According to this release, the percentage of StoneCo's non-performing loans—loans the Company did not expect to be repaid—was now up to 48% from the 35% the Company had disclosed the previous quarter.  *Id.*  On this news, the Company's share price fell $10.96, or *34%*, to close at $20.70 per share on November 17, 2021.  ¶41.

### D.    The Proposed Class Representative

Since appointment, Lead Plaintiff and Lead Counsel have vigorously prosecuted this action through the review and filing of documents with the Court, propounding and producing discovery, and ongoing negotiations with opposing counsel.  Lead Plaintiff has reviewed and monitored the progress of this litigation and regularly conferred with Lead Counsel concerning the prosecution of this action.  *See* INPRS Decl. ¶¶5-6.  For example, Lead Plaintiff has received and reviewed periodic updates and other correspondence from counsel regarding all aspects of the case, including the progress of discovery and the filing of significant pleadings and court orders.  *Id.*

In sum, Lead Plaintiff is committed to vigorously prosecuting this litigation and intends to obtain the largest recovery for the class consistent with good faith and sound judgment. *See* INPRS Decl. ¶7.

## III.   THE PROPOSED CLASS SATISFIES RULE 23 AND SHOULD BE CERTIFIED

Certification is appropriate where a putative class meets all four requirements of Rule 23(a) and one requirement of Rule 23(b). *See Passman v. Peloton Interactive, Inc.*, 671 F. Supp. 3d 417, 435 (S.D.N.Y. 2023). Though "a court's class-certification analysis must be 'rigorous' . . . Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465-66 (2013). For this reason, "[a] motion for class certification should not become a minitrial on the merits." *Erickson v. Jernigan Cap., Inc.*, 692 F. Supp. 3d 114, 125 (S.D.N.Y. 2023); *Amgen, Inc.*, 568 U.S. at 465 (class members need not prove materiality of the alleged misstatements in a securities fraud class action prior to the class certification stage).

"If the Court finds that the requirements of Rule 23 have been met, the Court may, in its discretion, certify the [C]lass." *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *7 (S.D.N.Y. 2019). The Second Circuit has construed Rule 23 liberally and directed district courts to err on the side of granting class certification. *Katz v. Curis Pharmacy, LLC*, 2023 WL 5769499 at *2 (S.D.N.Y. 2023) ("doubts concerning the proprietary of class certification should be resolved in favor of class certification").

### A.   The Proposed Class Satisfies the Requirements of Rule 23(a)

#### 1.   Numerosity Is Established

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Numerosity "does not mandate that joinder of all parties be impossible—only that the difficulty or inconvenience of joining all members of the class make

use of the class action appropriate." *Cent. States SE & SW Areas Health & Welfare Fund v. Marck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244-45 (2d Cir. 2007). The Second Circuit has recognized that "[n]umerosity is presumed for classes larger than forty members." *Pa. Pub. Sch. Emps. Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 120 (2d Cir. 2014). In securities class actions, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period. *Erickson,* 692 F. Supp. 3d at 125-26 (numerosity requirement satisfied when class consisted of owners of over 22 million shares traded on the New York Stock Exchange); *Signet*, 2019 WL 3001084, at *8 (numerosity satisfied when between 60.5 and 80.5 million shares outstanding and average of 1.34 million shares traded daily).

Here, the Class is so numerous that joinder would be impractical. During the Class Period, there were between 178 million and 264 million shares of Class A common stock outstanding and the average weekly trading volume of StoneCo stock on the NASDAQ was 14.0 million shares. Cain Rpt. ¶¶39, 90. Based on the frequency of stock transactions in which investors buy and sell shares, one can infer that there are many thousands of Class members who purchased stock at various times during the Class Period. The numerosity requirement is therefore easily satisfied.

### 2. Commonality Is Established

Rule 23(a)(2) requires that "there are questions of law or fact common to the class," Fed. R. Civ. P. 23(a)(2). The inquiry is considered "a low hurdle easily surmounted." *Erickson*, 692 F. Supp. 3d at 126 (citation omitted). A single common question of fact or law suffices to satisfy the element. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. at 338, 359 (2011). Common questions of law or fact are present where the alleged fraud involves "material misrepresentations and omissions in documents circulated to the investing public, press releases and statements provided to the investment community and the media, and investor conference calls." *Ashe v. Arrow Fin. Corp.*, 2025 WL 487427, at *4 (N.D.N.Y. 2025) (citation omitted).

