**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE STONECO LTD. SECURITIES LITIGATION | Civil Action No. 1:21-cv-9620 (GHW)(OTW) |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND PAYMENT OF EXPENSES**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..... 1

ARGUMENT ..... 3

I. THE REQUESTED FEE WOULD BE REASONABLE UNDER EITHER THE PERCENTAGE OR LODESTAR METHOD ..... 3

A. The Requested Attorneys' Fee Would Be Reasonable Under the Percentage-of-the-Fund Method ..... 4

B. Fees Awarded in Comparable Cases Within This District ..... 4

C. The Requested Attorneys' Fee Would Be Reasonable Under the Lodestar Method ..... 6

II. THE REQUESTED FEE IS FAIR AND REASONABLE WHEN APPLYING THE SECOND CIRCUIT'S FACTORS ..... 9

A. Lead Counsel Has Devoted Significant Time and Labor to the Action ..... 9

B. The Magnitude and Complexity of the Action Support the Requested Fee ..... 10

C. The Risks of the Litigation Support the Requested Fee ..... 10

D. The Quality of Lead Counsel's Representation Supports the Requested Fee ..... 14

E. The Requested Fee in Relation to the Settlement ..... 16

F. Public Policy Considerations Support the Requested Fee ..... 16

III. LEAD COUNSEL'S EXPENSES ARE REASONABLE AND WERE NECESSARILY INCURRED TO ACHIEVE THE BENEFIT OBTAINED ..... 17

IV. LEAD PLAINTIFF'S REQUESTED REIMBURSEMENT UNDER 15 U.S.C. §78u-4(a)(4) IS REASONABLE ..... 19

V. THE REACTION OF THE SETTLEMENT CLASS TO DATE SUPPORTS THE REQUESTED FEES AND EXPENSES ..... 20

CONCLUSION ..... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 3D Sys. Sec. Litig.*,
2024 WL 50909 (E.D.N.Y. Jan. 4, 2024) ....................15

*In re Adelphia Commc'ns Corp. Sec. and Derivative Litig.*,
2006 WL 3378705 (S.D.N.Y. Nov. 16, 2006), *aff'd*, 272 F. App'x. 9 (2d Cir. 2008) ....................15

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*,
127 F. Supp. 2d 418 (S.D.N.Y. 2001)....................11

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
472 U.S. 299 (1985)....................3

*In re Bayer AG Sec. Litig.*,
2008 WL 5336691 (S.D.N.Y. Dec. 15, 2008) ....................13

*In re Beacon Associated Litig.*,
2013 WL 2450960 (S.D.N.Y. May 9, 2013) ....................5

*In re BHP Billiton Sec. Litig.*,
2019 WL 1577313 (S.D.N.Y. Apr. 10, 2019), *aff'd City of Birmingham Ret. Sys. v. Davis*, 806 F. App'x. 17 (2d Cir. 2020)....................5, 6

*In re Bristol-Myers Squibb Sec. Litig.*,
361 F. Supp. 2d 229 (S.D.N.Y. 2005)....................6

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
2022 WL 3220783 (S.D.N.Y. Aug. 5, 2022)....................6

*In re China Sunergy Sec. Litig.*,
2011 WL 1899715 (S.D.N.Y. May 13, 2011) ....................17

*City of Providence v. Aeropostale Inc.*,
2014 WL 1883494 (S.D.N.Y. May 9, 2014), *aff'd*, *Arbuthnot v. Pierson,* 607 F. App'x. 73 (2d Cir. 2015) ....................4, 10

*City of Birmingham Ret. Sys. v. Davis*,
806 F. App'x. 17 (2d Cir. 2020) ....................5

*City of Warren Police and Fire Ret. Sys. v. World Wrestling Ent., Inc.*,
2021 WL 2736135 (S.D.N.Y. June 30, 2021) ....................20

*In re Comverse Tech., Inc. Sec. Litig.*,
2010 WL 2653354 (E.D.N.Y. June 24, 2010) ....................6, 11, 16

*In re Deutsche Bank AG Sec. Litig.*,
2020 WL 3162980 (S.D.N.Y. June 11, 2020) (Woods, J.) ....................5

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
2015 WL 6971424 (S.D.N.Y. Nov. 9, 2015), *aff'd*, 674 F. App'x. 37 (2d Cir. 2016) ....................5

*In re FLAG Telecom Holdings, Ltd. Sec. Litig.*,
2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) ....................6, 14, 16

*In re Global Crossing Sec. & ERISA Litig.*,
225 F.R.D. 436 (S.D.N.Y. 2004) ....................14

*Goldberger v. Integrated Res, Inc.*,
209 F.3d 43 (2d Cir. 2000) ....................3, 4, 9

*Hicks v. Morgan Stanley*, *et al.*,
2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005) ....................3, 17

*Luciano v. Olsten Corp*.,
109 F.3d 111 (2d Cir. 1997) ....................7

*Maley v. Del Global Techs. Corp*.,
186 F. Supp. 2d 358 (S.D.N.Y. 2002) ....................3, 8

*McDaniel v. Cnty. of Schenectady*,
595 F.3d 411 (2d Cir. 2010) ....................3

*Missouri v. Jenkins*,
491 U.S. 274 (1989) ....................7

*In re Northern Dynasty Minerals Ltd. Sec. Litig*.,
2023 WL 5511513 (E.D.N.Y. Aug. 24, 2024) ....................15

*Pearlstein v. Blackberry Ltd.*,
2022 WL 4554858 (S.D.N.Y. Sept. 29, 2022) ....................5

*In re Perrigo Co. PLC Sec. Litig.*,
2022 WL 500913 (S.D.N.Y. Feb. 18, 2022) ....................4, 5

*In re Sadia S.A. Sec. Litig*.,
2011 WL 6825235 (S.D.N.Y. Dec. 28, 2011) ....................5

*Savoie v. Merchs. Bank*,
166 F.3d 456 (2d Cir. 1999) ....................4

*In re Signet Jewelers Ltd. Sec. Litig.*,
2020 WL 4196468 (S.D.N.Y. July 21, 2020) ....................10, 11