Here, the commonality requirement is met.  The Complaint raises significant questions common to the proposed Class, including whether: (1) StoneCo violated the federal securities laws; (2) StoneCo's statements made during the Class Period were false or misleading; (3) StoneCo acted with scienter; (3) the price of StoneCo's common stock during the Class Period was artificially inflated or artificially maintained because of StoneCo's conduct complained of in the Complaint; and (4) the proper measure of damages.  ¶247.  *See In re Aphria, Inc. Sec.Litig.*, 342 F.R.D. 199, 204-05 (S.D.N.Y. 2022) (commonality is satisfied in a securities fraud suit because class members were injured by similar material misrepresentations and omissions).

### 3.    Typicality Is Established

Rule 23(a)(3) requires that the representative party's claims be "typical" of the claims of the class.  Fed. R. Civ. P. 23(a)(3).  The typicality requirement "is satisfied when each class member's claim arises from the same course of events, and each class members makes similar legal arguments to prove the defendant's liability."  *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (citation omitted).  The typicality requirement "is not highly demanding" and does not require plaintiffs' claims to be identical, only that they share the same essential characteristics. *Passman*, 671 F. Supp.3d at 441 (citation omitted).

Here, typicality is easily met.  Lead Plaintiff's claims arise out of the same alleged facts and legal theories as the claims of all other Class members—i.e., Lead Plaintiff alleges that Defendant made materially false and misleading public statements and omissions, in violation of Section 10(b) of the Exchange Act.  ¶44.  *Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at *4-5 (S.D.N.Y. 2018) (typicality established in case arising under federal securities laws.)  Moreover, the injury Lead Plaintiff suffered is alleged to be the same as the injury suffered by the proposed Class—i.e., Lead Plaintiff purchased StoneCo common stock at artificially inflated and/or artificially maintained prices during the Class Period, suffering losses when the truth about

9

StoneCo's poor credit standards and collectability issues were revealed to the market, just like all other Class members.  ¶¶32, 37, 41.  Thus, Lead Plaintiff's claims are typical of—if not identical to—those of other members of the Class.  *Barrows v. Becerra*, 24 F.4th 116, 131 (2d Cir. 2022) (typicality requires that the claims of the class representatives be typical of those of the class, and is satisfied when each member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability).[5]

### 4.      Adequacy Is Established

Rule 23(a) requires that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  This requirement seeks to ensure that Lead Plaintiff's interests are not antagonistic to those of the Class, and that Lead Plaintiff's attorneys are qualified, experienced, and able to conduct the litigation.  *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d. Cir. 2000).   The purpose of this inquiry is to ensure that the named representatives will "have an interest in vigorously pursuing the claims of the class, and . . . have no interests antagonistic to the interests of other class members."  *Wilson*, 2018 WL 3913115, at *7 (citation omitted).  "A conflict or potential conflict alone will not defeat class certification—the conflict must be fundamental."  *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006).  "[D]enial of class certification on the grounds of inadequacy should only occur in the most extreme instances." *Haw. Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*, 338 F.R.D. 205, 212 (S.D.N.Y. 2021).

---

[5] Further bolstering its typicality, Lead Plaintiff is not subject to unique defenses.  *Erickson.,* 692 F. Supp. 3d at 127 (a proposed class representative who is subject to unique defenses that could impact the materiality determination and threaten to become a focus of the litigation is not adequate or typical); *In re Parmalat Sec. Litig.*, 2008 WL 3895539, at *5 (S.D.N.Y. 2008) (the unique defense rule "is not rigidly applied in this Circuit," and "is intended to protect [the] plaintiff class—not to shield defendants from a potentially meritorious suit").

The adequacy requirement is satisfied here.  Lead Plaintiff's interests are not antagonistic to those of the proposed Class.  Lead Plaintiff, like all Class members, purchased StoneCo common stock at inflated market prices during the Class Period and were injured by the same material misrepresentations and omissions, and subsequent stock price declines.  Lead Plaintiff's interests in establishing Defendant's liability and maximizing recovery are aligned with those of absent Class members.  *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011) (adequate class representative must not have interests antagonistic to the interests of other class members); *see* INPRS Decl. ¶10.  Moreover, Lead Plaintiff has already proven its willingness and ability to serve as Class Representatives by actively supervising and monitoring this litigation, participating in discussions with counsel concerning case developments, responding to discovery requests from Defendant, and receiving regular case status reports from counsel.  Lead Plaintiff intends to continue to perform similar activities, including participating in discovery and trial preparation.  Lead Plaintiff understands its duty to the Class and is committed to prosecuting this Action to maximize the recovery of all Class members.[6]

Finally, Lead Plaintiff has engaged competent counsel that is "qualified, experienced and able to conduct this litigation." *Baffa*, 222 F.3d at 60.  Labaton has extensive experience litigating securities class actions throughout the country and has successfully prosecuted hundreds of securities class actions on behalf of injured investors.  *See* Rogers Decl. Ex. B (Labaton Firm Resume).  The interests of the Class are therefore protected.