*In re Telik, Inc. Sec. Litig.*,
576 F. Supp. 2d 570 (S.D.N.Y. 2008)....................4, 7, 8

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)....................3

*In re Veeco Instruments Inc. Sec. Litig.*,
2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007) ....................14, 15, 21

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
396 F.3d 96 (2d Cir. 2005)....................4, 6, 8

*In re WorldCom, Inc. Sec. Litig.*,
388 F. Supp. 2d 319 (S.D.N.Y. Sept. 21, 2005) ....................16

*Xu v. Gridsum Holding Inc.*,
2024 WL 5301450 (S.D.N.Y. Apr. 3, 2024)....................20

**Docketed Cases**

*In re Barclays PLC Sec. Litig.*,
No. 1:22-cv-08172-KPF, slip op. (S.D.N.Y. Mar. 18, 2025) ....................5

*In re BRF S.A. Sec. Litig.*,
No. 1:18-cv-02213, ECF No. 181 at 17-19, Tr. of Hr’g. (S.D.N.Y. Oct. 23, 2020) ....................8

*In re Celestica Inc. Sec. Litig.*,
No. 07-cv-00312-GBD, slip op. (S.D.N.Y. July 28, 2015) ....................5

*In re Changyou.com Ltd. Sec. Litig.*,
No. 1:21-cv-07858-GHW, slip op. (S.D.N.Y. Jan. 28, 2023)....................20

*City of St. Clair Shores Police and Fire Ret. Sys. v. Credit Suisse Grp. AG*,
No. 1:21-cv-03385, fee brief excerpt (S.D.N.Y. Mar. 31, 2023)....................8

*Citiline Holdings, Inc. v. iStar Fin., Inc.*,
No. 1:08-cv-03612-RJS, slip op. (S.D.N.Y. Apr. 5, 2013)....................5

*City of St. Clair Shores Police and Fire Ret. Sys. v. Credit Suisse Grp. AG*,
No. 1:21-cv-03385, slip op. (S.D.N.Y. May 11, 2023) ....................7, 8

*In re Cnova N.V. Sec. Litig.*,
Master File No. 1:16-cv-00444-LTS-OTW, slip op. (S.D.N.Y. Mar. 20, 2018)....................5

*Landmen Partners, Inc. v. Blackstone Grp. L.P.*,
No. 08-cv-03601-HB-FM, slip op. (S.D.N.Y. Dec. 18, 2013) ....................................................6

*In re Y-mAbs Therapeutics, Inc. Sec. Litig.*,
No. 1:23-cv-00431-AS, slip op. (S.D.N.Y. Oct. 29, 2024)....................................................5, 7

*In re Y-mAbs Therapeutics, Inc. Sec. Litig.*,
No. 1:23-cv-00431-AS, fee brief excerpt (S.D.N.Y. Oct. 7, 2024) ..........................................8

**Statutes**

15 U.S.C. §78u-4(a)(4) .........................................................................................................19

Court-appointed Lead Counsel, Labaton Keller Sucharow LLP ("Labaton"), respectfully submits this memorandum of law in support of its motion for an award of attorneys' fees in the amount of 28% of the Settlement Fund. Lead Counsel also seeks payment of $310,263.24, plus accrued interest, in Litigation Expenses that Lead Counsel reasonably incurred in prosecuting the Action, as well as $3,000 as reimbursement to Lead Plaintiff Indiana Public Retirement System ("INPRS" or "Lead Plaintiff"), directly related to the time it dedicated to representing the Settlement Class, as authorized by the Private Securities Litigation Reform Act of 1995 (the "PSLRA").[1]

## PRELIMINARY STATEMENT

As set forth in the Stipulation, the proposed Settlement, if approved by the Court, will resolve this case in its entirety in exchange for a $26.75 million cash payment. The recovery represents a very favorable result for the Settlement Class as it provides substantial, near-term compensation to Settlement Class Members, while avoiding the risks associated with pursuing the Action through further dispositive motion practice, class certification briefing, trial, and the inevitable appeals that would follow. The Settlement eliminates these risks while providing a very favorable recovery to the Settlement Class.

---

[1] Lead Counsel is simultaneously submitting the Declaration of Michael H. Rogers in Support of (I) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses, dated January 23, 2026 (the "Rogers Declaration") (cited as "¶"). Capitalized terms have the meanings given to them in the Rogers Declaration or the Stipulation and Agreement of Settlement (ECF No. 123-1) (the "Stipulation").

All exhibits referenced below are attached to the Rogers Declaration. For clarity, citations to exhibits that themselves have attached exhibits will be referenced as "Ex. ___ - ___." The first numerical reference is to the designation of the entire exhibit attached to the Declaration and the second alphabetical reference is to the exhibit designation within the exhibit itself.

At significant contingency risk, Lead Counsel devoted substantial resources to prosecuting the Action against highly skilled opposing counsel. Among the other work detailed in the Rogers Declaration, Lead Counsel: (i) conducted a comprehensive investigation of the claims at issue, including contacting and interviewing former employees of StoneCo, all of whom were in Brazil; (ii) prepared and filed a particularized amended Complaint, which expanded the scope of the initial complaint by adding additional misrepresentations, disclosures, and other allegations in support of the claims at issue; (iii) defeated, in part, StoneCo's motion to dismiss the Complaint; (iv) moved for class certification; (v) drafted and propounded discovery requests on StoneCo; (vi) engaged in protracted and often contentious negotiations regarding the scope of those discovery requests and the subsequent timing of productions in response thereto, (vii) analyzed over 12,000 pages of documents produced in discovery, many of which required significant translation efforts from Portuguese to English; (viii) engaged consultants concerning Brazilian law and the financial technology sector in Brazil; (ix) engaged and consulted with experts in accounting matters, damages and loss causation; and (x) prepared for and participated in a formal in-person arms' length mediation. *See generally* Rogers Decl. at §§ III-V.