---

[6] Further, as institutional investors, Lead Plaintiff is particularly well-qualified to serve as Class Representative.  The PSLRA was intended "to increase the likelihood that institutional investors will serve as lead plaintiffs." *See* H.R. Conf. Rep. No. 104-369, at 34 (1995) (Conf. Rep.); *Micholle v. Ophthotech Corp.*, 2018 WL 1307285, at *6 (S.D.N.Y. 2018) (same).

11

B.      **The Proposed Class Satisfies the Requirements of Rule 23(b)(3)**

The proposed Class also satisfies Rule 23(b)(3)'s requirements that common questions of law or fact predominate and that a class action be the superior method to adjudicate this dispute. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997).

1.      **Predominance Is Established**

"Predominance is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017) (citation omitted). "Predominance is a test readily met in certain cases alleging consumer or securities fraud." *Katz v. Image Innovations*, 2010 WL 2926196, at *5 (S.D.N.Y. 2010) (citation omitted).

The analysis of whether common questions predominate "begins . . . with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809-10 (2011) ("*Halliburton I*"). The elements of Lead Plaintiff's fraud claims are: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or commission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

Falsity, materiality, scienter, and loss causation are common issues to a class, which means that whether common questions of law or fact predominate in a securities fraud action "often turns on the element of reliance." *See Amgen*, 568 U.S. at 474-75; *Halliburton I*, 563 U.S. at 810; *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 52 (S.D.N.Y. 2012) ("All of these elements, other than reliance . . . are subject to class wide proof in securities litigation[.]"). Here, Lead Plaintiff and the Class are entitled to a presumption of Class-wide reliance under the fraud-on-the-market theory set forth in *Basic Inc.*, 485 U.S. 224, and reaffirmed in *Halliburton II*, 573 U.S. at 276, or set forth

12

in *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972).  As set forth below, damages will also be determined on a class-wide basis using the same formula and measure of artificial inflation attributable to Defendant's conduct.   Accordingly, the predominance requirement is satisfied.

> **a.      Lead Plaintiff Is Entitled to the Fraud-on-the-Market Presumption of Reliance**

Lead Plaintiff may invoke the fraud-on-the-market presumption of reliance because StoneCo common stock traded in an efficient market.   The fraud-on-the-market doctrine recognizes that "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentation."  *Halliburton II*, 573 U.S. at 270 (quoting *Basic*, 485 U.S. at 246).  To invoke the *Basic* presumption of reliance, plaintiffs must show that: "(1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed." *Halliburton II*, 573 U.S. at 277-78.  In *Basic*, the Supreme Court held that investors could satisfy the reliance element of Section 10(b) by invoking a rebuttable presumption of reliance.   485 U.S. at 245-49.   The *Basic* presumption of reliance is premised on the fact that "the price of a security traded in an efficient market will reflect all publicly available information about a company; accordingly, a buyer of the security may be presumed to have relief on that information in purchasing the security."  *Amgen*, 568 U.S. at 458; *Basic*, 485 U.S. at 229-30 (concluding that anyone who buys or sells stock at the market price may be considered to have relied on material misstatements).

Lead Plaintiff may invoke the presumption by establishing that "the alleged misrepresentations were publicly known . . . , that [StoneCo's] stock traded on an efficient market, and that the relevant transaction took place between the time the misrepresentations were made

and the time the truth was revealed." *Halliburton I*, 563 U.S. at 811 (citation omitted).  Once the *Basic* presumption of reliance is invoked (as is the case here), "the burden then shifts" and Defendant "bear[s] the burden of persuasion [under *Halliburton II*] to rebut the *Basic* presumption by a preponderance of the evidence." *Signet*, 2019 WL 3001084, at \*11 (citation omitted).[7]

Here, Lead Plaintiff has successfully invoked the *Basic* presumption.  ***First***, Lead Plaintiff alleges that Defendant made material misrepresentations and omissions in its public statements to investors through StoneCo's SEC filings and press releases, as well as during earnings conference calls and investor conferences, that artificially inflated and/or artificially maintained the market price of StoneCo common stock.  ¶¶162, 167, 171, 173, 178, 185, 190-92.  ***Second***, with respect to the market timing, Lead Plaintiff alleges that it, like other members of the proposed Class, bought StoneCo stock during the Class Period at artificially inflated prices and suffered losses when that inflation was removed upon the disclosure of the truth.  ¶¶198-228.  ***Third***, as alleged and as detailed below and in the Cain Report, the market for StoneCo's common stock was efficient at all relevant times during the Class Period.  ¶¶249-51; Cain Rpt. ¶112.