Against this backdrop, Lead Counsel requests a fee of 28% of the Settlement Fund, payment of Lead Counsel's Litigation Expenses in the amount of $310,263.24, plus accrued interest, and reimbursement of $3,000 to Lead Plaintiff for the time and resources it dedicated to representing the class, pursuant to the PSLRA. As demonstrated below, the fee request is within the range of attorneys' fees typically awarded in securities class actions of this size, and the fee and expense requests are well supported by both case law and the facts of this case.

For the following reasons, Lead Counsel respectfully submits that its efforts and the results achieved in this Action justify the requested fees and expenses.

## ARGUMENT

### I. THE REQUESTED FEE WOULD BE REASONABLE UNDER EITHER THE PERCENTAGE OR LODESTAR METHOD

The Supreme Court has emphasized that private securities actions are "an essential supplement to criminal prosecutions and [SEC] civil enforcement actions…." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007); *accord Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (private securities actions provide "a most effective weapon in the enforcement" of the securities laws and are "a necessary supplement to [SEC] action"). Compensating counsel for bringing these actions is important because "[s]uch actions could not be sustained if plaintiffs' counsel were not to receive remuneration from the settlement fund for their efforts on behalf of the class." *Hicks v. Morgan Stanley*, *et al.*, 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005); *see also Maley v. Del Global Techs. Corp*., 186 F. Supp. 2d 358, 373 (S.D.N.Y. 2002) ("In considering an award of attorney's fees, the public policy of vigorously enforcing the federal securities laws must be considered.").[2]

In the Second Circuit, courts "may award attorneys' fees in common fund cases under either the 'lodestar' method or the 'percentage of the fund' method." *McDaniel v. Cnty. of Schenectady*, 595 F.3d 411, 417 (2d Cir. 2010). "[W]hether calculated pursuant to the lodestar or the percentage method, the fees awarded in common fund cases may not exceed what is 'reasonable' under the circumstances." *Goldberger v. Integrated Res, Inc.*, 209 F.3d 43, 47 (2d Cir. 2000).

In this case, the requested fee award—28% of the Settlement Fund—is well supported under either the "percentage" or "lodestar" method.

---

[2] All internal quotations and citations are omitted unless otherwise stated.

### A. The Requested Attorneys' Fee Would Be Reasonable Under the Percentage-of-the-Fund Method

Lead Counsel respectfully submits that the Court should award a fee based on a percentage of the common fund obtained. Courts have recognized that, in addition to providing just compensation, "awards of fair attorneys' fees from a common fund should also serve to encourage skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons, and to discourage future alleged misconduct of a similar nature." *City of Providence v. Aeropostale Inc.*, 2014 WL 1883494, at *11 (S.D.N.Y. May 9, 2014), *aff'd*, *Arbuthnot v. Pierson,* 607 F. App'x. 73 (2d Cir. 2015).

The Second Circuit has approved the percentage method, recognizing that the "trend in this Circuit is toward the percentage method" and that the method "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 121 (2d Cir. 2005); *see also Goldberger v. Integrated Res. Inc.,* 209 F.3d 43, 48-50 (2d Cir. 2000) (either percentage of fund method or lodestar method may be used to determine fees, but noting the "lodestar method proved vexing" and results in "inevitable waste of judicial resources"); *Savoie v. Merchs. Bank*, 166 F.3d 456, 460 (2d Cir. 1999) ("percentage-of-the-fund method has been deemed a solution to certain problems that may arise when the lodestar method is used in common fund cases"); *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 586 & n.7 (S.D.N.Y. 2008) ("[T]here is a strong consensus – both in this Circuit and across the country – in favor of awarding attorneys' fees in common fund cases as a percentage of the recovery.").

### B. Fees Awarded in Comparable Cases Within This District

District courts within the Second Circuit routinely award attorneys' fees of 28% (or more) in securities class actions of a similar size. *See*, *e.g., In re Perrigo Co. PLC Sec. Litig.,*

2022 WL 500913, at *1 (S.D.N.Y. Feb. 18, 2022) (awarding 33 1/3% of $31.9 million settlement); *In re Celestica Inc. Sec. Litig.*, No. 07-cv-00312-GBD, slip op. at 2 (S.D.N.Y. July 28, 2015) (awarding 30% fee of $30 million settlement) (Ex. 8);[3] *Citiline Holdings, Inc. v. iStar Fin., Inc.*, No. 1:08-cv-03612-RJS, slip op. at 1 (S.D.N.Y. Apr. 5, 2013) (awarding 30% of $29 million settlement) (Ex. 8); *In re Cnova N.V. Sec. Litig.*, Master File No. 1:16-cv-00444-LTS-OTW, slip op. at 5 (S.D.N.Y. Mar. 20, 2018) (awarding 33.3% of $28.5 million settlement) (Ex. 8); *In re Sadia S.A. Sec. Litig.*, 2011 WL 6825235, at *3 (S.D.N.Y. Dec. 28, 2011) (awarding 30% of $27 million settlement); *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 2015 WL 6971424, at *9-10 (S.D.N.Y. Nov. 9, 2015) (awarding 33% of $26.5 million settlement fund), *aff'd*, 674 F. App'x. 37 (2d Cir. 2016); *In re Y-mAbs Therapeutics, Inc. Sec. Litig.,* No. 1:23-cv-00431-AS, slip op. at 8 (S.D.N.Y. Oct. 29, 2024) (awarding 33.3% of $19.65 million settlement) (Ex. 8); *In re Barclays PLC Sec. Litig.*, No. 1:22-cv-08172-KPF, slip op. at 2 (S.D.N.Y. Mar. 18, 2025) (awarding 29% of $19.5 million settlement) (Ex. 8); *In re Deutsche Bank AG Sec. Litig.*, 2020 WL 3162980, at *1 (S.D.N.Y. June 11, 2020) (Woods, J.) (awarding 33 1/3% of $18.5 million settlement); *see also In re Beacon Associated Litig.*, 2013 WL 2450960, at *5 (S.D.N.Y. May 9, 2013) ("In this Circuit, courts routinely award attorneys' fees that run to 30% and even a little more of the amount of the common fund.").