Dr. Cain's report demonstrates StoneCo common stock traded in an efficient market.  Cain Rpt. ¶¶22-93.  Moreover, where a company's stock trades on an open and developed exchange, like the NASDAQ, courts need not conduct any further analysis to determine whether market efficiency exists.  StoneCo's listing on the NASDAQ alone supports a presumption of market efficiency.  *Strougo v. Barclays PLC*, 312 F.R.D. 307, 318 n.68 (S.D.N.Y. 2016) ("[t]he federal

---

[7] "To meet their burden, [D]efendants must 'do more than merely produce evidence that *might* result in a favorable outcome; they must demonstrate that the misrepresentations did not affect the [company's] stock's price by a preponderance of the evidence." *Signet*, 2019 WL 3001084, at \*11 (citing *Waggoner*, 875 F.3d at 101 (emphasis in original)).  Moreover, Defendant must "sever the link between the misrepresentation and the price received or paid" in order to rebut the *Basic* presumption of reliance, *Waggoner*, 875 F.3d at 101 (*quoting Halliburton II*, 134 U.S. at 2415-16), and in so attempting, "must demonstrate a lack of price impact by a preponderance of the evidence at the class certification stage rather than merely meet a burden of production." *Waggoner*, 875 F.3d at 101.

courts are unanimous in their agreement that a listing on the NASDAQ or a similar national market is a good indicator of efficiency"); *Carpenters Pension Trust Fund of St Louis v. Barclays PLC*, 310 F.R.D. 69, 81 (S.D.N.Y. 2015) (collecting cases noting that some courts presume securities traded on national markets to be efficient). At a minimum, StoneCo's trading on a national exchange provides a "strong indication" of efficiency. *In re JP Morgan Chase & Co. Sec. Litig.*, 2015 WL 10433433, at *7 (S.D.N.Y. 2015); *see also* Cain Rpt. ¶27.

In evaluating this showing, courts apply the five-factor analysis set forth in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989), to determine whether stock is traded in an efficient market. The Second Circuit has held that the burden to show market efficiency at class certification "is not an onerous one." *In re Petrobras Sec. Litig.*, 862 F.3d 250, 278 (2d Cir. 2017). Instead, it is a flexible inquiry for which the Second Circuit has declined to adopt any particular test, instead directing "a holistic analysis based on the totality of the evidence presented." *Waggoner*, 875 F.3d at 94, 96-97 (citation omitted). As detailed herein and in the accompanying Cain Report, Lead Plaintiff has established that the market for StoneCo stock was efficient at all relevant times, triggering the presumption of reliance.

<blockquote><strong>b.        The <em>Cammer</em> and <em>Krogman</em> Factors Support a Finding of Market Efficiency</strong></blockquote>

The "prevailing tests for market efficiency" are the factors set forth in *Cammer v. Bloom*, 711 F. Supp. at 1286-87, and *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001)—known as the *Cammer* and *Krogman* factors. *Signet*, 2019 WL 3001084, at *11. The five *Cammer* factors are (1) the average weekly trading volume of the stock, (2) the number of securities analysts following and reporting on it, (3) the extent to which market makers traded in the stock, (4) the issuer's eligibility to file an SEC registration Form S-3, and (5) the demonstration of a cause and effect relationship between unexpected, material disclosures and changes in the stock's price. *Id.*

15

The three *Krogman* factors are: "(1) the market capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders." *Id*.

Courts are clear that these factors should be used "as an analytical tool rather than as a checklist," *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 60 (S.D.N.Y. 2012), and should be analyzed holistically "based on the totality of the evidence presented." *Petrobras*, 862 F.3d at 275, 277. A holistic consideration of the *Cammer* and *Krogman* factors overwhelmingly supports a finding that the market for StoneCo common stock was efficient during the Class Period.