Awards of 28% or more are also regularly awarded in cases with larger settlements in courts within the Second Circuit. *See, e.g., Pearlstein v. Blackberry Ltd.,* 2022 WL 4554858, at *10-11 (S.D.N.Y. Sept. 29, 2022) (awarding 33 1/3% of $165 million settlement); *In re BHP Billiton Sec. Litig.*, 2019 WL 1577313, at *1 (S.D.N.Y. Apr. 10, 2019) (awarding fees of 30% of

[3] All unreported slip opinions and excerpts from cited briefs and hearing transcripts are submitted in a compendium, which is Exhibit 8 to the Rogers Declaration.

$50 million recovery), *aff'd City of Birmingham Ret. Sys. v. Davis*, 806 F. App'x. 17 (2d Cir. 2020); *Landmen Partners, Inc. v. Blackstone Grp. L.P.*, No. 08-cv-03601-HB-FM, slip op. at 5 (S.D.N.Y. Dec. 18, 2013) (awarding 33.33% of $85 million settlement) (Ex. 8); *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2022 WL 3220783, at *1 (S.D.N.Y. Aug. 5, 2022) (awarding 33 1/3% of $44 million settlement).

Accordingly, the requested fee is comparable to fees awarded within this District.

### C. The Requested Attorneys' Fee Would Be Reasonable Under the Lodestar Method

To ensure the reasonableness of a fee awarded under the percentage-of-the-fund method, the Second Circuit encourages district courts to "cross-check" the proposed award against counsel's lodestar. *Walmart Stores Inc. v. Visa USA Inc.*, 396 F. 3d 96, 123 (2d Cir. 2005) (quoting *Goldberger*, 209 F.3d at 50); *see also In re Bristol-Myers Squibb Sec. Litig.*, 361 F. Supp. 2d 229, 233 (S.D.N.Y. 2005) ("Typically, courts utilize the percentage method and then 'cross-check' the adequacy of the resulting fee by applying the lodestar method."). Fees representing multiples above a lodestar are frequently awarded to reflect the contingency risk and other relevant enhancement factors. *See In re FLAG Telecom Holdings, Ltd. Sec. Litig.*, 2010 WL 4537550, at *26 (S.D.N.Y. Nov. 8, 2010) ("[A] positive multiplier is typically applied to the lodestar in recognition of the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors[.]"); *In re Comverse Tech., Inc. Sec. Litig.*, 2010 WL 2653354, at *5 (E.D.N.Y. June 24, 2010) ("Where, as here, counsel has litigated a complex case under a contingency fee arrangement, they are entitled to a fee in excess of the lodestar[.]").

Here, Lead Counsel has spent more than 6,300 hours of attorney and other professional staff time litigating and settling the case. *See* Ex. 6-A. Lead Counsel's lodestar, derived by

multiplying the hours spent by each attorney and other professional by their standard "current" hourly rates is $4,011,102.50. *Id.*[4] Lead Counsel's lodestar is based on its 2025 hourly rates, which are comparable to those in the legal community for similar services by attorneys of reasonably comparable skill, experience, and reputation. "[P]erhaps the best indicator of the 'market rate' in the New York area for plaintiffs' counsel in securities class actions is to examine the rates charged by New York firms that *defend* class actions on a regular basis." *Telik*, 576 F. Supp. 2d at 589; *Luciano v. Olsten Corp*., 109 F.3d 111, 115 (2d Cir. 1997) ("[t]he 'lodestar' figure should be in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation"). Lead Counsel's rates here range from $800 to $1,375 for partners, $850 to $975 for of counsels, and $350 to $700 for associates and other attorneys. *See* ¶119; Ex. 6-A. Sample defense firm rates in 2025, gathered by Labaton annually from their fee applications in bankruptcy court filings nationwide, often exceeded these rates. ¶119; Ex. 7.

The requested fee of 28% of the Settlement Fund, *i.e.,* $7,490,000, plus accrued interest, would represent a multiplier of 1.87 of the total lodestar of Lead Counsel. Such a multiplier is within the parameters used throughout courts within the Second Circuit and, as discussed herein, has been well-earned. *See, e.g*., *In re Y-mAbs Therapeutics, Inc. Sec. Litig.,* No. 1:23-cv-00431-AS, slip op. at 8 (S.D.N.Y. Oct. 29, 2024) (awarding fees from $19.65 million settlement representing a multiplier of 3.8, as noted in the fee brief at ECF No. 63 at 14) (Ex. 8); *City of St. Clair Shores Police and Fire Ret. Sys. v. Credit Suisse Grp. AG*, No. 1:21-cv-03385, slip op. at 1

[4] The Supreme Court and other courts have held that the use of current rates is proper since such rates compensate for inflation and the loss of use of funds. *See Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989). Because the Settlement was submitted to the Court in 2025, Labaton is using its rates as of December 2025, rather than its 2026 rates.

(S.D.N.Y. May 11, 2023) (awarding fees from $32.5 million settlement representing a multiplier of 5.6, as referenced in the fee brief at ECF No. 79 at 29) (Ex. 8); *In re BRF S.A. Sec. Litig.*, No. 1:18-cv-02213, ECF No. 181 at 17-19, Tr. of Hr'g. (S.D.N.Y. Oct. 23, 2020) (awarding fees from $40 million settlement representing a lodestar multiplier of 5.57) (Ex. 8); *see also Walmart Stores Inc.* 396 F. 3d at 123 (upholding a multiplier of 3.5 as reasonable on appeal); *In re Telik, Inc. Sec. Litig.,* 576 F. Supp. 2d at 590 ("[L]odestar multiples of over 4 are routinely awarded."); *Maley* 186 F. Supp. 2d at 369) (noting that multiplier of 4.65 was "well within the range awarded by courts in this Circuit and courts throughout the country").