### i.    *Cammer* Factor 1: Average Weekly Trading Volume

StoneCo common stock's average weekly trading volume supports a showing of market efficiency. Cain Rpt. ¶39. The first *Cammer* factor, stock trading volume, was defined by the *Cammer* court using average weekly trading volume relative to shares outstanding. In setting a threshold of trading volume for the presumption of market efficiency, the court stated, "[t]urnover measured by average weekly trading volume of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption."[8] *See In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 447 (S.D.N.Y. 2013) ("Average weekly trading volume of 2% or more of outstanding securities justifies a 'strong presumption' of an efficient market for that security"). StoneCo's average weekly trading volume of 6.1% of common stock outstanding over the Class Period easily exceeds both the 1%-2% thresholds established by the *Cammer* court. Cain Rpt. ¶38.

### ii.    *Cammer* Factor 2: Analyst Coverage

The second *Cammer* factor looks at the amount of analyst coverage the company at issue receives. An analyst is someone, usually working for a financial institution such as a brokerage,

---

[8] *Cammer*, 711 F. Supp. at 1293.

bank, or investment bank, who studies financial information and trends for a specific company or industry to provide company assessments and forecasts of future operating performance. *Id*. at ¶40. Analyst coverage "supports a finding of market efficiency" because it shows that "investment professionals" are "inject[ing] their views on the . . . security into the market." *Winstar*, 290 F.R.D. at 446; *Cammer*, 711 F. Supp. at 1286 ("[I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period").

Analysts from 24 different firms including Susquehanna, BTG, Morgan Stanley, UBS, J.P. Morgan, and Evercore issued 168 reports on StoneCo during the Class Period. Cain Rpt. ¶42. Indeed, Dr. Cain observed that this high degree of analyst coverage is greater than that of most other publicly traded firms. *Id*. at ¶43. Dr. Cain's report also found that StoneCo's high level of analyst coverage placed it above the 90th percentile when compared with all companies listed on the NASDAQ and NYSE from 2016-2018, per an academic study assessing companies in that time frame. *Id*. Additionally, Dr. Cain identified over 350 unique articles published throughout the Class Period from leading news outlets concerning StoneCo, including *Dow Jones Institutional News*, *Investor's Business Daily*, *Reuter's News*, and *Business Wire*, among others. *Id*. at ¶44. The analyst coverage, number of analyst research reports produced, and substantial public dissemination of news, SEC filings, and information about StoneCo supports the conclusion that the Company's common stock traded in a well-developed and informationally efficient market throughout the Class Period.

### iii.    *Cammer* Factor 3: Market Makers

Under *Cammer*, the existence of "ten market makers for a security" is sufficient to invoke the "presumption that the market for the security is an efficient one." *Cammer*, 711 F. Supp. at 1293; Cain Rpt. ¶47-48. Courts in this Circuit "have found that anywhere between six and twenty market makers is sufficient to support a finding of market efficiency." *Carpenters*, 310 F.R.D. at

92.  Here, StoneCo had at least 122 market makers and brokers providing similar activity over the Class Period.  Cain Rpt. ¶49.  Additionally, StoneCo stock traded on the NASDAQ, a well-developed and established national exchange, which courts typically view as informationally efficient.  *Id*. at ¶50.  Finally, Dr. Cain observes that courts view institutional investors as potentially providing similar benefits to market makers by supplying trading liquidity and informationally efficient and informed trading.  *Id*. at ¶51.  StoneCo's common stock was held by over 750 unique institutional investors during the Class Period, who owned an average of 202.0 million, or 88.4% of StoneCo's common stock outstanding.  *Id*.

### iv.    *Cammer* Factor 4: SEC Form S-3 Filing Eligibility

As the *Cammer* court explained, "it would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was . . . [not] because the minimum stock requirements set forth in the instructions to Form S-3 were not met."[9]  *Cammer*, 711 F. Supp. at 1287.  Dr. Cain found that StoneCo made required filings with the SEC in a timely manner and satisfied the other Form F-3 requirements throughout the Class Period.  Cain Rpt. ¶56.  Indeed, Dr. Cain observed that StoneCo filed a form F-3ASR during the Class Period.  *Id*.  This factor therefore supports a finding of market efficiency.