Here, Lead Counsel carefully and efficiently staffed the Action and litigated the case with three main partners, only two of whom worked on the case simultaneously. Other partners were involved, but only at particular stages of the case, such as lead plaintiff appointment or settlement. Rogers Decl. ¶117; Ex. 6-A. The result of this staffing was that associates and of counsel with lower hourly rates handled the case on a day-to-day basis, as opposed to more expensive partners.

Additional work will be required of Lead Counsel on an ongoing basis, including: correspondence with Settlement Class Members; preparation for, and participation in, the final approval hearing; supervising the claims administration process being conducted by the Claims Administrator; and supervising the distribution of the Net Settlement Fund to Settlement Class Members who have submitted valid Claim Forms. However, Lead Counsel will not seek payment for this additional work.

For all these reasons, the lodestar "cross-check" supports the reasonableness of the requested fee.

* * *

In sum, Lead Counsel's requested fee award is well within the range of what courts regularly award in comparable class actions, whether calculated as a percentage of the fund or in relation to Lead Counsel's lodestar.

## II. THE REQUESTED FEE IS FAIR AND REASONABLE WHEN APPLYING THE SECOND CIRCUIT'S FACTORS

The Second Circuit has set the following criteria for courts to consider when reviewing a request for attorneys' fees in a common fund case, whether under the percentage approach or the lodestar multiplier approach:

> (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

*Goldberger*, 209 F.3d at 50. As discussed below, these factors and the analyses above demonstrate that Lead Counsel's requested fee would be reasonable.

### A. Lead Counsel Has Devoted Significant Time and Labor to the Action

The time and effort expended by Lead Counsel to prosecuting the Action and achieving the Settlement support the requested fee. As set forth in greater detail in the Rogers Declaration, Lead Counsel, among other things: (i) conducted a comprehensive investigation of the claims at issue, including contacting and interviewing former employees of StoneCo, all of whom were in Brazil; (ii) prepared and filed a particularized amended Complaint, which expanded the scope of the initial complaint by adding additional misrepresentations, disclosures, and other allegations in support of the claims at issue; (iii) defeated, in part, StoneCo's motion to dismiss the Complaint; (iv) moved for class certification; (v) drafted and propounded discovery requests on StoneCo; (vi) engaged in protracted and often contentious negotiations regarding the scope of those discovery requests and the subsequent timing of productions in response thereto, (vii) analyzed over 12,000 pages of documents produced in discovery, many of which required

significant translation efforts from Portuguese to English; (viii) engaged consultants concerning Brazilian law and the financial technology sector in Brazil; (ix) engaged and consulted with experts in accounting matters, damages and loss causation; and (x) prepared for and participated in a formal in-person arms' length mediation. *See generally* Rogers Decl. at §§ III-V.

Lead Counsel expended more than 6,300 hours prosecuting the Action with a lodestar value of $4,011,102.50. *See* Ex. 6-A. At all times, Lead Counsel took care to staff the matter efficiently to avoid unnecessary duplication of effort.

### B. The Magnitude and Complexity of the Action Support the Requested Fee

Courts regularly recognize that securities class action litigation is "notably difficult and notoriously uncertain." *City of Providence,* 2014 WL 1883494, at *5; *In re Signet Jewelers Ltd. Sec. Litig.,* 2020 WL 4196468, at *4 (S.D.N.Y. July 21, 2020) ("[s]ecurities class actions are generally complex and expensive to prosecute"). Here, prosecuting the class's claims required expertise, skill, and dedication, including extensive expert analysis across multiple fields like damages and loss causation, as well as Brazilian civil law and its regulatory landscape, all while navigating language barriers and hurdles. Certifying a class, completing discovery, prevailing in connection with summary judgment challenges, and then achieving a litigated verdict at trial, would have been difficult, complex, and uncertain.

Accordingly, the magnitude and complexity of the Action support the conclusion that the requested fee is fair and reasonable. *See City of Providence*, 2014 WL 1883494, at *16 ("[T]he complex and multifaceted subject matter involved in a securities class action such as this supports the fee request.").

### C. The Risks of the Litigation Support the Requested Fee

The risks associated with this contingency fee case also support the requested fee. "Little about litigation is risk-free, and class actions confront even more substantial risks than other

forms of litigation." *Comverse*, 2010 WL 2653354, at *5; *see also In re Signet*, 2020 WL 4196468, at *19 ("The Second Circuit has recognized that the risks associated with a case undertaken on a contingent fee basis is an important factor in determining an appropriate fee award."); *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 127 F. Supp. 2d 418, 433 (S.D.N.Y. 2001) (it is "appropriate to take [contingent-fee] risk into account in determining the appropriate fee.").

The Parties were deeply divided on virtually every issue in the litigation, as detailed in the Rogers Declaration at Section VI. and the accompanying Memorandum of Law in Support of Lead Plaintiff's Motion for Final Approval of Proposed Class Action Settlement and Plan of Allocation ("Settlement Memorandum"), and there was no guarantee Lead Plaintiff's position would prevail. If StoneCo had succeeded with respect to any of its defenses, Lead Plaintiff and the class could have recovered nothing or far less than the Settlement Amount.

Although Lead Plaintiff and Lead Counsel believe that the alleged misstatements supported strong claims of securities fraud, and although the Court denied, in part, StoneCo's Motion to Dismiss, Lead Plaintiff faced the ongoing burdens of supporting its liability claims in connection with summary judgment and prevailing at trial, as well as in likely appeals – a process that could possibly extend for years and might lead to a smaller recovery, or no recovery at all. ¶¶69-86.

Summary judgment would provide Defendant with another chance to contest elements of Lead Plaintiff's claims as a matter of law, including, falsity, materiality, scienter, and loss causation. With respect to falsity, Defendant would likely marshal evidence purportedly demonstrating that: (i) COVID-19 caused significant problems for StoneCo's Credit Product; and (ii) the new registry laws in Brazil presented difficulties and contributed to increasing

delinquencies. Lead Counsel consulted with an expert regarding the Brazilian government's directives and regulations impacting the financial technology industry, including changes to the Brazilian Registry System and Brazil's response to the COVID-19 pandemic, but the issues presented by these matters were complex and novel, and it was uncertain how they would evolve during ongoing discovery or how a jury would view them. ¶¶70-73.