### v.    *Cammer* Factor 5: Cause and Effect Relationship Between Company Information and Stock Prices

The fifth *Cammer* factor relates to how the price of a security reacts to the release of new, company-specific news events.  The Second Circuit has held that the fifth *Cammer* factor allows, but does not require, plaintiffs to submit "direct evidence" demonstrating a "cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."  *Waggoner*, 875 F.3d at 94 (citation omitted).  Alternately, a strong showing

---

[9] Foreign issuers, such as StoneCo are eligible to file a Form F-3 rather than a Form S-3.

of market efficiency through indirect evidence, as demonstrated by the first four *Cammer* factors, will suffice. *See Waggoner*, 875 F.3d at 97-98. Lead Plaintiff has demonstrated through indirect evidence that StoneCo stock traded in an efficient market during the Class Period, which is sufficient to satisfy *Cammer*, and the Cain Report further supplements that showing with direct evidence of market efficiency.

The relationship between news events and security price changes is typically analyzed through a statistical regression analysis, commonly referred to as an "event study," "that seek[s] to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events." *Halliburton II*, 573 U.S. at 280. Dr. Cain performed an event study where he "compared the behavior of StoneCo's common stock on days when potential value relevant news was issued via earnings releases with its behavior on days when no such news was issued," and found a strong causal connection between new-company-specific events and movements in the market price as evidence of market efficiency. Cain Rpt. ¶¶58, 78. To assess whether StoneCo stock responded to the release of new StoneCo-specific news during the Class Period, Dr. Cain analyzed whether the price of StoneCo stock reacted differently on the seven earnings releases days that occurred during the Class Period as compared to the 330 days without any StoneCo-specific news. *Id*. at ¶¶73-74. Dr. Cain found that four out of the seven StoneCo earnings releases that occurred during the Class Period caused stock price movements that were statistically significant. *Id*. at ¶75 (noting that disclosures caused stock movements that were statistically significant 57.1% of the time). In contrast, Dr. Cain discovered that statistically significant stock price movements occurred on just 5.2% of the days without any StoneCo-specific news. *Id*. at ¶76.

19

The conclusion of Dr. Cain's analysis demonstrates that relative to days that contained the least news during the Class Period, days that contained news day events "resulted in a greater proportion of statistically significant stock price movements at the 95% confidence level, higher absolute abnormal returns, and greater trading volumes and these differences are statistically significant." *Id*. at ¶78. "[A]n event study that correlates the disclosures of unanticipated, material information about a security with corresponding fluctuations in price has been considered *prima facie* evidence of the existence of such a causal relationship." *Petrobras*, 862 F.3d at 278 (quoting *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 207-08 (2d Cir. 2008)); *see also Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 328 F.R.D. 86, 98 (S.D.N.Y. 2018) (finding efficiency even where defendants were able to "poke[] some holes" in plaintiffs' expert's conclusions, as "the event study goes to the basic premise of *Cammer* 5"). Therefore, StoneCo's common stock price "reacted to company-specific news, and thus further supports the conclusion that StoneCo's common stock traded in an efficient market throughout the Class Period." Cain Rpt. ¶58.

### vi.  *Krogman* Factor 1: Market Capitalization

During the Class Period, the market capitalization for StoneCo common stock averaged $13.6 billion. *Id*. at ¶81. This supports a finding of market efficiency. *See, e.g., Pearlstein v. Blackberry Ltd.*, 2021 WL 253453 at *16 (S.D.N.Y. 2021) ($6.45 billion market cap, larger than 90% of publicly-traded companies, supports market efficiency). Moreover, StoneCo's total market capitalization places it above the 90th percentile of all companies on the NASDAQ and NYSE from 2016-2018, as per an academic study analyzing publicly traded companies' market capitalization in that time span. Cain Rpt. ¶81. Dr. Cain concluded that StoneCo's "market capitalization, shares outstanding available for trading, and its sizeable float . . . are consistent with

20

the conclusion that the Common Stock traded in an efficient market during the Class Period." *Id.* at ¶82.

### vii.    *Krogman* Factor 2: Bid-Ask Spread

The bid-ask spread is the difference between the prices at which investors are willing to buy and current stockholders are willing to sell shares. *Id.* at ¶84. Dr. Cain concluded that the bid-ask spread of StoneCo's common stock during the Class Period averaged 0.11%. *Id.* at ¶85. This is well within what courts have found indicative of market efficiency. *See In re Global Brokerage, Inc.*, 2021 WL 1160056, at *18 (S.D.N.Y. 2021) (bid-ask spread averaging .28% is consistent with efficiency); *Signet*, 2019 WL 3001084, at *12 ("the average bid-ask spread for all stocks trading on the NYSE and NASDAQ was .68%"). StoneCo's bid-ask spread supports the conclusion that its common stock traded in an efficient market throughout the Class Period. Cain Rpt. ¶87.