Regarding scienter, StoneCo would have likely argued, *inter alia*, that Lead Plaintiff could not establish that any executive whose intent could be imputed to StoneCo reviewed data from StoneCo's "Marco Polo" system, internal reports, or Company meetings sufficient to contradict StoneCo's public statements. Moreover, StoneCo would likely seek to prove that any problems arising from or failures related to the Credit Product do not constitute recklessness in the context of securities fraud. ¶¶78-80. Affirmatively proving StoneCo's intent through documents and witnesses would have been extremely difficult, particularly given language barriers. ¶74. Additionally, StoneCo would have likely attempted to prove a lack of scienter by attacking the Complaint's allegations through purported modifying or recanting declarations obtained from certain confidential witnesses. ¶80.

Even if Lead Plaintiff was successful in proving falsity and scienter with respect to the misstatements alleged in the Complaint, it faced significant challenges and uncertainty with respect to proving loss causation and damages. In order to recover maximum damages, estimated to be approximately $2 billion by Lead Plaintiff's expert, Lead Plaintiff would need to prove that the allegedly corrective information disclosed by StoneCo on August 25, 2021, August 30, 2021, and November 16, 2021 revealed new information about StoneCo's Credit Product that caused the price StoneCo's stock to decline, as opposed to other information that was unrelated to the alleged misstatements. ¶¶81-84. However, StoneCo would have likely argued, for example, that

the decline on August 25 was not statistically significant and that confounding information released during the trading day on November 17, 2021 significantly reduced recoverable damages. *Id*.

Additionally, StoneCo was likely to argue that Lead Plaintiff could not disaggregate confounding factors from the stock price declines on certain dates, including, for example, November 17, 2021. Such arguments would likely entail that the disclosures did not disclose any new information regarding the Credit Product. StoneCo was also likely to argue that Lead Plaintiff could not quantify the stock price declines on the alleged disclosure dates in a way that was distinct from unrelated announcements regarding the impact of Brazil's new Registry System and/or COVID-19 business interruptions. ¶82.

If only the August 30, 2021 allegedly corrective disclosure was found to be actionable, aggregate damages would have decreased to approximately $400 million. In addition, there were risks that the Class Period could have been shortened to start much later, in March 2021, which could have reduced aggregate damages to approximately $200 million. ¶84. Accordingly, the contours of the ultimate class definition and the actionable misstatements could have significantly compromised Lead Plaintiff's ability to succeed at trial and obtain a judgment for the class. *See In re Bayer AG Sec. Litig*., 2008 WL 5336691, at *5 (S.D.N.Y. Dec. 15, 2008) (noting the "difficulty of establishing loss causation [] and the difficulty in proving that Defendants acted with scienter, militate in favor of fee awards").

Additionally, while StoneCo had not yet submitted its opposition to Lead Plaintiff's motion for class certification, Lead Plaintiff anticipated a robust opposition to the motion, likely on several grounds including that the Class Period should be reduced significantly because of the inactionability of certain misstatements, and that one or more of the corrective disclosures at

issue did not cause a statistically significant price decline or reveal new information about the Credit Product. ¶¶76-77.

In the face of many uncertainties, Lead Counsel undertook this case on a wholly contingent basis, knowing that the litigation would require the devotion of substantial time and expense with no guarantee of compensation. ¶¶106-112. Lead Counsel's assumption of this contingency fee risk strongly supports the requested fee. *See FLAG Telecom*, 2010 WL 4537550, at *27 ("Courts in the Second Circuit have recognized that the risk associated with a case undertaken on a contingent fee basis is an important factor in determining an appropriate fee award.").

**D. <u>The Quality of Lead Counsel's Representation Supports the Requested Fee</u>**

The quality of the representation by Lead Counsel is another important factor that supports the reasonableness of the requested fee. Lead Counsel is a nationally recognized leader in the field of securities class action litigation and has substantial experience litigating and trying securities class actions in courts throughout the country. ¶114; Ex. 6-C. The attorneys who were principally responsible for prosecuting this case relied upon their skill to develop and implement strategies to overcome myriad obstacles raised by Defendant throughout the litigation. Lead Counsel respectfully submits that the quality of its representation is best evidenced by the progress of the litigation and the quality of the result achieved. *See, e.g.*, *In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115808, at *7 (S.D.N.Y. Nov. 7, 2007); *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 467 (S.D.N.Y. 2004).

The Settlement is above industry trends. The $26.75 million recovery is almost double the median recovery of $12.5 million in securities class actions settled in the first half of 2025, when the Settlement was reached. *See* Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: H1 2025 Update*, (NERA Economic Research Associates,

Inc. 2025), Ex. 2 at 2. It is significantly more than the $17 million median recovery for all settlements in 2025. *See* Edward Flores, Svetlana Starykh & Ivelina Velikova, *Recent Trends in Securities Class Action Litigation: 2025 Full-Year Review*, (NERA Economic Research Assoc. Jan. 2026), Ex. 5 at 24.

While the Settlement recovers 1.3% of estimated maximum damages, it recovers a range of 6.7% to 13.4% of more likely recoverable estimated damages. Since the passage of the PSLRA, courts have regularly approved settlements that recover lower or similar percentages of damages. *See, e.g., In re 3D Sys. Sec. Litig*., 2024 WL 50909, at *12 (E.D.N.Y. Jan. 4, 2024) (settlement representing approximately 1% of maximum damages approved as reasonable); *In re Northern Dynasty Minerals Ltd. Sec. Litig*., 2023 WL 5511513, at *10-11 (E.D.N.Y. Aug. 24, 2024) (approving settlement with a recovery of 2.3% of maximum potential damages). According to NERA's full-year 2025 report, for securities cases with total NERA-defined investor losses of between $200 million and $399 million, the median percentage of recovery from 2016 to 2025 was 2.7% of estimated losses, and the median percentage of recovery for such cases in 2025 was 1.5%. *See* Ex. 5 at 27-28.