### viii.    *Krogman* Factor 3: Public Float

A stock's public float is the number of shares outstanding, excluding shares held by insiders and affiliated corporate entities. A higher public float indicates greater market efficiency. *Krogman*, 202 F.R.D. at 478. Here, StoneCo's public float during the Class Period was more than 98% of shares outstanding. Cain Rpt. ¶90. This equates to an average public float of $11.1 billion during the Class Period. *Id.* The large size and high percentage of StoneCo's float supports a finding of market efficiency. *See Signet*, 2019 WL 3001084, at *12 (public float of 99.4 and 99.8% "weigh[s] heavily in favor of a finding of market efficiency"); Cain Rpt. ¶90.[10] Dr. Cain concluded

---

[10] Moreover, StoneCo's public float greatly exceeded the $75 million minimum for S-3 and F-3 filing eligibility. *See* SEC Form S-3, *available at* https://www.sec.gov/files/forms-3.pdf; SEC Form F-3, available at https://www.sec.gov/files/formf-3.pdf.

that the large degree of public float for StoneCo's common stock supports the conclusion that it traded in an efficient market throughout the Class Period.  *Id*. at ¶91.

### ix.    Additional Factor: Institutional Ownership

Dr. Cain's Report also addresses an additional factor that demonstrates market efficiency: the presence of institutional investors.  *Id*. at ¶¶92-93.  Institutional investors are pension funds, endowments, mutual funds, investment banks, hedge funds, and other sophisticated investors who have significant resources to allocate to investing decisions.  Courts consider high institutional ownership indicative of market efficiency.  *See, e.g. In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008); *see also Wilson.*, 2018 WL 3913115, at *12) (finding ownership of company stock by at least 251 major institutions supported efficiency.)  Dr. Cain noted that the presence of these institutional shareholders can be an indicator of market efficiency because they "can improve market efficiency by digesting new public information and making investment decisions over large block holdings of shares, thus causing the new information to be quickly impounded into stock prices." Cain Rpt. ¶92.  Here, at least 751 institutions held StoneCo common stock at some point during the Class Period.  *Id*. at ¶93.

Because all the *Cammer* and *Krogman* factors, as well as additional market analyses, demonstrate here that the market for StoneCo's common stock was efficient during the Class Period, Lead Plaintiff is entitled to rely on the fraud-on-the-market presumption of reliance.[11]

---

[11] Reliance is also presumed under *Affiliated Ute*, 406 U.S. 128 (1972).  Where, as here, a claim "involv[es] primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery." *Id*. at 153. Instead, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [their] decision." *Id*. at 153-54.  The *Affiliated Ute* presumption reflects the reality that where no positive statements exist "'reliance as a practical matter is impossible to prove.'" *Wilson v. Comtech Telecomms. Corp.*, 648 F.2d 88, 93 (2d Cir. 1981).  Furthermore, because materiality itself is a common question, plaintiffs need not prove materiality in order to invoke the *Affiliated Ute* presumption at the class certification stage; it need only be alleged.  *See Amgen*, 568 U.S. at 465-6. Lead Plaintiff's Complaint includes numerous allegations regarding what Defendant failed to disclose. *E.g.*, ¶¶178-79, 185-86.  Under these circumstances, a showing of reliance on the omissions is unnecessary, even if Lead Plaintiffs also allege that StoneCo disseminated affirmative misstatements.  *Haw.*

### c.    Damages Will Be Calculated Using a Common Methodology

In the Second Circuit, a court's decision to certify a class does not require "a finding that damages are capable of measurement on a classwide basis," and it is "well-established" that "the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification." *Roach v. TL.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (discussing *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013)).  All that is required under *Comcast* is that "a model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury."  *Waggoner*, 875 F.3d at 106; *see also Signet*, 2019 WL 3001084, at *20 ("Plaintiff's burden at this stage is simply to propose a methodology for calculating damages that corresponds to its theory of liability.")

As with virtually all securities class actions, damages in this case are subject to an "out-of-pocket" damages model that can easily be applied class-wide using a common formula.  Cain Rpt. ¶96.  Courts in this Circuit have recognized that a model applying "[o]ut-of-pocket damage[s] is entirely consistent with [a plaintiff's] theory of Section 10(b) liability and would be measurable on a class-wide basis." *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 105–06 (S.D.N.Y. 2016) (alterations in original); *see also Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 2023 WL 2932485, at *14 (D. Conn. 2023) (collecting cases).