The quality of Lead Counsel's representation is further demonstrated by the fact that this substantial recovery was obtained after opposing a consistently aggressive defense by highly skilled attorneys at Quinn Emanuel Urquhart & Sullivan LLP. Courts recognize that the strength of Lead Counsel's opposition should be considered in assessing its performance. *See, e.g.*, *Veeco*, 2007 WL 4115808, at *7 (among factors supporting 30% fee award was that defendants were represented by "one of the country's largest law firms"); *In re Adelphia Commc'ns Corp. Sec. and Derivative Litig.*, 2006 WL 3378705, at *3 (S.D.N.Y. Nov. 16, 2006) ("The fact that the settlements were obtained from defendants represented by 'formidable opposing counsel from

some of the best defense firms in the country' also evidences the high quality of lead counsels' work."), *aff'd*, 272 F. App'x. 9 (2d Cir. 2008).

**E. <u>The Requested Fee in Relation to the Settlement</u>**

"When determining whether a fee request is reasonable in relation to a settlement amount, 'the court compares the fee application to fees awarded in similar securities class-action settlements of comparable value.'" *Comverse*, 2010 WL 2653354, at *3. As discussed in Section I.B, *supra*, the requested fee is within the range of percentage fees that this Court and other courts have awarded in comparable cases and, accordingly, the fee requested is reasonable in relation to the Settlement.

**F. <u>Public Policy Considerations Support the Requested Fee</u>**

As mentioned above, courts within the Second Circuit have long held that public policy favors the award of reasonable attorneys' fees in class action securities litigation. *See*, *e.g., Flag Telecom*, 2010 WL 4537550, at *29 (if the "important public policy [of enforcing the securities laws] is to be carried out, the courts should award fees which will adequately compensate Lead Counsel for the value of their efforts, taking into account the enormous risks they undertook"). "In order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives." *In re WorldCom, Inc. Sec. Litig*., 388 F. Supp. 2d 319, 359 (S.D.N.Y. Sept. 21, 2005).

Judge McMahon has noted the importance of "private enforcement actions and the corresponding need to incentivize attorneys to pursue such actions on a contingency fee basis" in *Shapiro v. J.P. Morgan Chase & Co*:

> [C]lass actions serve as private enforcement tools when . . . regulatory entities fail to adequately protect investors . . . . [P]laintiffs' attorneys need to be sufficiently incentivized to commence such actions in order to ensure that defendants who

> engage in misconduct will suffer serious financial consequences . . . . [A]warding counsel a fee that is too low would therefore be detrimental to this system of private enforcement.

2014 WL 1224666, at *24 (S.D.N.Y. Mar. 24, 2014) (citing, *In re Initial Pub. Offering Sec. Litig*., 671 F. Supp. 2d 467, 515-16 (S.D.N.Y. 2009)); *see also Hicks*, 2005 WL 2757792, at *9 ("To make certain that the public is represented by talented and experienced trial counsel, the remuneration should be both fair and rewarding.").

Accordingly, this factor supports Lead Counsel's fee and expense application.

## III. LEAD COUNSEL'S EXPENSES ARE REASONABLE AND WERE NECESSARILY INCURRED TO ACHIEVE THE BENEFIT OBTAINED

Lead Counsel's fee application includes a request for payment of Lead Counsel's Litigation Expenses, in the amount of $310,263.24, which were reasonably incurred and necessary to prosecute the Action. *See* Ex. 6-B. *See In re China Sunergy Sec. Litig.*, 2011 WL 1899715, at *6 (S.D.N.Y. May 13, 2011) (in a class action, attorneys should be compensated "for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long as they were 'incidental and necessary to the representation'"). This amount is well below the $420,000 cap that the notices informed potential Settlement Class Members that counsel may apply for, and to which—to date—there have been no objections.

The amount of Litigation Expenses is consistent with the stage of the litigation and the claims and defenses at issue. Lead Counsel incurred expenses related to, among other things, expert and consultant fees, mediation fees, international investigators, translation costs, legal counsel for confidential witnesses subpoenaed by StoneCo, and litigation support fees related to electronic discovery. A complete breakdown by category of the expenses incurred is set forth in Exhibit B to the Declaration of Michael H. Rogers on behalf of Labaton Keller Sucharow. These

expense items are reported separately by Lead Counsel, and such costs are not duplicated in the firm's hourly rates.

The largest expense relates to the retention of Lead Plaintiff's testifying and consulting experts. These fees total $172,470.88, or approximately 56% of the total Litigation Expenses. ¶126; Ex. 6-B. In connection with class certification, Lead Counsel retained Matthew D. Cain, Ph.D., to opine on loss causation and market efficiency matters. Mr. Cain was also retained to analyze aggregate damages and to draft the proposed Plan of Allocation. Lead Counsel consulted with an expert on topics concerning the financial technology industry in Brazil, including the enactment of the Brazilian government's Registry System, regulatory changes impacting financial technology, and impacts of the COVID-19 pandemic. Lead Counsel consulted with an accounting expert to explore potential accounting claims related to credit and credit underwriting. Lead Counsel also consulted with a Brazil-based law firm concerning Brazilian law and civil procedure, including the service of subpoenas issued in the United States on individuals and entities in Brazil. *Id.*

Litigation support costs related to electronic discovery total $53,096.29, or approximately 17% of all expenses. Lead Counsel also incurred $22,486.19 (approximately 7% of total expenses) in connection with retaining an outside investigation firm with international investigative expertise, particularly with respect to financial issues, and an investigator who spoke Portuguese to assist with the investigation. ¶129; Ex. 6-B.

Lead Counsel also incurred $4,002.89 in connection with retaining a Brazil-based law firm to represent and provide counsel to certain confidential witnesses subpoenaed by StoneCo, all of whom were based in Brazil. ¶128; Ex. 6-B.

The expenses also include $39,532.50 for the fees and costs of the mediator (approximately 13% of total expenses) and $2,067.00 for work-related transportation expenses, meals, and lodging related to, among other things, working late hours and INPRS's travel to NYC in connection with the mediation. (Airfare was at economy rates.). ¶130; Ex. 6-B.