Moreover, while not necessary for class certification, damages in this case can be calculated on a class-wide basis using a common methodology.  Cain Rpt. ¶¶95-105, 111.  Dr. Cain explains that class-wide damages can be calculated using standard tools of valuation to measure the difference between the amount of price inflation when Class members purchased

---

*Structural Ironworkers*, 338 F.R.D. at 216 (*Affiliated Ute* applied where §10(b) claims focused on the omission of material information).

shares of StoneCo common stock and the amount of inflation at the time of sale, subject to certain uniform limitations. *Id*. at ¶95-105. This calculation of per-share artificial inflation can be applied class-wide and is universally accepted. *Id*.

Accordingly, common questions of law and fact predominate, and the first prong of Rule 23(b)(3) is satisfied.

### 2.    Superiority Is Established

Four factors are relevant when determining whether a class action is superior to other methods for fair and efficient adjudication: (1) the interests of members of the class in "individually controlling the prosecution of defense of separate actions;" (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members;" (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum;" and (4) the difficulties likely to be encountered in the management of a class action. Fed. R. Civ. P. 23(b)(3). Generally, class actions are considered superior to individual cases in securities cases. *Erickson*, 692 F. Supp. 3d at 134. Indeed, each of the superiority factors is satisfied here.

*First*, the proposed Class consists of hundreds, if not thousands, of potential Class members. "[P]roceeding as a class will preserve judicial resources by consolidating common issues of fact and law, and avoid repetitive proceedings and inconsistent adjudications." *Vasquez v. A+ Staffing LLC*, 746 F. Supp. 3d 26, 51 (E.D.N.Y. 2024). *Second*, Lead Plaintiff is unaware of any other related securities litigation commenced by Class members. *Third*, "concentrating the litigation in this forum would promote judicial economy." *In re Pfizer Inc.*, 282 F.R.D. at 53. *Fourth*, Lead Plaintiff does not foresee any management difficulties that will preclude this action from being maintained as a class action. Indeed, there is a risk of inconsistent judgments if there were multiple actions challenging the same common issues of fact and law. *Erickson*, 692 F. Supp. 3d at 134.

### 3.    The Court Should Appoint Labaton as Class Counsel

Under Rule 23(g)(1)(A), the Court must appoint counsel who will fairly and adequately represent the Class and, to that end, consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class. *See Hunter v. Blue Ridge Bankshares, Inc.*, 346 F.R.D. 16, 26 (E.D.N.Y. 2024) (lead counsel appointed after court considered its experience handling over 75 securities class actions).

Labaton has investigated and vigorously pursued the Class's claims in the action and will continue to do so. For example, Labaton conducted an extensive investigation of the claims; developed a detailed plan for the prosecution of the case; prepared a detailed operative Complaint and successfully defended that Complaint from a Rule 12(b)(6) dismissal; propounded substantial discovery on Defendant; responded to Defendant's discovery requests; and is now pursuing class certification. Additionally, as discussed above, and as supported by its firm resume, *see* Rogers Decl. Ex. C, Labaton has consistently demonstrated its ability to litigate securities cases, has extensive knowledge of the securities laws, and has proven its willingness to commit substantial time and resources to representing the Class. Finally, Labaton has no known conflicts that would prevent them from fairly and adequately representing the Class. Lead Plaintiff respectfully requests that the Court appoint Labaton as Class Counsel pursuant to Rule 23(g).

## IV.    CONCLUSION

Lead Plaintiff respectfully requests that the Court certify the proposed Class, appoint INPRS as Class Representative, and appoint Labaton as Class Counsel.

Respectfully submitted,

Dated: April 4, 2025                    **LABATON KELLER SUCHAROW LLP**

25

By:  */s/ Michael H. Rogers*

Michael P. Canty
Michael H. Rogers
Jacqueline R. Meyers
Grace T. Harmon
140 Broadway
New York, New York 10005
Tel.: (212) 907-0700
Fax: (212) 818-0477
Email: mcanty@labaton.com
        mrogers@labaton.com
        jmeyers@labaton.com
        gharmon@labaton.com

*Lead Counsel for Lead Plaintiff Indiana Public
Retirement System and the Proposed Class*

26

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel for Lead Plaintiff Indiana Public Retirement System certifies that this brief contains 8,185 words, which complies with the word limit of L.R. 7.1(c).

Dated: April 4, 2025                                    */s/ Michael H. Rogers*
                                                        Michael H. Rogers