The remainder of the expenses sought are the types that are necessarily incurred in complex litigation and routinely charged to clients who pay by the hour.

## IV. LEAD PLAINTIFF'S REQUESTED REIMBURSEMENT UNDER 15 U.S.C. §78u-4(a)(4) IS REASONABLE

Lead Counsel also seeks reimbursement of $3,000 on behalf of Lead Plaintiff, INPRS, directly related to its representation of the class. *See* Declaration of Jeffrey Gill, dated January 23, 2026, submitted herewith as Ex. 1. The PSLRA specifically provides that an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" may be made to "any representative party serving on behalf of a class." 15 U.S.C. § 78u-4(a)(4).

Here, as described more fully in the Declaration of Jeffrey Gill submitted on behalf of INPRS, Lead Plaintiff has been committed to pursuing the class's claims—and has taken an active role in so doing. Among other things, Lead Plaintiff, through Mr. Gill and others: (i) conferred with counsel on the overall strategy for prosecuting the Action and maximizing the recovery for the class; (ii) reviewed material pleadings and court filings; (iii) evaluated regular status reports from counsel regarding developments in the litigation; and (iv) responded to discovery requests propounded by Defendant, including interrogatories and requests for the production of documents. Additionally, Lead Plaintiff INPRS, through Mr. Gill, analyzed and responded to Defendant's settlement proposals over the course of the mediation efforts,

including attending the mediation session and ultimately authorizing the acceptance of the Settlement. Ex. 1 at ¶5.

These efforts required representatives of Lead Plaintiff to dedicate time and resources to the Action that they would have otherwise devoted to their regular duties. Lead Plaintiff seeks $3,000 in connection with the approximately 20 hours dedicated to the litigation. *See Id*. at ¶¶133-34.

Courts within this District, including this Court, have approved payments to compensate representative plaintiffs under similar circumstances. *See, e.g., Xu v. Gridsum Holding Inc.,* 2024 WL 5301450, at *2 (S.D.N.Y. Apr. 3, 2024) (Woods, J.) (awarding lead plaintiff $25,000 and named plaintiff $5,000 as reimbursement for their reasonable costs and time dedicated to the prosecution of the Action); *In re Changyou.com Ltd. Sec. Litig.,*, No. 1:21-cv-07858-GHW, slip op. at 2 (S.D.N.Y. Jan. 28, 2023) (Woods, J.) (awarding lead plaintiff $15,000 for time spent related to its representation) (Ex. 8); *City of Warren Police and Fire Ret. Sys. v. World Wrestling Ent.*, *Inc.,* 2021 WL 2736135, at *1 (S.D.N.Y. June 30, 2021) (awarding $6,286.40 to lead plaintiff pension fund).

## V. THE REACTION OF THE SETTLEMENT CLASS TO DATE SUPPORTS THE REQUESTED FEES AND EXPENSES

The reaction of the Settlement Class to date also supports the fee and expense request. Through January 21, 2026, the Claims Administrator has mailed or emailed 149,804 copies of the Postcard Notice to potential Settlement Class Members and nominees informing them that, among other things, Lead Counsel intended to apply to the Court for an award of attorneys' fees in an amount not to exceed 30% of the Settlement Fund and up to $420,000 in Litigation Expenses. *See* Declaration of Lance Cavallo Regarding: (A) Dissemination of Postcard Notice and Notice Packet; (B) Publication of Summary Notice; (C) Establishment of Telephone Hotline

and Settlement Website, and (D) Report on Requests for Exclusion Received to Date (the "Mailing Declaration" or "Mailing Decl."), dated January 22, 2026, Ex. 4 at ¶¶2-8 and Ex. A thereto. While the time to object to the Fee and Expense Application does not expire until February 6, 2026, to date no objections have been received. Lead Counsel will address any that are submitted in its reply papers, which will be filed on or before February 20, 2026.

Additionally, the requested fee of 28% is made with the full support of the Lead Plaintiff. *See* Ex. 1. Lead Plaintiff's endorsement of the fee supports its approval. *See Veeco*, 2007 WL 4115808, at *8 ("Public policy considerations support the award in this case because the Lead Plaintiff . . . – a large public pension fund – conscientiously supervised the work of lead counsel and has approved the fee request[.]").

## CONCLUSION

For all the foregoing reasons, Lead Counsel respectfully requests that the Court award attorneys' fees in the amount of 28% of the Settlement Fund, which includes accrued interest; $310,263.24 in Litigation Expenses incurred by Lead Counsel, plus accrued interest; and $3,000 as reimbursement to Lead Plaintiff pursuant to the PSLRA. A proposed order will be submitted with Lead Counsel's reply papers, after the deadline for objecting has passed.

Dated: January 23, 2026

Respectfully submitted,

**LABATON KELLER SUCHAROW LLP**

*/s/ Michael H. Rogers*

Michael P. Canty
Michael H. Rogers
Jacqueline R. Meyers
Stephen Boscolo
Grace T. Harmon
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

mcanty@labaton.com
mrogers@labaton.com
jmeyers@labaton.com
sboscolo@labaton.com
gharmon@labaton.com

*Counsel for Lead Plaintiff Indiana Public Retirement System and Lead Counsel for the Proposed Settlement Class*

## CERTIFICATION OF WORD-COUNT COMPLIANCE

The undersigned hereby certifies that the foregoing brief complies with the word limit set forth in Local Civil Rule 7.1(c). The word count, exclusive of the caption, any index, table of contents, table of authorities, signature blocks, or any required certificates, is 6,361 words according to the word-processing system used to prepare the document, which is less than the 8,750 maximum.

Dated: January 23, 2026

/s/ *Michael H. Rogers*
MICHAEL H. ROGERS

**CERTIFICATE OF SERVICE**

I hereby certify that on January 23, 2026, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered ECF participants.

Dated: January 23, 2026

/s/ *Michael H. Rogers*
MICHAEL H. ROGERS